Exhibit B

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT,
IN AND FOR PALM BEACH COUNTY, FLORIDA

GARY FELSHER,                                    Case No.: _____

      Plaintiff,

v.

W. MONSEES STUBBS, JR.,

      Defendant.

_____/

## COMPLAINT FOR BREACH OF CONTRACT

Plaintiff, GARY FELSHER ("Felsher" or "Plaintiff"), by and through his undersigned

counsel, sues Defendant W. MONSEES STUBBS, JR., ("Defendant") and alleges:

## PARTIES, JURISDICTION, AND VENUE

1.     This is an action for breach of contract seeking Declaratory Relief and Specific

Performance between Felsher and Defendant.

2.     Felsher is an individual residing in Palm Beach County, Florida.

3.     Upon information and belief, Defendant is an individual residing in New York.

Defendant is subject to the jurisdiction of the courts in the State of Florida by virtue of the fact that

Defendant has and does regularly conduct business in the State of Florida, has owned partnership

interests in partnerships that operate in the State of Florida, owning substantial real and personal

property located in Florida, managed property located in Florida, including the property that is the

subject matter of this case, and breached a contract by failing to provide operating and management

services relating to partnerships that owned and operated real property located in Florida, which

partnerships and properties are the subject of this action. Moreover, the cause of action arose in

Florida.

1

4.      Venue is proper in Palm Beach County, Florida, pursuant to Florida Statute § 47.011, as Plaintiff resides in Palm Beach County, Plaintiff's cause of action accrued in this county and Plaintiff suffered injury in Palm Beach County.

5.      The Circuit Court has jurisdiction over this matter in that the amount in dispute exceeds $100,000 and the Complaint seeks both specific performance and declaratory relief pursuant to Florida Statute § 86.011 for properties valued in excess of $100,000.

6.      All conditions precedent to the filing of this action have occurred, been waived or been otherwise satisfied.

## FACTUAL ALLEGATIONS

7.      On September 22, 1992, Felsher formed FGHP Capital Limited Partnership (the "Partnership") pursuant to a certificate of limited partnership filed with the State of Delaware. The Partnership's sole business was to acquire and ultimately own and operate a portfolio of debt interests and real property to be acquired from NationsBank of North Carolina, N.A., NationsBank of South Carolina, N.A., and NationsBank of Florida, N.A. (the "Properties").

8.      Under the contemplated terms of the Partnership agreement, Felsher and Defendant were to be both investors and operators of the Partnership and Properties it acquired through their ownership interest and positions in the general partners, Garmont Capital and related companies (collectively, "Garmont Capital"), to be formed and to serve that purpose. Felsher was to provide oversight, while Defendant was to be responsible for the actual management and operation of the Partnership and its Properties.

9.      To memorialize their agreement, on December 30, 1992, Felsher and Defendant entered into a written agreement. A true and correct copy of the agreement, dated December 30, 1992, is attached hereto as **Exhibit A** (the "F&S Agreement").

10.     The F&S Agreement was executed for purposes of memorializing:  i) the respective rights, responsibilities, and obligations of Felsher and Defendant, particularly when it came to the management and operation of the Partnership and its Properties, in anticipation of the Partnership acquiring the Properties shortly thereafter; ii) Felsher and Defendant's rights in Garmont Capital; and iii) the remedies for default of their obligations under the F&S Agreement.

11.     On January 8, 1993, Felsher, Defendant, and numerous third parties entered into the Partnership Agreement. A true and correct copy of the Partnership Agreement is attached hereto as **Exhibit B** (the "FGHP Agreement").

12.     The purpose of the FGHP Agreement was to acquire, own and operate a large group of assets, including the Properties acquired from NationsBank.  The FGHP Agreement provided that all investors would be Class A limited partners and would share in the profits based on their percentage investment in the Partnership.  The Garmont Capital entities were the general partners of the Partnership and have a one percent interest in the Partnership.  Felsher and the Defendant were equal Class B limited partners.  The Class B limited partners receive 40 percent of the profits of the Partnership (20 percent each) once the Class A limited partners received the return of their invested capital plus a 30 percent internal rate of return.  The Partnership was dependent upon Felsher's expertise in raising capital and providing oversight, while Defendant was to do the day-to-day management of the Partnership.  The Properties were commercial in nature requiring the commitment of significant time to ensure the proper operation and management.

13.     The F&S Agreement expressly provided that Felsher and related persons or entities would be investing $5,550,000 in contrast to Defendant's investment of $500,000 and that Felsher would not make his substantial investment absent Defendant's agreement to make the commitment of time and effort toward the operation of the Properties Defendant agreed to make as set forth in

the F&S Agreement. In reliance in part on the parties to the F&S Agreement performing their respective obligations as set forth therein, Felsher ultimately raised over 20 million dollars from friends, family, and associates for the purpose of acquiring the Properties.

14.     The F&S Agreement and the FGHP Agreement also provided Defendant with significant incentives to perform his obligations.  In addition to a generous salary, Defendant was given an equal 50 percent ownership interest in Garmont Capital to that of Felsher, notwithstanding Felsher's investment of significantly more capital in the Partnership.  *See* ¶ 2.9 of the FGHP Agreement and schedules attached thereto; *see* F&S Agreement, p. 1.

15.     In recognition of Defendant's commitment to manage and operate the Properties, the F&S Agreement specifically provided that "Felsher [would] not make the investment unless [Defendant] agreed to make the commitment of time and effort described in this Agreement." *See* F&S Agreement, p. 1.  The F&S Agreement also made clear that Felsher was "relying on [Defendant's] availability and commitment [to the management and operation of the Properties] as an inducement to enter into this Transaction." *See id.* at ¶ 6.

16.     In the event Defendant did not dedicate the time and effort necessary to manage, operate, maintain, and service the Properties, as provided in the FGHP Agreement, the F&S Agreement specifically provided as follows:

> If [Defendant] fails to comply with the terms of 6.3(a) of the FGHP Agreement relating to the time and effort he must provide to the transaction on behalf of the Partnership for any reason other than [Defendant's] death or disability, then [Defendant] shall a) resign as an officer and director of all General Partners, b) assign his shares of stock of each General Partner to Felsher for which Felsher shall pay to [Defendant] the amount of $1 . . . and [surrender] 50% of [Defendant's] "B" interest [in the Partnership].

*See id.*

17.     The Partnership operated as a successful business entity for many years.  Each of the Class A partners not only received a return of all of their invested capital and distributions equaling a 30 percent internal rate of return on that capital in the first two years, but have thereafter received significant additional distributions based on their initial investments.  After the time that the Class A limited partners received the return of their initial capital plus distributions equaling a 30 percent internal rate of return, the Defendant has received approximately a 15 million dollar return on his Class B limited partnership interest, in addition to the return of his invested capital and his Class A distributions (based on the pro rata share of his investment of capital).

18.     Defendant has and continues to materially breach the F&S Agreement by failing to devote the time and attention required to conduct, diligently and prudently, the business of the Partnership in compliance with Paragraph 6 of the F&S Agreement and Paragraph 6 of the FGHP Agreement.  Defendant has had minimal to no business contact with the Partnership and has not participated as required in the management and operation of the Partnership as required by the F&S Agreement.  His contact with the Partnership has been limited to requesting K-1's and inquiring about distributions, rather than operating and managing the Partnership as required by the requisite documents.

19.     As a result of Defendant's material breach of the F&S Agreement, Felsher has been required to step in and manage and operate the Partnership, rather than to provide oversight as set forth in the F&S Agreement and the FGHP Agreement in order to ensure the continued successful operation of the Partnership and its Properties.

20.     As a result of Defendant's material breach of the F&S Agreement, Plaintiff is entitled to the relief provided in paragraph 6 of the F&S Agreement as demanded below.  In addition, the Partnership may be entitled to additional relief, including, but not limited to, clawing

NOT A CERTIFIED COPY

back any distributions that were not due to Defendant as a result of Defendant's material breaches of the F&S Agreement.

**WHEREFORE,** Plaintiff requests that the Court enter judgment for Plaintiff by finding that (1) Defendant has breached his obligations under the F&S Agreement; (2) directing Defendant to take such steps and actions as are necessary to resign as an officer and director of all Garmont Capital entities involved in managing and operating the Partnership and the Properties owned by the Partnership; (3) assign his shares in all Garmont Capital entities to Felsher for 1 dollar, retaining only his economic interest in such entities; and (4) declare that Defendant's Class B limited partnership interest is reduced by 50 percent (to 10 percent of the profits), along with all other rights and remedies provided for in the F&S Agreement for its breach, all as provided in paragraph 6 of the F&S Agreement, together with such other and further relief as may be just and proper.

Dated:  December 18, 2024

Respectfully submitted,

GREENBERG TRAURIG, P.A.
777 South Flagler Dr., Suite 300
East West Palm Beach, FL 33401
Telephone: (561) 650-7900
Facsimile: (561) 655-6222

By: */s/ Mark F. Bideau*
   **MARK F. RIDEAU**
   Florida Bar No. 564044
   bideaum@gtlaw.com
   whitfieldd@gtlaw.com
   WPBLitDock@gtlaw.com
   **COREY A. GROSS**
   Florida Bar No. 1032362
   Corey.Gross@gtlaw.com
   Alex.Amburgy@gtlaw.com

*Attorneys for Plaintiff*

6

# Exhibit A

Management Agreement, dated December 30, 1992

NOT A CERTIFIED COPY

## AGREEMENT

Agreement made this 30th day of December, 1992 by and between W. Monsees Stubbs, Jr. and Gary Felsher.

Stubbs and Felsher have agreed to participate in a venture to acquire certain assets (the "Assets") from Nationsbank (the "Transaction"). Felsher and related persons or entities will be investing at least $5,550,000 and Stubbs will be investing $500,000. Felsher will not make the investment unless Stubbs agrees to make the commitment of time and effort described in this Agreement. The parties understand that as shareholders of the general partners of various entities (the "General Partners") owning the Assets they will enter into shareholders agreements. If, for any reason, such shareholders agreements are not executed, the parties intend that this Agreement shall be binding on them and is essential consideration for each to induce the other to enter into the transaction.

In consideration of the agreements set forth below, the parties hereto agree as follows:

1.  Felsher and Stubbs shall own all entities involved in the Transaction other than their so-called "A" partnership interests in FGHP Capital Limited Partnership ("FGHP") on a 50-50 basis.

2.  a)  Stubbs shall be entitled to receive out of available funds before expenses of operation from the asset management entity formed by Stubbs and Felsher, a salary of

C/H 99999.000 94991.1 01/07/93 8:28pm

$100,000 and a draw of $100,000 per year paid monthly for each of 1993 and 1994. Stubbs agrees that the $100,000 draw shall be repaid to Felsher first from any profits or amounts paid to Stubbs from his so-called "B" interest held in FGHP before a sharing of any profits. Thereafter, except as provided in this Agreement or in the FGHP Agreement if Stubbs is removed as a shareholder of the FGHP General Partner, or any affiliated entity, the "B" distributions shall be made in accordance with the FGHP Partnership Agreement.

b) For the year 1995 and 1996, Stubbs shall, if he is not gainfully employed for a majority of his time elsewhere or if he is not making at least $150,000 in 1995 and $100,000 in 1996 from other asset management or comparable fee generating activities entered into jointly with Felsher, be entitled to receive as a draw against future Class B LP Distributions $150,000 and $100,000 per annum, respectively from available funds. If such draws are taken the full amount thereof shall be a credit against future distributions of his "B" interest calculated as in (a) above. This paragraph assumes substantially all of the assets have not been liquidated.

3. Until Felsher shall have received a return of all of his capital (the "Capital") invested in the Transaction together with an IRR of 15% as well as amounts due under Paragraph 4 below, Stubbs agrees that Felsher shall have the right to vote all the shares owned both by Felsher and Stubbs in the General Partners of all entities involved in the Transaction and all

- 2 -

other Felsher-Stubbs entities organized to be involved in the operation or management of the assets or FGHP and shall have the right to make all final decisions in case of any disagreement between them with respect to each and every matter involving the Transaction or the Assets.

4.   The expenses of the Felsher organization, so long as such expenses are primarily devoted to the Transaction, shall be paid from the asset management fees received from the Transaction.  If additional funds are needed, Felsher may, but shall not be obligated to, advance additional funds (the "Expense Advance").  During any period of time the Expense Advance has not been repaid together with interest at the rate of 10% per annum, Felsher shall be entitled to the benefit of paragraph 2 hereof.

5.   The General Partner of FGHP shall use its best efforts to obtain and keep in force during the life of the Transaction, a disability insurance policy on Felsher in the amount of $500,000 (or higher if available but not more than $1,000,000).  If Felsher becomes disabled during the term of the policy, and as a result thereof, Stubbs loses any of his "B" interest pursuant to Section 9.9cii, the proceeds of the policy shall be payable to Stubbs.  If Felsher becomes disabled and Stubbs retains his "B" interest, the proceeds of the policy shall be payable to Felsher.

6.   If Stubbs fails to comply with the terms of 6.3a of the FGHP Agreement relating to the time and effort he must provide to the transaction on behalf of the Partnership for any reason other than Stubbs' death or disability, then Stubbs shall a) resign as

~ 3 ~

an officer and director of all General Partners, b) assign his shares of stock of each General Partner to Felsher for which Felsher shall pay to Stubbs the amount of $1 provided, however, that the economic interest of the General Partner allocable to Stubbs shall be converted to an "A" interest in FGHP or if such a conversion is not practicable after Felsher uses his best efforts to effect such conversion and recommends same to the Parytners, the General Partner shall hold Stubbs economic interest as a nominee and c) sell to a replacement General Partner unrelated to Felsher for $1.00: (i) 75% of Stubbs "B" interest if the event described herein occurs prior to the time Felsher's Capital has been returned together with an IRR of 15% or, (ii) 50% of Stubbs "B" interest if this event occurs after the return of funds described in (i) above but before the liquidation of substantially all of the Assets involved in the Transaction. Stubbs acknowledges that Felsher is relying on Stubbs' availability and commitment as Felsher's inducement to enter into the Transaction. If Stubbs disagrees with Felsher's allegations that Stubbs has failed to comply with this paragraph 5, he shall have the right within 15 days of receipt of notice of such allegation to demand arbitration in New York City before a one person panel in accordance with the rules of the American Arbitration Association then prevailing.  If the arbitrator finds in favor of Felsher, he shall direct Stubbs to comply with the provisions of this paragraph relating to the resignation and transfers described herein.  The award may be enforced in the

— 4 —

C/M 99999.000 94991.1 01/07/93 8:28pm

courts of the appropriate jurisdiction.  Any distributions attributable to Stubbs B interest after an allegation has been made shall be with held by FGHP and paid to Stubbs or Felsher as the case may be after the arbitrators award.  The provisions of this Paragraph 6 shall not apply if Stubb's failure to comply is solely attributable to Felsher's acts or the acts of a co-general partner appointed as a result of Felsher's acts.

7.    If either Felsher or Stubbs commits a felony unrelated to the Partnership the result of which is to cause a reduction in the "B" interest allocated to Felsher and Stubbs in FGHP, the person committing the felony shall absorb the full amount of the reduction up to his entire share of his "B" interest.

8.    If, for any reason, Stubbs is removed from his position as a shareholder of a general partner under Section 9.9 of the FGHP Agreement, he shall be deemed to have resigned as an officer and director of all general partners involved in the Transaction and all Felsher-Stubbs entities involved in the Transaction including without limitation the entities performing asset management and property management.

9.    Stubbs may not participate out or syndicate his $500,000 investment in the Transaction.

10.    If the Transaction does not close for any reason, the out-of-pocket expenses relating to the Transaction shall be paid 80% by Felsher and 20% by Stubbs.

11.    The parties acknowledge that this is a complete and binding agreement with respect to the matters set forth herein.

- 5 -

C/M 99999.000 94991.1 01/07/93 8:28pm

The parties intend to incorporate such matters in appropriate shareholders agreement but agree that if, for any reason, such shareholder agreements are not executed, this agreement is and shall remain binding on the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

_____
Gary Felsher

_____
W. Monsees Stubbs, Jr.

- 6 -

# Exhibit B

Partnership Agreement, dated January 8, 1993

NOT A CERTIFIED COPY

PGHP CAPITAL LIMITED PARTNERSHIP

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

NOT A CERTIFIED COPY

79093.14

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| PREAMBLE | | 1 |
| | | |
| ARTICLE 1 | THE LIMITED PARTNERSHIP | 2 |
| 1.1 | Continuation | 2 |
| 1.2 | Name | 2 |
| 1.3 | Character of Business | 2 |
| 1.4 | Principal Offices | 2 |
| 1.5 | Delaware Office | 3 |
| 1.6 | Fiscal Year | 3 |
| | | |
| ARTICLE 2 | DEFINITIONS | 3 |
| 2.1 | Adjusted Capital Account Deficit | 3 |
| 2.2 | Affiliate | 3 |
| 2.3 | Allocated Purchase Price | 4 |
| 2.4 | Bankruptcy | 4 |
| 2.5 | Business Plan | 4 |
| 2.6 | Capital Account | 4 |
| 2.7 | Capital Contribution | 5 |
| 2.8 | Class A Limited Partners | 5 |
| 2.9 | Class B Limited Partners | 5 |
| 2.10 | Code | 5 |
| 2.11 | Consent and Consent of the Class A Limited Partners | 5 |
| 2.12 | Depreciation | 5 |
| 2.13 | Estimated Recovery Value | 6 |
| 2.14 | Fiscal Year | 6 |
| 2.15 | Gap Lender and Gap Loan | 6 |
| 2.16 | General Partner | 6 |
| 2.17 | Gross Asset Value | 6 |
| 2.18 | Interest | 7 |
| 2.19 | Invested Assets | 7 |
| 2.20 | Investment Property | 8 |
| 2.21 | Limited Partners | 8 |
| 2.22 | Majority | 8 |
| 2.23 | Majority Consent | 8 |
| 2.24 | Net Capital Contribution | 8 |
| 2.25 | Net Cash Available For Distribution | 8 |
| 2.26 | Nonrecourse Deductions | 8 |
| 2.27 | Operating Partnership | 8 |
| 2.28 | Operating Partnership Agreement | 9 |
| 2.29 | Partners | 9 |
| 2.30 | Partnership | 9 |
| 2.31 | Partnership Minimum Gain | 9 |
| 2.32 | Partnership Property | 9 |
| 2.33 | Percentage Interests | 9 |
| 2.34 | Permitted Interim Investments | 9 |
| 2.35 | Person | 9 |

79093.14

-i-

|  |  |  | Page |
|---|---|---|---|
| 2.36 | Profits and Losses | . . . . . . . . . . | 9 |
| 2.37 | Regulations | . . . . . . . . . . . . | 10 |
| 2.38 | Supermajority Consent | . . . . . . . . | 10 |
| 2.39 | Syndication Expenses | . . . . . . . . | 10 |
| 2.40 | Tax Distribution Amount | . . . . . . | 10 |
| 2.41 | Uniform Act | . . . . . . . . . . . . | 11 |
| 2.42 | Voluntary Loan | . . . . . . . . . . | 11 |
| ARTICLE 3 | CAPITAL CONTRIBUTIONS | . . . . . . . . | 11 |
| 3.1 | Capital Contributions of the General Partner | . . | 11 |
| 3.2 | Capital Contributions of Limited Partners | . . | 11 |
| 3.3 | Additional Capital Contributions | . . . . | 12 |
| 3.4 | No Right to Return of Capital | . . . . . | 13 |
| ARTICLE 4 | FEES, COSTS AND EXPENSES | . . . . . . | 14 |
| 4.1 | Organization and Acquisition Costs and Expenses | . . . . . . . . . . . . | 14 |
| 4.2 | Asset Management Fee | . . . . . . . . . | 14 |
| 4.3 | Partner Due Diligence Expenses | . . . . | 15 |
| ARTICLE 5 | DISTRIBUTIONS; PROFITS AND LOSSES | . . . . | 15 |
| 5.1 | Distributions and Allocations | . . . . . | 15 |
| 5.2 | Distributions of Partnership Funds | . . . | 15 |
| 5.3 | Allocations of Profits and Losses | . . . | 17 |
| ARTICLE 6 | MANAGEMENT | . . . . . . . . . . . . | 21 |
| 6.1 | Rights and Duties of Limited Partners; Consent | . | 21 |
| 6.2 | Fiduciary Duty of General Partner | . . . | 22 |
| 6.3 | Powers of General Partner | . . . . . . | 23 |
| 6.4 | Activities of General Partner Subject to Limited Partner Consent | . . . . . . | 25 |
| 6.5 | Restrictions on General Partner's Authority | . . | 29 |
| 6.6 | Exculpation and Indemnification | . . . | 32 |
| 6.7 | Other Activities | . . . . . . . . . . | 32 |
| 6.8 | General Partner Net Worth | . . . . . . | 33 |
| ARTICLE 7 | [RESERVED] | . . . . . . . . . . . . | 33 |
| ARTICLE 8 | ACCOUNTS | . . . . . . . . . . . . | 33 |
| 8.1 | Books | . . . . . . . . . . . . . . | 33 |
| 8.2 | Partners' Accounts | . . . . . . . . . | 33 |
| 8.3 | Reports, Returns and Audits | . . . . . | 33 |
| ARTICLE 9 | TRANSFERS; WITHDRAWAL; ELECTION OF SUBSTITUTE GENERAL PARTNER | . . . . . | 35 |
| 9.1 | Transfer of General Partner's Interest | . . . | 35 |
| 9.2 | Transfer of a Limited Partner's Interest | . . | 35 |
| 9.3 | Allocations and Distributions Subsequent to Assignment | . . . . . . . . . . | 36 |

79093.14

-ii-

                                                                      Page

      9.4    Death, Incompetence, Bankruptcy, Liquidation or
             Withdrawal of a Limited Partner . . . . . . .    36
      9.5    Satisfactory Written Assignment Required . . . .    36
      9.6    Assignee's Rights . . . . . . . . . . . . . . . .    37
      9.7    Assignees Admitted as Limited Partners . . . . .    37
      9.8    Limitation on Transfers of Partnership
             Interests . . . . . . . . . . . . . . . . . . .    38
      9.9    Election of Substitute General Partner . . . . .    38

ARTICLE 10    DISSOLUTION . . . . . . . . . . . . . . . . .    43
      10.1    Events of Dissolution . . . . . . . . . . . . .    43
      10.2    Final Accounting . . . . . . . . . . . . . . .    44
      10.3    Liquidation . . . . . . . . . . . . . . . . . .    44
      10.4    Distribution in Kind . . . . . . . . . . . . .    44
      10.5    Cancellation of Certificate . . . . . . . . . .    45
      10.6    Compliance With Timing Requirements of
              Regulations . . . . . . . . . . . . . . . . . .    45
      10.7                                                       46

ARTICLE 11    POWER OF ATTORNEY . . . . . . . . . . . . . .    46
      11.1    Appointment of General Partner . . . . . . . .    46
      11.2    Duration of Power . . . . . . . . . . . . . . .    46

ARTICLE 12    AMENDMENTS TO AGREEMENT . . . . . . . . . . . .    47

ARTICLE 13    NOTICES . . . . . . . . . . . . . . . . . . .    47
      13.1    Method of Notice . . . . . . . . . . . . . . .    47
      13.2    Routine Communications . . . . . . . . . . . .    47
      13.3    Computation of Time . . . . . . . . . . . . . .    47

ARTICLE 14    REPRESENTATIONS AND WARRANTIES . . . . . . . .    48
      14.1    Investment Purpose . . . . . . . . . . . . . .    48
      14.2    Investment Restriction . . . . . . . . . . . .    48
      14.3    Suitability of the Investment . . . . . . . . .    48
      14.4    Other Warranties and Representations of All
              Partners . . . . . . . . . . . . . . . . . . .    49
      14.5    No Prior Business of the Partnership . . . . .    49

ARTICLE 15    GENERAL PROVISIONS . . . . . . . . . . . . . .    49
      15.1    Entire Agreement . . . . . . . . . . . . . . .    49
      15.2    Governing Law . . . . . . . . . . . . . . . . .    49
      15.3    Binding Effect . . . . . . . . . . . . . . . .    49
      15.4    Separability . . . . . . . . . . . . . . . . .    49
      15.5    Headings . . . . . . . . . . . . . . . . . . .    50
      15.6    Gender and Number . . . . . . . . . . . . . . .    50
      15.7    No Third-Party Rights . . . . . . . . . . . . .    50
      15.8    Counterparts . . . . . . . . . . . . . . . . .    51

NOT A CERTIFIED COPY

79093.14                      -iii-

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

OF

FGHP CAPITAL LIMITED PARTNERSHIP

This agreement, dated as of the 8th day of ~~December~~ January, ~~1997~~ 1993, constitutes the amended and restated agreement of limited partnership (the "Agreement") by and among Garmont Capital Inc., a Delaware corporation (the "General Partner"), the persons executing this Agreement, the names and respective capital contributions of whom shall be listed by the General Partner on the original counterpart of Schedule A hereto, from time to time as Class A Limited Partners (each, a "Class A Limited Partner" and, collectively, the "Class A Limited Partners") and Gary H. Felsher ("Felsher"), W. Monsees Stubbs, Jr. ("Stubbs") and Michael Felsher (each, a "Class B Limited Partner" and, collectively, the "Class B Limited Partners")   The Class A Limited Partners and the Class B Limited Partners are herein referred to collectively as the "Limited Partners" and the General Partner and the Limited Partners are herein referred to collectively as the "Partners" and each of them individually as a "Partner."

PREAMBLE

FGHP Capital Limited Partnership (the "Partnership") was formed under the Delaware Revised Uniform Limited Partnership Act (the "Uniform Act") pursuant to a Certificate of Limited Partnership (the "Certificate") which was filed in the office of the Secretary of State of the State of Delaware on September 22, 1992, and an Agreement of Limited Partnership, dated as of September 22, 1992, among the General Partner and the Class B Limited Partners.

This Agreement is being entered into by the Partners to provide for (i) the continuation of the Partnership, (ii) the admission to the Partnership of the Limited Partners being admitted on the date hereof, (iii) the payment of capital contributions to the Partnership and (iv) the terms and conditions of the operation of the Partnership.   In consideration of the mutual covenants herein contained, the parties hereto agree as follows:

79073.14

## ARTICLE 1

### THE LIMITED PARTNERSHIP

1.1 <u>Continuation</u>.  Pursuant to the provisions of the Uniform Act and this Agreement the parties hereto hereby continue the Partnership on the terms and conditions set forth herein.  To the extent that the laws of other jurisdictions shall be applicable, the Partnership is intended to be qualified as a foreign limited partnership or as a partnership <u>in commendam</u> under such laws.

1.2 <u>Name</u>.  The Partnership shall continue to be conducted under the name and style of FGHP Capital Limited Partnership, but the business of the Partnership may be conducted under any other name designated by the General Partner, except that the Partnership's name shall not under any circumstances contain the word "Steinhardt." In the event of a change in the Partnership's name, the General Partner shall provide notice to the Limited Partners of such name change not later than thirty days before the change.

1.3 <u>Character of Business</u>.  The sole business of the Partnership is to acquire a portfolio of debt interests and real estate properties from NationsBank of North Carolina, N.A., NationsBank of South Carolina, N.A., and NationsBank of Florida, N.A. (the "NationsBank Portfolio") consisting of those assets listed on Schedule B hereto, and to operate, manage and sell or otherwise realize the value of such debt interests and properties, either directly or by means of ownership of limited partnership interests, all on such terms and conditions as the General Partner shall determine subject to the terms of this Agreement.  The Partnership shall have and exercise all the powers now or hereafter conferred by the laws of the State of Delaware on limited partnerships formed under the laws of that State, and do any and all things as fully as natural persons might or could do as are not prohibited by law in furtherance of the aforesaid business of the Partnership.  The business of the Partnership shall be conducted in accordance with, and any action required or permitted to be taken by the General Partner or any Limited Partner shall be taken in compliance with, all applicable laws, rules and regulations.

1.4 <u>Principal Offices</u>.  The principal offices of the Partnership shall be established in a location outside of New York City as soon as practicable after the date hereof, and the Limited Partners shall be provided notice immediately of such location. If the General Partner changes the location of the principal offices of the Partnership, the Limited Partners shall be notified not later than ten days before the change; however, the General Partner shall not at any time establish the principal offices of the Partnership in New York City.  The Partnership may

maintain such other offices at such other places as the General Partner deems advisable.

1.5  Delaware Office.  The address of the registered office of the Partnership in the State of Delaware is 32 Loockerman Square, Suite L-100, Kent County, Dover, Delaware 19901, or such other address as may be designated from time to time by the General Partner.  The name and address of the registered agent for service of process on the Partnership in the State of Delaware is The Prentice Hall Corporation System, Inc. at the above address, or such other agent and address as may be designated from time to time by the General Partner.

1.6  Fiscal Year.  The fiscal year of the Partnership shall be the calendar year (the "Fiscal Year").

ARTICLE 2

DEFINITIONS

The following defined terms used in this Agreement shall have the respective meanings specified below.

2.1  Adjusted Capital Account Deficit.  "Adjusted Capital Account Deficit" shall mean, with respect to any Limited Partner, the deficit balance, if any, in such Limited Partner's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)  credit to such Capital Account any amounts which such Limited Partner is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentence of Regulations Sections 1.704-2(g)(1) and (i)(5); and

(ii)  debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

2.2  Affiliate.  "Affiliate" shall mean (i) any person directly or indirectly controlling, controlled by, or under common control with, another person, (ii) a person owning or controlling ten percent (10%) or more of the outstanding voting securities of such other person, (iii) any officer, director, general partner or trustee of such other person, (iv) if such other person is an officer, director, general partner or trustee, any other entity for which such person is an officer, director,

79070.14                          -3-

general partner or trustee and (v) with respect to the General Partner and the Partnership, any person who is directly or indirectly controlled by the General Partner or who is an Affiliate of Felsher or Stubbs, as long as Felsher or Stubbs control the General Partner and it is the sole general partner of the Partnership.

2.3  <u>Allocated Purchase Price</u>.  "Allocated Purchase Price" shall mean the dollar amount allocated to each Investment Property as shown on Schedule B attached hereto, subject to revision as provided in the definition of "Invested Assets", Section 2.16.

2.4  <u>Bankruptcy</u>.  The "Bankruptcy" of a Partner shall mean (i) the filing by a Partner of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of such Partner's debts under Title 11 of the United States Code or any other federal or state insolvency law, or a Partner's filing an answer consenting to or acquiescing in any such petition, (ii) the making by a Partner of any assignment for the benefit of such Partner's creditors or (iii) the expiration of ninety days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for the assets of a Partner, or an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of such Partner's debts under any other federal or state insolvency law, provided that the same shall not have been vacated, set aside or stayed within such ninety-day period.

2.5  <u>Business Plan</u>.  "Business Plan" shall have the meaning given thereto in Section 6.4(a).

2.6  <u>Capital Account</u>.  "Capital Account" shall mean, with respect to any Partner, the Capital Account maintained for such Partner in accordance with the following provisions:

(i)  To each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Article 5 hereof, and the amount of any Partnership liabilities assumed by such Partner or which are secured by any Partnership Property distributed to such Partner.

(ii)  To each Partner's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Article 5

79093.14

hereof, and the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership.

(iii)   In the event any Interest in the Partnership is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

(iv)   In determining the amount of any liability for purposes of determining Capital Account balances hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.   In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the General Partner may make such modification provided that it is not likely to have a material effect on the amounts distributable to any Partner pursuant to Article 10 hereof upon the dissolution of the Partnership.

2.7   Capital Contribution.   "Capital Contribution" shall mean, with respect to any Partner, the amount of money contributed to the Partnership by such Partner.

2.8   Class A Limited Partners.   "Class A Limited Partners" shall mean those persons listed as Class A Limited Partners on Schedule A hereto.

2.9   Class B Limited Partners.   "Class B Limited Partners" shall mean Gary H. Felsher, Michael Felsher and W. Monsees Stubbs Jr.

2.10   Code.   "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

2.11   Consent and Consent of the Class A Limited Partners.   "Consent" and "Consent of the Class A Limited Partners" shall have the meaning set forth in Section 6.1(c).

2.12   Depreciation.   "Depreciation" shall mean, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period,

except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted tax basis of such property is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

2.13   <u>Estimated Recovery Value</u>.  "Estimated Recovery Value" shall mean the amount stated in the then current Business Plan or other written statement provided by the General Partner for each Investment Property representing the Partnership's estimate of the amount expected to be realized upon the disposition of such Investment Property.

2.14   <u>Fiscal Year</u>.  "Fiscal Year" shall have the meaning given thereto in Section 1.6.

2.15   <u>Gap Lender and Gap Loan</u>.  "Gap Lender" and "Gap Loan" shall have the meanings given thereto in Section 3.2(b).

2.16   <u>General Partner</u>.  "General Partner" shall mean Garmont Capital Inc., a Delaware corporation and the sole general partner of the Partnership.

2.17   <u>Gross Asset Value</u>.  "Gross Asset Value" shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)   the Gross Asset Values of all Partnership assets may, in the sole discretion of the General Partner, be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times:  (a) the acquisition of an additional Interest in the Partnership by any new or existing Partner in exchange for more than a <u>de minimis</u> Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a <u>de minimis</u> amount of Partnership Property as consideration for an Interest in the Partnership; and (c) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

(ii)   the Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution; and

(iii)   the Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Sec-

tion 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) and Article 5 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this paragraph (iii) to the extent the General Partner determines that an adjustment pursuant to paragraph (i) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (iii).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (i), (ii) or (iii) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

2.18   _Interest_.  "Interest" shall mean an ownership interest of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which a Partner in that class of Partners may be entitled as provided in this Agreement, together with the obligation of such Partner to comply with all terms and provisions of this Agreement.

2.19   _Invested Assets_.  "Invested Assets" shall mean the aggregate of the Allocated Purchase Prices of the Investment Properties owned by all of the Operating Partnerships from time to time.  The amount of Invested Assets shall be reduced upon the total disposition of the interest of the Partnership in an Investment Property, as of the last day of the fiscal quarter in which the disposition occurs, by an amount equal to the Allocated Purchase Price of such Investment Property.  In the event of a partial disposition of an Investment Property or a change in the nature of the ownership of an Investment Property, including, but not limited to, a sale or refinancing of an Investment Property by an Operating Partnership subject to, or which results in, the retention of a debt or equity interest in the Investment Property by such Operating Partnership or another Operating Partnership, the amount of the Allocated Purchase Price for such Investment Property shall remain unchanged unless the Operating Partnership disposing of the Investment Property receives cash proceeds equal to 90% or more of the Estimated Recovery Value of the Investment Property, in which event the Allocated Purchase Price of the Investment Property shall be adjusted, as of the last day of the fiscal quarter in which the disposition occurs, to equal the value of the retained or residual interest of the Operating Partnership in the Investment Property as reasonably determined by the General Partner subject to Supermajority Consent by the Class A Limited Partners.

2.20  Investment Property.  "Investment Property" shall mean any real and associated personal property and all direct and indirect equity and debt investments therein owned by the Partnership or the Operating Partnerships, but shall exclude Permitted Interim Investments.  The Investment Properties as of the date hereof are as listed on Schedule B attached hereto.

2.21  Limited Partners.  "Limited Partners" shall mean the limited partners of the Partnership, and shall include the Class A Limited Partners and the Class B Limited Partners.

2.22  Majority.  With respect to any class of Limited Partners, "Majority" shall mean as of any date those Limited Partners of such class holding greater than 50% of the Percentage Interests held by all of the Partners of such class.

2.23  Majority Consent.  "Majority Consent" shall have the meaning given thereto in Section 6.1(c).

2.24  Net Capital Contribution.  The "Net Capital Contribution" of any Partner on any day shall be equal to the amount, if any, by which the aggregate Capital Contributions of such Partner on or before such day exceed the aggregate distributions made to such Partner pursuant to Section 5.2(a)(ii) hereof on or before such day.

2.25  Net Cash Available For Distribution.  "Net Cash Available For Distribution" shall mean distributions to the Partnership from all Operating Partnerships including, without limitation, net proceeds from refinancing or sale of Investment Properties and cash proceeds of the Partnership, reduced by the portion thereof used to pay, or establish reserves for, all Partnership expenses and debt payments (including payments on Voluntary Loans).

2.26  Nonrecourse Deductions.  "Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

2.27  Operating Partnership.  "Operating Partnership" shall mean any limited partnership formed to acquire and hold interests in one or more Investment Properties, in which (unless another ownership structure is permitted pursuant to Section 6.4(b)(iii)) the Partnership invests as a limited partner owning 99% of the partnership interests and an entity wholly owned, controlled and actually managed by Felsher and Stubbs is the sole general partner, owning 1% of the partnership interests.  In the event of the election of a Substitute General Partner pursuant to Section 9.9, the general partner of each Operating Partnership shall be a person affiliated with the Substitute General Partner and in the event of removal of the General Partner, the existing

79093.14                                    -8-

general partner of the Operating Partnership shall be removed pursuant to Section 9.9.

2.28  Operating Partnership Agreement.  "Operating Partnership Agreement" shall mean the agreement of limited partnership of an Operating Partnership.

2.29  Partners.  "Partners" shall mean the General Partner and all Limited Partners, where no distinction is required by the context in which the term is used herein. "Partner" means any one of the Partners.

2.30  Partnership.  "Partnership" shall mean the limited partnership created pursuant to this Agreement, as said limited partnership may from time to time be constituted.

2.31  Partnership Minimum Gain.  "Partnership Minimum Gain" has the meaning set forth in Section 1.704-2(b)(2) of the Regulations.

2.32  Partnership Property.  "Partnership Property" shall mean all Investment Properties and all other Partnership assets.

2.33  Percentage Interests.  "Percentage Interests" shall mean, with respect to a Class A Limited Partner, the ratio that such Class A Limited Partner's Capital Contributions bears to the total Capital Contributions of all Class A Limited Partners.  The initial Percentage Interests of the Class A Limited Partners are as specifically set forth in Schedule A attached hereto.  With respect to a Class B Limited Partner, Percentage Interest shall mean the percentage amount of interest of each Class B Limited Partner in the rights, duties, obligations and share of distributions of the Class B Limited Partners as a class.  The initial Percentage Interests of the Class B Limited Partners are as specifically set forth in Schedule A attached hereto.

2.34  Permitted Interim Investments.  "Permitted Interim Investments" shall have the meaning given thereto in Section 6.3(b)(vi).

2.35  Person.  "Person" means any individual, partnership, corporation, trust or other entity.

2.36  Profits and Losses.  "Profits" and "Losses" shall mean, for each Fiscal Year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be

79093.14                                    -9-

included in taxable income or loss), with the following adjustments:

   (i)   any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss;

   (ii)  any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

   (iii) in the event the Gross Asset Value of any Partnership asset is adjusted pursuant to paragraph (i) or (iii) of the definition of Gross Asset Value herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

   (iv)  gain or loss resulting from any disposition of Partnership Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value; and

   (v)   in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of Depreciation herein.

   2.37  _Regulations_.  "Regulations" shall mean the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

   2.38  _Supermajority Consent_.  "Supermajority Consent" shall have the meaning given thereto in Section 6.1(c).

   2.39  _Syndication Expenses_.  "Syndication Expenses" shall mean all expenditures classified as syndication expenses pursuant to Section 1.709-2(b) of the Regulations. Syndication Expenses shall be taken into account under the Partnership's method of accounting as if they were deductible expenses.

   2.40  _Tax Distribution Amount_.  "Tax Distribution Amount" shall mean for any class of Limited Partners and for any

Fiscal Year an amount equal to the product of (x) the income and gain allocated to such class of Limited Partners pursuant to Sections 5.3(a)(ii), (iii) and (iv) and 5.3(d) for such Fiscal Year, and (y) the maximum applicable combined overall personal Federal, New York State and New York City tax rates applicable to such Fiscal Year, determined after giving effect to any available deduction for the payment of such taxes.

2.41  <u>Uniform Act</u>.  "Uniform Act" shall mean the Delaware Revised Uniform Limited Partnership Act.

2.42  <u>Voluntary Loan</u>.  "Voluntary Loan" shall have the meaning given to such term in Section 3.3(b) hereof.

## ARTICLE 3

### CAPITAL CONTRIBUTIONS

3.1  <u>Capital Contributions of the General Partner</u>.  The General Partner shall make a contribution to the capital of the Partnership equal to 1% of the aggregate contributions of all Partners.  Except as provided in Sections 3.3, 3.4 and 10.3, the General Partner, in its capacity as such, shall not be required to make any additional capital contributions.

3.2  <u>Capital Contributions of Limited Partners</u>.

(a)  Each Class A Limited Partner has contributed to the Partnership in cash the amount set forth opposite such Partner's name in Schedule A attached hereto as such Partner's contribution amount.  Limited Partners shall not be required to make any additional capital contributions to the Partnership.

(b)  If, on the effective date hereof, the Partnership has not received Capital Contributions from the General Partner and the Class A Limited Partners aggregating $23,000,000, the General Partner or any of its Affiliates that is not a tax-exempt trust, C corporation or other person ineligible to be a Class A Limited Partner may make a loan to the Partnership (a "Gap Loan") in the amount of the additional funds required.  The Gap Loan may continue in effect for a period up to six months after the first closing at which Class A Limited Partners are admitted to the Partnership.  During the term of such Gap Loan, the Gap Loan shall accrue interest at an annual rate equal to the distributions the person making the Gap Loan (the "Gap Lender") would have received pursuant to Sections 5.2(a)(i), (iii) and (iv) during such period on a Class A Limited Partnership Interest for a Capital Contribution in the amount of the Gap Loan and the principal of the Gap Loan shall be payable in an amount equal to the distributions he or it would have received pursuant to Section 5.2(a)(ii) during such period on a Class A Limited

Partnership Interest for a Capital Contribution in the amount of the Gap Loan, such payments of interest and principal to be made pari passu with distributions to Class A Limited Partners pursuant to Section 5.2(a). During the six-month term of the Gap Loan the remaining Class A Partnership Interests may be purchased by a qualified investor, including the Gap Lender, for an amount equal to the remaining principal balance of the Gap Loan. For the purposes of calculating the Percentage Interests of the new Class A Limited Partners, the new Class A Limited Partners shall be deemed to have made a Capital Contribution equal to the original principal amount of the Gap Loan (or portion thereof) purchased at the time of the first closing at which Class A Limited Partners were admitted to the Partnership, but shall have a Net Capital Contribution at the time of his or her actual admission to the Partnership equal to the then outstanding principal amount of the Gap Loan, and for purposes of calculating the returns pursuant to Sections 5.2(a)(i) and 5.2(a)(iii) shall be deemed to have had a Net Capital Contribution from time to time during such period equal to the outstanding amount of the Gap Loan at such times. Calculations of the 15% return pursuant to Section 5.2(a)(i) and the 30% return pursuant to Section 5.2(a)(iii) shall be made as if payments of interest to the Gap Lender had been made as distributions to the new Class A Limited Partner. The proceeds of the sale to the new Class A Limited Partner shall be applied to payment of the remaining principal balance of the Gap Loan. The Gap Loan shall automatically convert to Class A Limited Partnership Interests in the equivalent amount of such Class A Limited Partnership Interests as described above if the remaining Class A Limited Partnership Interests have not been purchased by another person within the six-month term of the Gap Loan.

(c) The Capital Contributions set forth in Schedule A attached hereto are to be used to acquire the Investment Properties listed on Schedule B attached hereto and to pay transaction costs and expenses as set forth in this Agreement. If the acquisition of the Investment Properties, including closing of the financing to be received from US West Financial Services, Inc., is not closed by January 30, 1993, all Capital Contributions shall be returned to the Class A Limited Partners together with any interest earned thereon without deduction for any fees and expenses.

3.3   Additional Capital Contributions.

(a) In the event that the General Partner shall determine that the Partnership requires additional capital in connection with the operation of its business and the pursuit of its investment objectives, the General Partner may give one or more notices to the Class A Limited Partners (each, a "Call Notice") requesting the Class A Limited Partners to make capital contributions to the Partnership in addition to the contributions

already made by them.  Each Call Notice shall set forth the amount of capital being requested from each Class A Limited Partner (the "Call Amount"), which shall be calculated as the total amount of additional capital being requested multiplied by such Partner's Percentage Interest as of the date of the Call Notice.  Each Class A Limited Partner may, but shall not be obligated to, contribute his or her Call Amount (or any portion thereof).  If any Class A Limited Partner elects not to contribute his or her Call Amount (or any portion thereof), then the other Class A Limited Partners may, but shall not be obligated to, contribute to the Partnership pro rata (based upon their relative Percentage Interests) all or any portion of the Call Amount which the non-contributing Partner elected not to make.

(b)  In the event that the Limited Partners elect not to contribute the aggregate Call Amounts requested by the General Partner pursuant to any Call Notice, the General Partner or any of its Affiliates may, but shall not be obligated to, make a loan to the Partnership (a "Voluntary Loan") in the amount of such shortfall.  The interest rate and terms of each Voluntary Loan shall not be in excess of the actual cost of borrowing the funds if such funds were borrowed by the person making the Voluntary Loan; if such funds were not borrowed by the person making the loan, then the Partnership shall pay interest at a rate no greater than the rate that would be charged by unrelated lending institutions on comparable loans for the same purpose in the same locality and shall not be obligated to pay financing charges or fees or any prepayment charge or penalty to the person making the Voluntary Loan.  If any Partner or Affiliate of any Partner provides a letter of credit or enters into a guaranty for or on behalf of the Partnership and such letter of credit or guaranty is drawn on, the amount of such draw shall constitute a Voluntary Loan and bear interest at the "all-in" cost to such Partner or Affiliate, provided that the draw was not caused by the gross negligence, willful misconduct or bad faith of such Partner or Affiliate.  However, if the Partnership is or will be unable to make payment under a Voluntary Loan in the amount of such draw, and the Class A Limited Partners will not make additional contributions adequate to cover such Voluntary Loan, the person who provided the letter of credit or guarantee shall have the right to acquire a participating interest in the loan or obligation in connection with which the letter of credit or guarantee was given, in an amount equal to his or its exposure pursuant to the letter of credit or guarantee.

3.4  <u>No Right to Return of Capital</u>.  No Partner shall have the right to require the return of all or any part of his or her Capital Contribution, except as expressly provided in this Agreement.  Except as otherwise provided in this Agreement or the Uniform Act, the General Partner and the Limited Partners shall not be liable for any deficit balance in their Capital Accounts.

Upon the dissolution of the Partnership, the General Partner shall be obligated to restore to the Partnership an amount equal to the lesser of the deficit balance in the Capital Account of the General Partner (determined after taking into account all allocations, distributions and contributions for the Fiscal Year) or 1.01% of the aggregate Capital Contributions to the Partnership.

ARTICLE 4

FEES, COSTS AND EXPENSES

    4.1  Organization and Acquisition Costs and Expenses. The Partnership shall pay or cause to be paid out of Partnership funds all reasonable unaffiliated costs and expenses incurred in connection with the formation and organization of the Partnership and the acquisition of the Partnership's Investments.  The Partnership shall reimburse the General Partner and any Affiliate of the General Partner for all reasonable payments to unaffiliated parties and out-of-pocket costs and expenses described in this Section 4.1 incurred by them.

    4.2  Asset Management Fee.  After all other expenses of the Partnership are paid, the Partnership shall pay to the General Partner or an Affiliate of the General Partner a fee (the "Asset Management Fee") for its services in connection with the administration of the affairs of the Partnership.  The Asset Management Fee shall be paid monthly in an amount equal to the excess of one-twelfth of 1% of the Invested Assets as of the first day of the month in respect to which the fee is computed over the amount of distributions received by all general partners of all Operating Partnerships that are Affiliates of the General Partner during such month or any prior month, to the extent that such distributions have not previously been included in a calculation of the Asset Management Fees payable pursuant to this provision.  Unpaid Asset Management Fees for any month will be deferred without interest and will be payable only to the extent that the Partnership has funds available to pay the same after paying all Partnership expenses.  Salaries, overhead and costs and expenses of the General Partner other than those described below incurred in managing the Partnership and overseeing the Partnership's investment in the Operating Partnerships shall be borne by the General Partner without reimbursement other than the Asset Management Fee; however, the Partnership shall pay directly, or reimburse the General Partner for (i) payments to attorneys, accountants, appraisers, environmental experts and other unaffiliated professional service providers, (ii) annual travel expenses not to exceed $30,000 in the first year of Partnership operations, and in an amount to be stated in the Business Plan in subsequent years, and (iii) data processing and other equipment, including peripherals and software, in an amount

79091.14                            -14-

not to exceed $40,000 aggregated over the life of the Partnership.

4.3 <u>Partner Due Diligence Expenses</u>. The Partnership shall pay directly or reimburse each Partner his or her reasonable out-of-pocket expenses incurred by a Partner in connection with the examination and inspection of the real estate properties, debt interests and properties securing such debt interests to be acquired by the Operating Partnerships, as set forth on Schedule C attached hereto, including fees paid to unaffiliated experts and reasonable attorneys fees incurred in connection with the review of this Agreement and other documents relating to the formation of the Partnership and the acquisition of the portfolio of assets contemplated by Section 1.3 of this Agreement.

ARTICLE 5

DISTRIBUTIONS; PROFITS AND LOSSES

5.1 <u>Distributions and Allocations</u>. Distributions from the Partnership to the Partners shall be determined in accordance with Section 5.2. Allocations of income, gain, loss, deduction and credit shall be determined in accordance with Section 5.3.

5.2 <u>Distributions of Partnership Funds</u>.

(a) <u>Distributions of Net Cash Available For Distribution</u>. Net Cash Available For Distribution shall be distributed not less often than annually in the following order of priority:

(i) FIRST, until the General Partner and each of the Class A Limited Partners has received aggregate distributions pursuant to this Section 5.2(a)(i) equal to a cumulative return of 15% per annum (commencing on the date of the first closing at which Class A Limited Partners are admitted to the Partnership (or, in the case of additional Capital Contributions made by Class A Limited Partners pursuant to Section 3.3(a), commencing on the date the contribution was actually made)) compounded annually on the amount of such Partner's Net Capital Contributions from time to time outstanding, (A) 1% to the General Partner and (B) 99% to the Class A Limited Partners pro rata in proportion to their respective Percentage Interests;

(ii) SECOND, until the General Partner and each of the Class A Limited Partners has received aggregate distributions pursuant to this Section 5.2(a)(ii) equal to such Partner's Net Capital Contributions, (A) 1% to the General Partner and (B) 99% to the Class A Limited Partners,

pro rata in proportion to their respective Percentage Interests;

(iii)   THIRD, until each of the Class A Limited Partners has received aggregate distributions pursuant to this Section 5.2(a)(iii) and Section 5.2(a)(i) above equal to a cumulative return of 30% per annum (commencing on the date of the first closing at which Class A Limited Partners are admitted to the Partnership (or, in the case of additional Capital Contributions made by Class A Limited Partners pursuant to Section 3.3(a), commencing on the date the contribution was actually made)) compounded annually on the amount of such Partner's Net Capital Contributions from time to time outstanding, (A) 1% to the General Partner, (B) 76.5% to the Class A Limited Partners, pro rata in proportion to their respective Percentage Interests, and (C) 22.5% to the Class B Limited Partners, pro rata in proportion to their respective Class B Percentage Interests; and

(iv)   THEREAFTER, (A) 1% to the General Partner, (B) 59% to the Class A Limited Partners, pro rata in proportion to their respective Percentage Interests and (C) 40% to the Class B Limited Partners, pro rata in proportion to their respective Class B Percentage Interests;

provided, however, that

(v)   if the amounts otherwise distributable to the Class B Limited Partners pursuant to Sections 5.2(a)(iii) and (iv) hereof for any Fiscal Year are less than the Class B Tax Distribution Amount, then the Tax Distribution Amount for the Class A Limited Partners and the Tax Distribution Amount for the Class B Limited Partners shall be distributed to the Class A and Class B Limited Partners pari passu between the two classes, in the proportion which each such amount bears to the total of such amounts, and pro rata among Limited Partners within each class according to their Percentage Interests, before the distribution prescribed by Section 5.2(a)(i).   Amounts distributed to the Limited Partners pursuant to this Section 5.2(a)(v) shall be offset against the amounts otherwise next distributable to them pursuant to Section 5.2(a).

(b)   Amounts Withheld.   All amounts withheld pursuant to the Code or any provisions of any state, local or foreign tax law with respect to any payment, distribution or allocation of income to the Partnership or the Partners shall be treated as amounts distributed to the Partners pursuant to this Section 5.2 for all purposes under this Agreement.

79093.14

-16-

5.3  <u>Allocations of Profits and Losses</u>.

(a)  <u>Profits</u>.  After giving effect to the special allocations set forth elsewhere in Section 5.3, Profits for any Fiscal Year shall be allocated in the following order and priority:

(i)  FIRST, among the Partners in accordance with, and in an amount equal to, cumulative Losses allocated among the Partners pursuant to Section 5.3(b) hereof for all prior periods and not previously taken into account under this clause, in the following order and priority:

> (a)  Section 5.3(b)(iv)
> (b)  Section 5.3(b)(iii);
> (c)  Section 5.3(b)(ii);
> (d)  Section 5.3(b)(i)(c);
> (e)  Section 5.3(b)(i)(b); and
> (f)  Section 5.3(b)(i)(a);

(ii)  SECOND, among the Partners in proportion to, and in an amount equal to, the cumulative cash distributions to which each Partner is entitled pursuant to Section 5.2(a)(i), whether or not actually paid;

(iii)  THIRD, among the Partners in proportion to and in an amount equal to the cumulative cash distributions to which each Partner is entitled pursuant to Section 5.2(a)(iii), whether or not actually paid; and

(iv)  FOURTH, among the Partners in proportion to and in an amount equal to the cumulative cash distributions to which each Partner is entitled pursuant to Section 5.2(a)(iv), whether or not actually paid.

(b)  <u>Losses</u>.  After giving effect to the special allocations set forth elsewhere in Section 5.3, Losses for any Fiscal Year shall be allocated in the following order and priority:

(i)  FIRST, except as provided in Section 5.3(b)(iv) hereof, to the extent that Profits have been allocated pursuant to Sections 5.3(a)(ii), (iii) and (iv) hereof for any prior Fiscal Year, Losses shall be allocated

(a)  1st, to offset any Profits allocated pursuant to Section 5.3(a)(iv) hereof;

(b)  2nd, to offset any Profits allocated pursuant to Section 5.3(a)(iii) hereof; and

NOT A CERTIFIED COPY

79093.14

-17-

(c)  3rd, to offset any Profits allocated pursuant to Section 5.3(a)(ii);

in each such case, pro rata among the Limited Partners and the General Partner in proportion to their shares of the Profits being offset.  To the extent that any allocations of Profits are offset pursuant to this Section 5.3(b)(i), such allocations of Profits shall be disregarded for purposes of computing subsequent allocations pursuant to this Section 5.3.

(ii)  SECOND, except as provided in Section 5.3(b)(iv) hereof, to the Partners, in an amount equal to each Partner's Net Capital Contributions;

(iii)  THIRD, except as provided in Section 5.3(b)(iv) hereof, Losses shall be allocated 1% to the General Partner and 99% to the Class A Limited Partners in accordance with their respective Percentage Interests.

(iv)  Deficit Capital Limitation.  The Losses allocated to the Limited Partners pursuant to Sections 5.3(b)(i), 5.3(b)(ii) and 5.3(b)(iii) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Limited Partner to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  All Losses in excess of the limitation set forth in this Section 5.3(b)(iv) shall be allocated to the General Partner.

(c)  Special Allocations.

(i)  Qualified Income Offset.  Except as provided in Section 5.3(c)(iii) hereof, in the event that any Partner unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5), or (6) of the Regulations, items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Partners as quickly as possible.

(ii)  Gross Income Allocation.  Except as provided in Section 5.3(c)(iii) hereof, in the event that any Partner has a deficit Capital Account at the end of any Partnership Fiscal Year that is in excess of the sum of

(I)  the amount such Partner is obligated to restore (pursuant to the terms of this Agreement or otherwise); and

(II)  the amount such Partner is deemed to be obligated to restore pursuant to the penultimate

19093.14

-18-

sentence of Regulations Sections 1.704-2(g)(1) and
(i)(5),

each such Partner shall be specially allocated items of
Partnership income and gain in the amount of such excess as
quickly as possible.

(iii)  <u>Minimum Gain Chargeback</u>.  Notwithstanding anything
contained in Section 5.3 hereof to the contrary, if there is
a net decrease in Partnership Minimum Gain during any
taxable year of the Partnership, except as otherwise
permitted by Sections 1.704-2(f)(2), (3), (4) and (5) of the
Regulations, items of Partnership income and gain for such
taxable year (and subsequent years, if necessary) in the
order provided in Section 1.704-2(j)(2)(i) of the
Regulations shall be allocated among all Partners whose
shares of Partnership Minimum Gain decreased during that
year in proportion to and to the extent of such Partner's
share of the net decrease in Partnership Minimum Gain during
such year.  The allocation contained in this Sec-
tion 5.3(c)(iii) is intended to be a minimum gain chargeback
within the meaning of Section 1.704-(2) of the Regulations,
and shall be interpreted consistently therewith.

(iv)  <u>Section 754 Election</u>.  To the extent that an
adjustment to the adjusted tax basis of any Partnership
asset pursuant to Code Section 734(b) or 743(b) is required,
pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), to be
taken into account in determining Capital Accounts, the
amount of such adjustment to the Capital Accounts shall be
treated as an item of gain (if the adjustment increases the
basis of the asset) or loss (if the adjustment decreases
such basis) and such gain or loss shall be specially
allocated to the Partners in a manner consistent with the
manner in which their Capital Accounts are required to be
adjusted pursuant to such section of the Regulations.

The General Partner may, in its discretion, cause
the Partnership to elect under Section 754 of the Code to
adjust the basis of Partnership property in the case of a
distribution of property and in the case of a transfer of an
Interest in the manner provided in Sections 734 and 743 of
the Code.  If a Section 754 election is made at the request
of a transferee of an Interest, such transferee shall pay
the accounting costs with respect thereto.

(v)  <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions
for any Fiscal Year or other period shall be allocated 99%
to the Class A Limited Partners in accordance with their
respective Percentage Interests in the Partnership and 1% to
the General Partner.

79093.14

-19-

(vi)  Curative Allocations.  The allocations set forth in Sections 5.3(c)(i), (ii) and (iii) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of Regulations Section 1.704-1(b). Notwithstanding any other provisions of this Section 5 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other Profits, Losses and items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of such allocations of other Profits, Losses and other items and the Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Regulatory Allocations had not occurred.

(d)  Other Allocations Rules.

(i)  The allocations of Profits and Losses and the distribution of Net Cash Available for Distribution among Limited Partners shall take into account the varying Percentage Interests of Limited Partners during the existence of the Partnership.

(ii)  Except as otherwise provided in this Agreement, all items of Partnership income, gain, loss, deduction and any other allocations for any Fiscal Year not provided for shall be divided among the Partners in the same proportions as they share Profits or Losses, as the case may be, for such Fiscal Year.  Notwithstanding anything to the contrary that may be expressed or implied in this Agreement, the interest of the General Partner in each item of Partnership income, gain, loss, deduction or credit shall be equal to at least 1% of each of those items at all times during the existence of the Partnership.

(iii)  The Partners are aware of the income tax consequences of the allocations made by this Section 5.3 and hereby agree to be bound by the provisions of this Section 5.3 in reporting their shares of Partnership income and loss for income tax purposes.

(e)  Tax Allocations:  Code Section 704(c).  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Gross Asset Value.

In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to paragraph (i) of the definition of

Gross Asset Value herein, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 5.3(e) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Person's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

## ARTICLE 6

### MANAGEMENT

6.1  Rights and Duties of Limited Partners; Consent.

(a)  Except as permitted by the Uniform Act and this Agreement, the Limited Partners shall take no part whatever in the control, management, direction or operation of the affairs of the Partnership and shall have no power to act for or bind the Partnership.

(b)  No Limited Partner shall be liable for losses or debts of the Partnership beyond the amount of his or her Capital Contribution plus his or her share of the undistributed share of the net profits of the Partnership, except as otherwise provided in the Uniform Act.

(c)  Whenever any provision of this Agreement requires "Consent of the Class A Limited Partners," such Consent shall be determined according to the following procedure. The General Partner shall provide Notice to every Class A Limited Partner that his or her consent is being sought with respect to one or more proposals. The Notice shall be delivered 30 days before such Consent is required in connection with the approval of the annual Business Plan, and at least five days before such Consent is required in every other case, to each Class A Limited Partner at the address provided by such Partner for the delivery of notice. Such Notice shall contain a description of each proposal as to which Consent is sought, the date ("Consent Date"), which shall not be sooner than the end of the relevant notice period described above, by which a document evidencing the Limited Partner's vote ("Vote") must be received in order to be counted, the address, if other than the principal office of the Partnership, at which U.S. mail or private courier delivery of a

39093.14                        -21-

Vote may be made and the telephone number of a facsimile transmission device to which a facsimile of a Vote may be transmitted.  If any Limited Partner shall fail to deliver a Vote by the close of the Consent Date the General Partner shall send a second notice to such Limited Partner by facsimile transmission and shall make a telephone call to such Limited Partner at the telephone number provided by the Limited Partner for such purpose, in order to ascertain such Limited Partner's Vote (which may be communicated by telephone on that date, provided that it is followed by a written statement confirming the Vote).  Any Vote received by mail, courier or facsimile transmission at the principal office of the Partnership or as otherwise provided in the Notice on or before the Consent Date, and any Vote received by the General Partner by telephone, courier or facsimile transmission in response to a solicitation in the 24-hour period following the Consent Date, shall be counted in determining whether Consent has been given.  Where Majority Consent is required, Consent shall be deemed to have been given unless Votes indicating non-consent have been received on or before 24 hours after the Consent Date from Class A Limited Partners owning 50% or more of the Class A Interests.  Where Supermajority Consent is required, Consent shall be deemed to have been given unless Votes indicating non-consent have been received on or before 24 hours after the Consent Date from Class A Limited Partners owning 40% or more of the Class A Interests.  The General Partner may deem Consent to have been granted prior to 24 hours after the Consent Date if Votes indicating consent have been received from Class A Limited Partners owning more than 50% of the Class A Interests where Majority Consent is required, or 60% of the Class A Interests where Supermajority Consent is required.

(d)  Wherever in this Agreement Unanimous Consent of the Class A Limited Partners is required, Unanimous Consent shall mean the actual affirmative consent of each and every Class A Limited Partner.  The persons indicated on Schedule A hereto as "Steinhardt Investors" agree to vote their combined Class A Limited Partnership Interests together, and designate Michael Steinhardt and Shimon Topor as their representatives to receive notices of solicitations of Consent and to render Votes on their behalf.  The General Partner shall be entitled to rely on the Vote of either Michael Steinhardt or Shimon Topor as a Vote on behalf of all of the Steinhardt Investors unless such Vote specifically states otherwise or the General Partner shall have received Notice from any Steinhardt Investor that Michael Steinhardt or Shimon Topor is no longer authorized to act on his or her behalf.

6.2  <u>Fiduciary Duty of General Partner</u>.  Without limiting the scope of the General Partner's fiduciary duties under applicable law, the General Partner shall have fiduciary responsibility for the safekeeping and use of all funds and assets (including records) of the Partnership, whether or not in

79093.14                    - 22 -

its immediate possession or control, and the General Partner shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Partnership.

6.3   Powers of General Partner.

(a)   The General Partner shall have full and complete charge of all affairs of the Partnership, and the management and control of the Partnership's business shall rest exclusively with the General Partner, subject to the terms and conditions of this Agreement.  Except as prohibited by law or this Agreement, the General Partner shall possess all of the rights and powers of a partner in a partnership without limited partners under Delaware law.  The General Partner shall be required to devote to the conduct of the business of the Partnership such time and attention as shall be necessary or appropriate to accomplish the purposes, and to conduct properly, diligently and prudently the business, of the Partnership.  The General Partner shall make Felsher available as reasonably necessary for the purposes of the Partnership.  Stubbs agrees that, as an officer of the General Partner, for a period of one year following the first closing at which Class A Limited Partners are admitted to the Partnership, he shall devote substantially all of his business time and energies to the business of the Partnership.  Thereafter, as an officer of the General Partner, Stubbs shall devote to the conduct of the business of the Partnership such of his time and attention as shall be necessary or appropriate to accomplish the purposes, and to conduct properly, diligently and prudently the business, of the Partnership.

(b)   Subject to the limitations set forth in this Agreement, including but not limited to Sections 6.4 and 6.5 (except, notwithstanding anything to the contrary in this Agreement, with respect to the period prior to delivery of the first Business Plan, which the General Partner is required to deliver on January 15, 1993, for which period the limitations shall only apply to (xii) and (xiii) below) the General Partner shall perform or cause to be performed all management and operational functions relating to the business of the Partnership.  Without limiting the generality of the foregoing, and subject to Sections 6.4 and 6.5 (except, notwithstanding anything to the contrary in this Agreement, with respect to the period prior to delivery of the first Business Plan, which the General Partner is required to deliver on January 15, 1993, for which period the limitations shall only apply to (xii) and (xiii) below), the General Partner is authorized on behalf of the Partnership, in its sole discretion and without the consent of the Limited Partners, to:

(i)   sell Class A Limited Partnership Interests in return for Capital Contributions in an amount not to exceed

79093.14                              -23-

$23,000,000, to permit the acquisition of the NationsBank Portfolio contemplated by Section 1.3 hereof together with the payment of such other costs and expenses and the maintenance of such reserves as are permitted by the terms of this Agreement;

(ii)  cause the Partnership to consent to the Operating Partnerships' entering into purchase and sale agreements and all other agreements and obligations related thereto in connection with the acquisition of the NationsBank Portfolio pursuant to Section 1.3 hereof, including a reimbursement obligation in connection with a letter of credit issued by NationsBank to Hilton Head Plantation Utilities, Inc. and the unfunded loan obligation under the Maconi loan agreement;

(iii)  cause the Partnership to consent to the Operating Partnerships' entering into any loan and security agreements necessary to obtain financing from U S West Financial Services, Inc. in connection with the acquisition of the NationsBank Portfolio contemplated by Section 1.3 hereof;

(iv)  expend the capital and revenues of the Partnership in furtherance of the Partnership's business as described in Section 1.3 hereof;

(v)  pay, in accordance with the provisions of this Agreement, all expenses, debts and obligations of the Partnership to the extent that funds of the Partnership are available therefor;

(vi)  make investments in United States government securities, securities of governmental agencies, commercial paper, money market funds, bankers' acceptances, certificates of deposit and other investment-grade securities ("Permitted Interim Investments"), pending disbursement of the Partnership's funds in furtherance of the Partnership's business as described in Section 1.3 or to provide a source from which to meet contingencies;

(vii)  cause the Partnership to maintain adequate records and accounts of all operations and expenditures;

(viii)  cause the Partnership to contribute Net Cash Available for Distribution to Operating Partnerships with respect to one or more existing Investment Properties;

(ix)  purchase, at the expense of the Partnership, liability, casualty, fire and other insurance and bonds to protect the Partnership's properties, business, partners and employees and to protect the General Partner and its employees, including, without limitation, a term life

79093.14                                    -24-

insurance policy in the amount of $3 million insuring the Partnership in the event of the death of Felsher during the first two years of the Partnership;

(x)  employ attorneys, appraisers, environmental experts and other professional service providers at the expense of the Partnership and terminate such employment;

(xi)  employ or permit Operating Partnerships to employ non-Affiliates of the General Partner to act as on-site managers of real estate properties owned by Operating Partnerships;

(xii)  permit an assignment of a Limited Partner's Interest in the Partnership and admit an assignee of a Limited Partner's Interest as a substituted limited partner in the Partnership, pursuant to and subject to the limitations of Article 9; and

(xiii)  in the event of a distribution to the Partnership of an undivided interest in a loan in connection with a transaction described in Sections 6.5(b)(ii) and (iii), cause the Partnership to take such steps as necessary to effectuate the transaction, including contributing its undivided interest in such loan to another Operating Partnership.

By executing this Agreement, each Limited Partner shall be deemed to have consented to any exercise by the General Partner of any of the foregoing powers or other powers of the General Partner contained in this Agreement, effected in accordance with the terms of this Agreement.

6.4  <u>Activities of General Partner Subject to Limited Partner Consent</u>.

(a)  The General Partner shall deliver for approval by the Class A Limited Partners a business plan, capital plan and budget for the Partnership, which shall incorporate a separate business plan, capital plan and budget for each Operating Partnership (together, the "Business Plan" and, as approved, the "Approved Business Plan") which shall describe, as appropriate, plans of the General Partner and the general partner of each Investment Property with respect to the sale, financing, refinancing (including debt, participating debt and equity refinancing, if known) or any other transfer of all or a portion of any Investment Property; restructuring or disposition of debt assets; proposed actions anticipated to be necessary to protect the interests of the Partnership in each Investment Property, including, without limitation, in the case of debt investments, the institution of foreclosure proceedings, acceptance of deeds in lieu of foreclosure, the restructuring of any such debt and

the pursuit of any other legal remedy; capital expenditures and improvements to Investment Properties; and the sources of funding for such expenditures if not expected to be available from the operations of the Operating Partnership owning such Investment Property; opening credit facilities with banks and other financial institutions for any Partnership purpose including, but not limited to, working capital; major leases at real estate properties owned by an Operating Partnership; the reinvestment of Net Cash Available for Distribution or of proceeds to any Operating Partnership of the sale or refinancing of Investment Properties; the establishment and maintenance of reserves, arrangements for debt and equity financing for the purpose of either establishing or maintaining reserves; contractual arrangements between the Partnership or General Partner acting for the Partnership and the General Partner or any Affiliate of the General Partner; the choice of accountants for the Partnership; and tax elections.  The Business Plan shall be updated by the General Partner after the first six months of the Partnership's Operations and annually thereafter, in each case, subject to approval by Supermajority Consent of the Class A Limited Partners, which Business Plan shall be delivered to the Class A Limited Partners for approval at least 30 days prior to the beginning of such fiscal year.

(b)   The General Partner may do, and may consent on behalf of the Partnership to the general partner of any Operating Partnership doing, any of the following only to the extent consistent with the expressed intent or specific limitations described in the Approved Business Plan for the year in which the action is proposed to be taken.  Notwithstanding anything to the contrary in Section 6.3, the General Partner may not take, or consent on behalf of the Partnership to the general partner of any Operating Partnership taking, any of the following actions to the extent not set forth in the Approved Business Plan (or, if there is no current Approved Business Plan, any of the following actions) unless the General Partner obtains the Supermajority Consent of the Class A Limited Partners determined in accordance with the procedures provided in Section 6.1(c):

(i)   cause the Partnership, or consent on behalf of the Partnership to the action by the general partner of any Operating Partnership to cause such Operating Partnership, to obtain or refinance unsecured debt or open credit facilities with banks and other financial institutions for any Partnership or Operating Partnership purpose including, but not limited to, a credit facility to provide the Partnership or Operating Partnership with working capital;

(ii)  cause the Partnership or any Operating Partnership to enter into contracts with the General Partner or any Affiliate of the General Partner, including contracts for

the payment of a property management fee, but not including any loan servicing agreement pursuant to Section 6.4;

(iii) cause the Partnership to consent to the formation of an Operating Partnership or reorganization of the interests in an existing Operating Partnership if such formation or reorganization results in the general partner or general partners of such Operating Partnership having an aggregate interest in the Operating Partnership greater than 1% or the Partnership having less than a 99% interest. Affiliates of the General Partner may not have a greater than 1% interest in any Operating Partnership without the Unanimous Consent of the Class A Limited Partners; or

(iv) enter into contracts relating to the development of undeveloped land owned by any Operating Partnership.

(c)   The General Partner may do, and may consent on behalf of the Partnership to the general partner of any Operating Partnership doing, any of the following only to the extent not inconsistent with the expressed intent and specific limitations described in the Approved Business Plan for the year in which the action is proposed to be taken.  Notwithstanding anything to the contrary in Section 6.3, the General Partner may not take or consent on behalf of the Partnership to the general partner of any Operating Partnership taking any of the following actions to the extent not set forth in such Approved Business Plan (or, if there is no current Approved Business Plan, any of the following actions) unless the General Partner obtains the Majority Consent of the Class A Limited Partners determined in accordance with the procedures provided in Section 6.1(c):

(i)   enter into agreements and contracts with third parties in connection with the sale or any other disposition or transfer of all or a portion of the Partnership's interest in any Investment Property (other than through the exercise of remedies in connection with a defaulted Investment Property constituting a debt interest);

(ii)   make capital expenditures and enter into contracts for capital improvements to properties;

(iii)   retain accountants other than those named in the Approved Business Plan;

(iv)   determine the accounting methods and conventions to be used in the preparation of the Returns (as defined in Section 8.3(c)), and make any and all elections under the tax laws of the United States, the several states and other relevant jurisdictions as to the treatment of items of income, gain, loss, deduction and credit of the Partnership;

T9093.14                              -27-

or any other method or procedure related to the preparation of the Returns.

(d)   The General Partner may do, and may consent on behalf of the Partnership to the general partner of any Operating Partnership doing, any of the following to the extent not expressly precluded or limited by the Approved Business Plan and as long as the same are consistent with the budget included therein.   To perform any of the following actions, if they are expressly precluded or limited by such Approved Business Plan (or, if there is no current Approved Business Plan, to perform any of the following actions) the General Partner must obtain the Majority Consent of the Class A Limited Partners determined in accordance with the procedures provided in Section 6.1(c):

(i)   conduct the day-to-day business of the Operating Partnership, including entering into Operating Partnership Agreements and agreements and contracts with third parties in furtherance of the Partnership's ordinary course of business, including but not limited to the leasing of space in an Investment Property owned by an Operating Partnership and making repairs thereto;

(ii)   take such action with respect to each Investment Property as the General Partner deems necessary to protect the interests of the Partnership in such Investment Property, including, without limitation, in the case of debt investments, the institution of foreclosure proceedings, acceptance of deeds in lieu of foreclosure and the restructuring of any such debt;

(iii)   reinvest Net Cash Available for Distribution (other than obtained pursuant to (iv) below) in any Operating Partnership;

(iv)   enter into mortgage loan transactions with unaffiliated institutional lenders with respect to Investment Properties owned by an Operating Partnership;

(v)   establish reserves for the Partnership and any Operating Partnership, provided that such reserves may be created outside of the Approved Business Plan and without the Consent of the Class A Limited Partners if the General Partner identifies a reasonably foreseeable contingent liability for which such reserve is required.

(e)   Notwithstanding any provision of this Section 6.4 to the contrary,

(i)   the General Partner may cause the Partnership or any Operating Partnership to enter into a loan servicing agreement with any party, including the General Partner, an Affiliate of the General Partner or any party not an Affiliate of

79093.14                              -28-

the General Partner, such that the loan servicing fees payable
under such agreement, when aggregated with the loan servicing
fees payable by the Partnership and all Operating Partnerships to
all parties, do not exceed the lesser of ten percent of the
interest accrued on the Operating Partnerships' loans other than
those specifically identified in Schedule B as uncollectible or
$150,000, annually.  The General Partner shall obtain the
Supermajority Consent of the Class A Limited Partners to increase
the aggregate amount of loan servicing fees in any year to an
amount in excess of the lesser of the two amounts described
herein, except that the General Partner may pay loan servicing
fees in excess of the amounts described herein if such greater
amount of fees is required to be paid to a loan servicing agent
unaffiliated with the General Partner, specified by U S West
Financial Services, Inc. or another lender to the Partnership or
any of the Operating Partnerships.

(ii)   the General Partner can take any reasonable action
and reasonably expend Partnership funds and the Limited Partners
cannot block such action or such expenditure of Partnership funds
which the General Partner proposes in order to avoid personal
liability under guarantees given by Felsher or Stubbs in
connection with Partnership or Operating Partnership indebtedness
or obligations, nor can the Limited Partners mandate or take
action that exposes Felsher or Stubbs to liability under any
guaranty.  The General Partner shall provide the Class A Limited
Partners with notice of any such action at least 5 days before
taking such action.  Notwithstanding the foregoing, if the
personal liability arises out of the gross negligence, willful
misconduct or bad faith of the General Partner, Felsher or Stubbs
as set forth in Section 6.6, the provisions of this Section
6.4e(ii) shall not be applicable.

6.5   Restrictions on General Partner's Authority.

(a)   General Restrictions.  Notwithstanding anything to
the contrary herein, the General Partner may not do any of the
following:

(i)   any act in contravention of this Agreement;

(ii)   any act that would make it impossible to carry on
the ordinary business of the Partnership, except as
otherwise provided in this Agreement;

(iii)   possess Partnership Property, or, except as
otherwise provided in this Agreement, assign any rights in
specific Partnership Property, for other than a Partnership
purpose;

(iv)   cause the Partnership or any Operating Partnership
to purchase property from, or to sell or otherwise transfer

79093.14                          -29-

any Investment Property or pay or lend any Partnership or Operating Partnership funds to, the General Partner or any Affiliate of the General Partner other than the Operating Partnerships, or enter into any agreement on behalf of the Partnership or any Operating Partnership to do any of the acts described in this Section 6.5(a)(iv), except as expressly authorized by Article 4 and Article 6 hereof;

(v)   admit a Person as a Partner, except as otherwise provided in this Agreement;

(vi)   amend this Agreement, except upon written consent of all Partners or as permitted pursuant to the terms of Article 12 herein or any other provision of this Agreement;

(vii)   change the character of the Partnership's business from that set forth in Section 1.3 hereof;

(viii)   knowingly commit any act that would subject any Limited Partner to liability as a general partner in any jurisdiction in which the Partnership or any Operating Partnership transacts business;

(ix)   elect to dissolve the Partnership, except as expressly permitted herein; or

(x)   cause the Partnership to accept contributions other than cash or make distributions other than cash except in connection with a transfer contemplated by Section 6.5(b)(ii) or in connection with the dissolution of the Partnership.

(b)   Provisions in Respect of Operating Partnerships.

(i)   Each Operating Partnership Agreement shall provide the Partnership, as the limited partner thereof, with the same rights and powers to make elections, grant or withhold consents and approvals and receive information (including, without limitation, periodic financial reports and tax returns) as the Class A Limited Partners possess under the terms of this Agreement (each, a "Lower-Tier Right"). Notwithstanding anything to the contrary in this Agreement, each Lower-Tier Right that the Partnership shall possess under the terms of any Operating Partnership Agreement shall be indirectly exercisable solely by the Class A Limited Partners in their capacity as limited partners of the Partnership, and the General Partner's authority on behalf of the Partnership in the exercise by the Partnership of its Lower-Tier Right shall be limited to causing the Partnership to comply with the written directions of such of the Class A Limited Partners whose election, Majority Consent, Supermajority Consent or approval would be required for any

act or omission (if such act or omission were being undertaken by the Partnership) at the Partnership level pursuant to the corresponding right of the Class A Limited Partners to make elections, grant Majority Consent, Supermajority Consent or approval under this Agreement. Each item of information received by the Partnership pursuant to a Lower-Tier Right shall be promptly forwarded to the Class A Limited Partners.

(ii)  Each Operating Partnership Agreement for an Operating Partnership owning loans shall contain a section in its Management article providing substantially as follows:

Prior to taking title to any property as a result of an event of default under a loan by foreclosure, deed in lieu of foreclosure, or otherwise, the general partner of this partnership (the "Operating Partnership") may create a new Operating Partnership and in connection therewith cause the Operating Partnership to distribute a 1% undivided interest in such loan to its general partner and a 99% undivided interest in such loan to FGHP Capital Limited Partnership, as its limited partner, for the purpose of enabling a contribution of the entire undivided interest in such loan to a limited partnership (the "Acquiring Partnership"), which may be either existing or newly-formed, owned 1% by a corporate general partner having the same ownership as the general partner of this Operating Partnership and 99% by FGHP Capital Limited Partnership as its limited partner.  The general partner of the Operating Partnership shall, simultaneously with the distribution and contribution described above, execute and deliver to the Acquiring Partnership an assignment of mortgage, endorsement of note and other documents transferring the beneficial interest in the mortgage, note and other documents evidencing and securing the loan, it being expressly agreed that such assignment shall not be deemed an assignment of the loan from the Operating Partnership to the Acquiring Partnership but a distribution from the Operating Partnership to its partners and a subsequent distribution by the general partner of the Operating Partnership to its stockholders, followed by a contribution by the stockholders of the general partner of the Operating Partnership to the general partner of the Acquiring Partnership, and a contribution by the partners of the Acquiring Partnership of their respective undivided interests in such loan to the Acquiring Partnership.

(iii)  Felsher and Stubbs, as stockholders of the General Partner,  agree that in the event of a distribution of an undivided interest in a loan in default, as described in Section 6.5(b)(ii), to the Partnership and the general partner of the Operating Partnership making the distribution, provided that Felsher and Stubbs remain the sole shareholders of the General Partner and the general partner of the Operating Partnership, they shall (w) cause the general partner of the Operating Partnership to distribute its undivided interest in such loan to them pro rata according to their ownership shares; (x) contribute their undivided interests in such loan to the corporate general partner of the Operating Partnership acquiring the loan (the "Acquiring Partnership"); (y) cause the general partner of the Acquiring Partnership to contribute its undivided interest in such loan to the Acquiring Partnership; and (z) cause FGHP Capital Limited Partnership to contribute its undivided interest in such loan to the Acquiring Partnership.

6.6  **Exculpation and Indemnification.**  Neither the General Partner nor its Affiliates, nor any of their officers, directors, partners, employees or agents, shall be liable, in damages or otherwise, to the Partnership or to any of the Partners for any act performed or omission made by the General Partner pursuant to the authority granted by this Agreement, except if such act or omission results from the General Partner's own gross negligence, willful misconduct or bad faith.  The Partnership shall indemnify, defend and hold harmless the General Partner, its Affiliates and their officers, directors, partners, employees and agents, from and against any and all claims or liabilities under letters of credit or guaranties entered into by them on behalf of the Partnership or any Operating Partnership, and any and all other claims or liabilities of any nature whatsoever, including reasonable attorneys' fees, arising out of or in connection with any action taken or omitted by the General Partner, its Affiliates or their respective officers, directors, partners, employees or agents pursuant to the authority granted by this Agreement, except that (i) the person claiming an indemnity shall not be entitled to the protection of this Section 6.6 if the claim or liability arises out of the gross negligence, willful misconduct or bad faith of such person or (ii) if the person claiming an indemnity is the General Partner, the General Partner shall not be entitled to the protection of this Section 6.6 if the claim or liability arises out of the gross negligence, willful misconduct or bad faith of its officers or directors, and provided further that all the other persons described herein shall be entitled to such protection.  The General Partner shall be entitled to rely on the advice of counsel, public accountants or other independent experts experienced in the matter at issue, and any act or omission of the General Partner pursuant to such advice shall in no event subject the General Partner to liability

-32-

to the Partnership or any Partner.  The General Partner shall use prudent business judgment in connection with the employment of employees and agents.

6.7  _Other Activities_.  Any Partner (including the General Partner) (the "Interested Party") may engage in or possess an interest in other business ventures of any nature or description, independently or with others, whether presently existing or hereafter created, and neither the Partnership nor any Partner (including the General Partner) other than the Interested Party shall have any rights in or to such independent business ventures or the income or profits derived therefrom; provided, however, that any such other business venture of the General Partner, Felsher or Stubbs does not adversely affect the ability of the General Partner, Felsher or Stubbs to perform his or its duties under this Agreement or does not adversely affect the business and operations of the Partnership or any Operating Partnership.

6.8  _General Partner Net Worth_.  The General Partner represents, warrants and covenants that each general partner of an Operating Partnership shall have, and shall continue to maintain, a net worth sufficient, in the opinion of counsel to the Partnership, to allow the Operating Partnerships to maintain their classifications as partnerships under the Code and the Regulations.  Prior to the date of admission of a Substitute General Partner, such Substitute General Partner shall represent, warrant and covenant that it has a net worth sufficient, in the opinion of counsel to the Partnership, to allow the Operating Partnership to maintain its classification as a partnership under the Code and the Regulations and that it will maintain such a net worth throughout the term of the Partnership.

ARTICLE 7

[RESERVED]

ARTICLE 8

ACCOUNTS

8.1  _Books_.  The General Partner shall maintain complete and accurate books of account of the Partnership's affairs at the Partnership's principal office, including a list of the names and addresses of all Partners.  Each Partner shall have the right to inspect the Partnership's books and records (including the list of the names and addresses of Partners).  At request of any Limited Partner, the General Partner shall deliver to such Limited Partner a copy of one or more specific reports provided by the General Partner or the general partner of any

Operating Partnership to lenders to the Partnership or any Operating Partnership.

8.2   Partners' Accounts.   Separate Capital Accounts shall be maintained for each Partner.

8.3   Reports, Returns and Audits.

(a)   The books of account shall be closed promptly after the end of each Fiscal Year.  Within 120 days thereafter, the General Partner shall make a written report to each Person who was a Partner at any time during such Fiscal Year which shall include statements of profits and losses and cash flows for the year ended and a balance sheet as of the close of the Fiscal Year, each of which shall be audited and prepared by an independent certified public accountant and accompanied by a report of the independent certified accountants stating that an audit of such financial statements has been made in accordance with generally accepted audited standards, stating the opinion of the accountants in respect of the financial statements and the accounting principles and practices reflected therein and as to the consistency of the application of the accounting principles, and identifying any matters to which the accountants take exception and stating, to the extent practicable, the effect of such exception on such financial statements.  The report shall also contain such additional statements with respect to the status of the Partnership business transactions by the Partnership with the General Partner or its Affiliates and the distribution of Partnership funds and any other information as is considered necessary by the General Partner in its sole discretion to advise all Partners properly about their investment in the Partnership.  The report shall be prepared in a form as required by the General Partner.  At the request of any Limited Partner the General Partner shall provide to such Limited Partner a report detailing the status of the Partnership for the immediately preceding fiscal quarter.

(b)   Prior to April 1 of each year, each Partner shall be provided with an information letter (containing such Partner's Form K-1 or comparable information) with respect to such Partner's distributive share of Profits, Losses and credits for income tax reporting purposes for the previous Fiscal Year, together with any other information concerning the Partnership necessary for the preparation of a Partner's income tax return(s).

(c)   The General Partner shall prepare or cause to be prepared all federal, state and local tax returns of the Partnership (the "Returns") for each year for which such Returns are required to be filed.  To the extent permitted by law, for purposes of preparing the Returns, the Partnership shall use the Fiscal Year.  The General Partner may (but need not), subject to the restrictions of Section 6.4, make any elections under the

79093.14                                    -34-

Code and/or applicable state or local tax laws, and the General Partner shall be absolved from all liability for any and all consequences to any previously admitted or subsequently admitted Partners resulting from its making or failing to make any such election.

(d)   The General Partner shall be the "tax matters partner," as such term is defined in Section 6231(a)(7) of the Code.

(e)   Together with any distribution to the Partners the General Partner shall provide a letter to the Partners briefly detailing the status of the Partnership.

ARTICLE 9

TRANSFERS; WITHDRAWAL; ELECTION OF SUBSTITUTE GENERAL PARTNER

9.1   Transfer of General Partner's Interest.   (a)   The General Partner shall not withdraw from the Partnership, nor shall it sell, assign, mortgage, hypothecate, transfer, pledge, grant a security interest in or lien upon, encumber, give, place in trust, or otherwise voluntarily or involuntarily dispose of (collectively referred to herein as a "Transfer") its general partnership Interest in the Partnership.

(b)   Felsher and Stubbs, the sole shareholders of the General Partner, agree that they shall not voluntarily Transfer their shares in the General Partner, and the shares of the General Partner shall reflect such restriction.

9.2   Transfer of a Limited Partner's Interest.

(a)   Except as otherwise permitted by this Agreement, none of the Limited Partners shall Transfer any Interest currently owned or hereafter acquired by such Limited Partner without the prior written consent thereto of the General Partner, which consent may be withheld by the General Partner in its sole discretion, for any reason whatsoever or for no reason. Notwithstanding the foregoing, Felsher may not Transfer his Class A Limited Partnership Interests without the Majority Consent of the Class A Limited Partners (other than Felsher) determined in accordance with the procedures provided in Section 6.1(c).

(b)   Notwithstanding Section 9.2(a) and subject to Section 9.8, a Limited Partner may, at any time and without the prior written consent of any Partner, Transfer all or any part of his or her Interests, during his or her lifetime or pursuant to a will or the laws of descent and distribution, including intestacy, to his or her spouse, children, grandchildren,

parents, siblings or a trust for the benefit of any such person or persons. In addition to the Transfers described in the preceding sentence, Felsher, Michael Felsher and Stubbs shall be permitted to Transfer their Class B Interests to their employees or employees of their Affiliates and to each other; provided, however, that such transfer shall be subject to the provisions of Section 9.9. Each recipient of the Transfer of a Class A Interest, however, shall become a substituted Limited Partner only in the sole discretion of the General Partner and upon compliance with the requirements of Section 9.7 hereof with respect to an assignee of an Interest. Recipients of Transfers of Class B Interests shall remain assignees of beneficial interests and shall not become Limited Partners. Any allowed Transfer under this Section shall be subject to the rights and obligations of this Partnership Agreement.

(c) Notwithstanding Section 9.2(a) and (b), no Partner may transfer his or her Interest to anyone other than an individual, trust (other than a tax-exempt trust), S-corporation, or partnership that has only individuals, trusts (other than tax-exempt trusts), S-corporations or partnerships as beneficiaries, shareholders or partners.

9.3  <u>Allocations and Distributions Subsequent to Assignment</u>. All Profits and Losses of the Partnership attributable to any Interest acquired by reason of an assignment or by reason of an increased Interest resulting from an incidence of one or more Partners meeting another Partner's capital call under Section 3.3(a) and any distributions made with respect thereto shall be allocated (i) in respect of the portion of the Fiscal Year ending on the effective date of the assignment, to the assignor and (ii) in respect of subsequent periods, to the assignee. The effective date of any such assignment shall be the first day of the calendar quarter following the calendar quarter in which the Partnership is notified of the assignment.

9.4  <u>Death, Incompetence, Bankruptcy, Liquidation or Withdrawal of a Limited Partner</u>: The death, incompetence, Bankruptcy, liquidation or withdrawal of a Limited Partner shall not cause a dissolution of the Partnership, but the rights of such Limited Partner to share in the Profits and Losses of the Partnership, to receive distributions and to assign his or her Interest pursuant to this Article 9, on the happening of such an event, shall devolve on his or her beneficiary or other successor, executor, administrator, guardian or other legal representative for the purpose of settling his or her estate or administering his or her property, and the Partnership shall continue as a limited partnership. Such successor or personal representative, however, shall become a substituted Limited Partner only in the sole discretion of the General Partner and upon compliance with the requirements of Section 9.7 hereof with respect to an assignee of an Interest. The estate of a Bankrupt

79093.14

-36-

Limited Partner shall be liable for all the obligations of the Limited Partner.

9.5  <u>Satisfactory Written Assignment Required</u>. Anything herein to the contrary notwithstanding, both the Partnership and the General Partner shall be entitled to treat the assignor of an Interest as the absolute owner thereof in all respects, and shall incur no liability for distributions of cash or other property made in good faith to him or her, until such time as a duly executed and acknowledged written instrument of assignment, being either a certificate evidencing the Interest owned by the assignor prior to such assignment or some other instrument approved by the General Partner has been received by and recorded on the books of the Partnership and the assignee has paid any fees and reimbursed the General Partner for any expenses paid or incurred in connection with the assignment, at which time the assignment shall become effective for purposes of this Agreement.

9.6  <u>Assignee's Rights</u>. Any purported Transfer of an Interest in the Partnership that is not in compliance with this Agreement is hereby declared to be null and void and of no force and effect whatsoever. A permitted assignee of any Interest pursuant to Sections 9.2 or 9.4 hereof shall be entitled to receive distributions of cash or other property from the Partnership and to receive allocations of Profits and Losses of the Partnership attributable to such Interest after the effective date of the assignment but shall not become a Limited Partner unless authorized pursuant to Section 9.7 hereof.

9.7  <u>Assignees Admitted as Limited Partners</u>. The assignee of any Interest shall be admitted as a Limited Partner only upon the satisfaction of the following conditions:

(a)  A duly executed and acknowledged written instrument of assignment, being either a certificate evidencing the Interest owned by the assignor prior to such assignment or some other instrument approved by the General Partner, is filed with the Partnership setting forth the request of the assignor that the assignee become a Limited Partner.

(b)  The assignee executes an irrevocable power of attorney appointing the General Partner as the assignee's lawful attorney-in-fact for the purposes specified in Article 11 hereof.

(c)  The assignee has paid any fees and reimbursed the General Partner for any expenses paid in connection with the assignment, transfer and admission.

(d)  The assignee is approved for admission as a Limited Partner, which approval may be withheld by the General Partner in its sole discretion, for any reason whatsoever or for

79093.14                          -37-

no reason.  The General Partner may make it a condition for approval that the assignor or assignee provide an opinion of qualified counsel that assignment or transfer of the Interest will not result in a violation of federal or state securities laws.

The effective date of an admission of a Limited Partner shall be the date all of such conditions are satisfied.

9.8  <u>Limitation on Transfers of Partnership Interests</u>.
(a)  Notwithstanding any other provision of this Agreement, no Partner shall have the right at any time to Transfer all or part of his Interest in the Partnership if such Interest, when added to the total of all other Interests transferred within the period of twelve consecutive months prior to the proposed date of Transfer, would, in the opinion of counsel for the Partnership, result in the termination of the Partnership under Section 708 of the Code.

(b)  Any Transfer or other action under Article 9 hereof shall, to the extent required, be subject to the approval of any lender to the Partnership.

9.9  <u>Election of Substitute General Partner</u>.
(a)  Within 120 days after the occurrence of a Disabling Event described in Section 9.9(c), and subject to the provisions of Sections 9.9(c)-(e), any Class A Limited Partner (the "Moving Partner") may call for a vote on the election of a general partner (the "Substitute General Partner") to exercise the powers described in Section 9.9(b), and the removal of the General Partner.  The Class A Limited Partners shall not be required to remove the General Partner upon election of a Substitute General Partner; however, the General Partner may, upon election of a Substitute General Partner, elect to have its General Partner Interest converted into a Class A Interest representing a Percentage Interest of 1% of the aggregate Percentage Interests of all Class A Limited Partners after such conversion but subject to the pro rata reduction of the Percentage Interests of all Class A Limited Partners to permit the provision of a 1% General Partner Interest to the Substitute General Partner, pursuant to Section 9.9(d).  Notice of election ("Notice of Election") of a Substitute General Partner shall be provided by the Moving Partner to the General Partner and all Class A Limited Partners at least ten days before the election date designated by such Moving Partner.  The Notice of Election shall state the Disabling Event giving rise to the election right, whether the Moving Partner seeks to remove the General Partner, the name and a brief statement of the experience and qualifications of the person nominated to become the Substitute General Partner and the election date.  The General Partner may, and upon request of Limited Partners holding in the aggregate at least 25% of the Class A Percentage Interests shall, cause the election date to be

79073.14                          -38-

extended up to an additional ten days.  Class A Limited Partners shall vote by delivering to the Moving Partner (with a copy to the General Partner), on or before the Election Date, a signed writing stating whether they approve or disapprove the election of the nominated person as Substitute General Partner and in connection therewith the removal of the General Partner, if applicable.  If any Class A Limited Partner shall fail to deliver a writing approving or disapproving by the close of the Election Date the Moving Partner shall send a second notice to such Class A Limited Partner by facsimile transmission and shall make a telephone call to such Class A Limited Partner at the telephone number provided by the Class A Limited Partner for such purpose, in order to ascertain such Class A Limited Partner's approval or disapproval (which may be communicated by telephone on that date, provided that it is followed by a written statement confirming the oral communication). If Class A Limited Partners owning more than 60% of the Class A Percentage Interests approve the election of the nominated person as a Substitute General Partner, then such person shall become the Substitute General Partner effective immediately.  If, in conjunction with the election of the Substitute General Partner, Class A Limited Partners owning more than 60% of the Class A Percentage Interests approve the removal of the General Partner, then such person shall cease to be the General Partner immediately and shall have its General Partner Interest converted pursuant to Section 9.9(d).

(b)   The Substitute General Partner shall have all of the powers of the General Partner under the Partnership Agreement and following the election shall manage the affairs of the Partnership in the place and stead of the General Partner, whether or not the General Partner has been removed, and shall act as the Tax Matters Partner.  The General Partner agrees that upon election of the Substitute General Partner, if the General Partner has not been removed, the General Partner shall cease to manage the affairs of the Partnership, and shall provide the Substitute General Partner with all bank accounts, books and records and other property of the Partnership held by the General Partner.  The Substitute General Partner may assume or cause to be assumed the duties of asset manager and cause the Partnership to cease paying the Asset Management Fee to the General Partner or its Affiliate pursuant to Section 4.2; if it does so, the Substitute General Partner shall assume or cause to be assumed the contractual obligations of the General Partner relating to the duties of asset manager to the Partnership including equipment and office space and office services to unaffiliated parties, but shall not be obligated to continue the employment of employees of the asset manager.

(c)   The following shall be Disabling Events, and shall be treated as set forth herein:

(i)  *The death of Felsher.*  The Partnership shall maintain, for a period of two years following the first closing at which Class A Limited Partners are admitted to the Partnership, a term life insurance policy insuring the Partnership in the event of the death of Felsher, of which the Partnership shall be the sole beneficiary, in the amount of $3,000,000.  The Partnership may use part or all of the proceeds of the insurance policy to compensate the Substitute General Partner, and may distribute any proceeds remaining to the Partners.

(ii)  *A physical or mental disability of Felsher rendering him incapable of conducting the business of the Partnership in accordance with the standards of Section 6.3.*  If such physical or mental disability of Felsher occurs in the first year of Partnership operations, and the Class A Limited Partners elect a Substitute General Partner, the Class A Limited Partners may elect to reduce the Class B Interests of the Class B Partners by an amount up to 50% of such Interests, and to award such Interests to the Substitute General Partner.  If such disability occurs in the second year of Partnership operations the Class A Limited Partners may, upon election of a Substitute General Partner, elect to reduce the Class B Interests of the Class B Partners by an amount up to 25% of such Interests, and to award such Interests to the Substitute General Partner.  If such disability occurs in later years, there shall be no reduction of the Interests of Class B Limited Partners.  The Partnership shall not be permitted to reduce the Interests of Class B Partners pursuant to this subparagraph except to the extent used to compensate the Substitute General Partner.  The Class B Interests of the Class B Limited Partners shall be reduced pro rata according to their Class B Percentage Interests.

(iii)  *Bankruptcy of the General Partner.*  Bankruptcy of the General Partner in the first year shall result in a reduction of the Class B Interests of the Class B Partners by an amount up to 50% of such Interests.  Bankruptcy of the General Partner in the second year shall result in a reduction of the Class B Interests of the Class B Partners by an amount up to 25% of such distributions.  Bankruptcy of the General Partner in later years shall not result in a reduction of the Interests of the Class B Partners.  The Class B Interests of the Class B Limited Partners shall be reduced pro rata according to their Class B Percentage Interests.

(iv)  *Personal bankruptcy of Felsher rendering him incapable of conducting the business of the Partnership.*  If a personal Bankruptcy of Felsher rendering him incapable of conducting the business of the Partnership in accordance

with the standards of Section 6.3 ("Felsher Bankruptcy")
occurs in the first year of Partnership operations, and the
Limited Partners elect a Substitute General Partner, the
Limited Partners may elect to reduce the Class B Interests
of the Class B Partners by an amount up to 50% of such
Interests, and to award such Interests to the Substitute
General Partner.  If such Felsher Bankruptcy occurs in the
second year of Partnership operations, the Class A Limited
Partners may, upon election of a Substitute General Partner,
elect to reduce the Class B Interests of the Class B
Partners by an amount up to 25% of such Interests, and to
award such Interests to the Substitute General Partner.  If
such Felsher Bankruptcy occurs in later years, there shall
be no reduction of the Interests of Class B Limited
Partners.  The Partnership shall not be permitted to reduce
the Interests of Class B Partners pursuant to this
subparagraph except to the extent used to compensate the
Substitute General Partner.  The Class B Interests of the
Class B Limited Partners shall be reduced pro rata according
to their Class B Percentage Interests.

   (v)  *Conviction of, or a plea of guilty or nolo
contendere to, a felony involving the Partnership, its funds
or its property by Felsher, Stubbs or the General Partner.*
Conviction of a felony involving the Partnership, its funds
or its property, after expiration of all appeal periods, or
a plea of guilty or nolo contendere to a felony involving
the Partnership, its funds or its property by Felsher,
Stubbs or the General Partner shall result in a reduction of
the Class B Interests of the person who committed the felony
by the amount of 75% of such Interests, regardless of the
year in which such felony, conviction or plea occurs.  For
the purposes of this clause, Michael Felsher's Class B
Interest shall be reduced if Felsher's Class B Interest is
reduced.

   (vi)  *Conviction of, or a plea of guilty or nolo
contendere to, a felony by Felsher which results in his
being incarcerated or otherwise incapable of conducting the
business of the Partnership in accordance with the standards
of Section 6.3.*  A conviction or plea described in this
subparagraph occurring in the first year of Partnership
Operations shall result in a reduction of the Class B
Interests of the Class B Partners by an amount up to 50% of
such Interests.  A conviction or pleas described in this
subparagraph occurring in the second year shall result in a
reduction of the Class B Interests of the Class B Partners
by an amount up to 25% of such Interests.  Such conviction
occurring in later years shall not result in a reduction of
the Interests of the Class B Partners.  The Class B
Interests of the Class B Limited Partners shall be reduced
pro rata according to their Class B Percentage Interests.

(vii)  *Fraud, bad faith, gross negligence or repeated willful misconduct*.  In the event that fraud, bad faith, gross negligence or willful misconduct involving the Partnership are alleged, by Class A Limited Partners owning in the aggregate at least 15% of the Class A Percentage Interests, to have been committed by the General Partner, Felsher or Stubbs, the General Partner shall be entitled to notice and a period of 60 days in which to cure any damages or disabilities alleged to have resulted from such conduct (if able to be cured).  If the General Partner does not cure such damages or disabilities, the Class A Limited Partners (or any Limited Partner) may commence arbitration for the purpose of determining whether fraud, bad faith, gross negligence or willful misconduct has occurred.  The parties to this agreement agree that any claim of fraud, bad faith, gross negligence or willful misconduct of the General Partner, Felsher or Stubbs involving the Partnership shall be settled by arbitration submitted to three arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.  A single finding by the arbitrators that fraud, bad faith or gross negligence involving the Partnership has occurred shall constitute a Disabling Event.  Two separate findings that such willful misconduct has occurred on two separate occasions shall constitute a Disabling Event.  The finding of any Disabling Event as described in this subparagraph shall result in a reduction of the Class B Interests of the Class B Limited Partners by the amount of 75% of such Interests, regardless of the year in which such Disabling Event occurs.

(d)  Upon the removal of the General Partner, the 1% Interest of the General Partner shall be converted into a Class A Interest representing a Percentage interest of 1% of the aggregate Percentage Interests of all Class A Limited Partners after such conversion but subject to the pro rata reduction of the Percentage Interests of all Class A Limited Partners to permit the provision of a 1% General Partner Interest to the Substitute General Partner.  If, upon removal of the General Partner, tax counsel to the Partnership determines that it shall be necessary for the Substitute General Partner to have 1% of the Interests of Partnership, then the interests of the Class A Limited Partners shall be reduced pro rata to permit provision of a 1% General Partner Interest to the Substitute General Partner.

(e)  Notwithstanding the foregoing:

(i).  if the Disabling Event arises under Section 9.9(c)(v) or (vii), the Class A Limited Partners may remove the General Partner and elect a Substitute General Partner without any requirement to cause the General Partner,

79093.14                                    -42-

Felsher or Stubbs to be released from any existing
guarantees, letters of credit or other obligations to third-
party lenders entered into by them, for the benefit of the
Partnership, provided that the Partnership's indemnification
of the General Partner, Felsher and Stubbs under Section 6.6
shall remain in place unless the liability of Stubbs or
Felsher under any such guarantee, letter of credit or other
obligation was caused by the act constituting the Disabling
Event; and

(ii)  if the Disabling Event arises under Section
9.9(c)(i)-(iv) or (vi), then the Class A Limited Partners
may not admit a Substitute General Partner (whether or not
such action also includes the removal of the General Partner
as a general partner) so long as there shall remain any
guarantees, letters of credit or other obligations,
contingent or otherwise, of Felsher or Stubbs to third-party
lenders entered into for the benefit of the Partnership,
including, but not limited to, guarantees to U.S West
Financial Services, Inc., except that if the holder of the
guaranty, letter of credit or other obligation agrees to
release Stubbs, then the Limited Partners may elect a
Substitute General Partner to act as co-general partner with
the General Partner, sharing the management authority of a
general partner equally with the General Partner and the
Partnership shall continue to indemnify the General Partner
and Felsher pursuant to Section 6.6.

In furtherance of the this Section, the General
Partner shall, from time to time upon request of a Limited
Partner, identify the current liabilities of the General Partner,
Felsher or Stubbs under guaranties, letters of credit or other
obligations.

(f)  If the General Partner is not removed and does not
withdraw, the General Partner shall reassume its right to share
the management of the Partnership with the Substitute General
Partner at such time as the Partnership distributes to the Class
A Limited Partners an amount at least equal to all amounts
payable to Class A Limited Partners pursuant to Sections
5.2(a)(i) and (ii).

(g)  Each Operating Partnership shall contain a
provision allowing the Partnership as its limited partner to vote
to elect a substitute general partner of the Operating
Partnership upon the election of a Substitute General Partner by
the Partnership and to remove its general partner upon the
removal of the General Partner by the Partnership.  The
Substitute General Partner may, upon its election, cause the
Partnership to vote its limited partnership interest to elect a
substitute general partner of the Operating Partnership and to
remove the general partner of the Operating Partnership.

.79093.14                         -43-

ARTICLE 10

DISSOLUTION

10.1 <u>Events of Dissolution</u>.  The Partnership shall continue until December 31, 2042, unless sooner dissolved upon the earliest to occur of the following events, which shall cause an immediate dissolution of the Partnership:

    (i)  the sale or other disposition of all or substantially all of the assets of the Partnership or of all the Operating Partnerships; or

    (ii)  the withdrawal, removal or Bankruptcy of the General Partner or the assignment of all of the Interest of the General Partner or any other event that causes the General Partner to cease to be a general partner under the Uniform Act; <u>provided, however</u>, that, upon the occurrence such event, the Partnership may be reconstituted and its business continued upon the unanimous approval or written consent of the Limited Partners to continue the Partnership and the election by a Majority of the Class A Limited Partners of one or more successor general partners, such action to be taken within ninety days after such event.

10.2 <u>Final Accounting</u>.  Upon the dissolution of the Partnership and the failure to continue or reconstitute the Partnership as provided in Section 10.1 hereof, a proper accounting shall be made by the Partnership's independent public accountants from the date of the last previous accounting to the date of dissolution.

10.3 <u>Liquidation</u>.  Upon the dissolution of the Partnership and the failure to continue or reconstitute the Partnership as provided in Section 10.1 hereof, the General Partner or, if there is no General Partner, a Person selected by a Majority of the Limited Partners shall act as liquidator to wind up the Partnership (the "liquidator").  The liquidator shall have full power and authority to sell, assign and encumber any or all of the Partnership's assets and to wind up and liquidate the affairs of the Partnership in an orderly and business-like manner.  All proceeds from liquidation shall be distributed in the following orders of priority:  (a) to the payment of the debts and liabilities of the Partnership and expenses of liquidation, (b) to the setting up of such reserves as the liquidator may reasonably deem necessary for any contingent liability of the Partnership, and (c) the balance to the Partners in the order of priority set forth in Section 5.2(a), in accordance with their positive Capital Account balances as determined <u>after</u> allocation of profits, losses and distribution for the taxable year.  The General Partner shall be obligated to

restore to the Partnership an amount equal to the lesser of the deficit balance in its Capital Account (determined after taking into account all allocations, distributions and contributions for the fiscal year) or 1.01% of the aggregate Capital Contributions to the Partnership.

10.4  Distribution in Kind.  If the liquidator or, in the case of distributions other than upon final liquidation and dissolution, the General Partner shall determine that a portion of the Partnership's assets should be distributed in kind to the Partners, such Person shall obtain an independent appraisal of the fair market value of each such asset as of a date reasonably close to the date of liquidation (or, in the case of distributions other than upon final liquidation and dissolution, the date of distribution).  Any unrealized appreciation or Depreciation with respect to such assets shall be allocated among the Partners (in accordance with Section 5.3 hereof, assuming that the property were sold for the appraised value) and distribution of any such assets in kind to a Partner shall be considered a distribution of an amount equal to the assets' appraised fair market value for purposes of Sections 5.2, 5.3 and 10.3 hereof.

10.5  Cancellation of Certificate.  Upon the completion of the distribution of Partnership assets in dissolution of the Partnership as provided in Sections 10.3 and 10.4 hereof, the Partnership shall be terminated and the Person acting as liquidator shall cause the cancellation of the Certificate and shall take such other actions as may be necessary or appropriate to terminate the Partnership.

10.6  Compliance With Timing Requirements of Regulations.  In the event the Partnership is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this Article 10 (if such liquidation constitutes a dissolution of the Partnership) or Article 5 hereof (if it does not) to the General Partner and the Limited Partners who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2).  In the discretion of the General Partner, a pro rata portion of the distributions that would otherwise be made to the General Partner and the Limited Partners pursuant to the preceding sentence may be:

(1)  distributed to a trust established for the benefit of the General Partner and the Limited Partners for the purposes of liquidating Partnership assets, collecting amounts owed to the Partnership, and paying any contingent or unforeseen liabilities or obligations of the Partnership or of the General Partner arising out of or in connection with the Partnership.  The assets of any such trust shall be distributed to the General Partner and the Limited Partners from time to time, in the reasonable

discretion of the General Partner, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to the General Partner and the Limited Partners pursuant to this Agreement; or

(2)   withheld to provide a reasonable reserve for Partnership liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Partnership, provided that such withheld amounts shall be distributed to the General Partner and the Limited Partners as soon as practicable.

10.7   It is intended that a distribution of the proceeds from a liquidation of the Partnership pursuant to Section 10.3(c) should result in each Partner receiving the amount that it would receive if such liquidation proceeds were distributed pursuant to the priorities set forth in Section 5.2. Therefore, subject to the second sentence of Section 5.3(d)(ii), notwithstanding Sections 5.3(a) and 5.3(b), Net Income and Net Loss and, if necessary, items of Gross Income and Gross Deductions of the Partnership for the Year of a liquidation of the Partnership shall be allocated among the Partners so as to adjust the Capital Accounts of the Partners as closely as possible to reflect the amount that each Partner would receive upon a distribution of such liquidation proceeds, pursuant to the priorities of Section 5.2.

## ARTICLE 11

### POWER OF ATTORNEY

11.1   Appointment of General Partner.  Each Limited Partner, by the execution of this Agreement, does irrevocably constitute and appoint the General Partner, with full power of substitution, as his or her true and lawful attorney, in his or her name, place and stead, to execute, acknowledge, swear to, deliver, record and file (i) all amendments to the original Certificate required or permitted by law or the provisions of this Agreement, (ii) all certificates and other instruments deemed necessary or advisable by the General Partner to carry out the provisions of this Agreement or to qualify or continue the Partnership as a limited partnership or partnership wherein the Limited Partner has limited liability in the states where the Partnership may be doing business, (iii) all conveyances and other instruments deemed necessary or advisable by the General Partner to effect the dissolution and termination of the Partnership in accordance with the terms of this Agreement, (iv) all fictitious or assumed name certificates required or permitted to be filed on behalf of the Partnership and (v) all

other instruments or papers that may be required or permitted by law to be filed on behalf of the Partnership.

11.2 <u>Duration of Power</u>. The power of attorney granted pursuant to Section 11.1 hereof (i) is coupled with an interest and shall be irrevocable and survive the Bankruptcy or dissolution of the grantor and (ii) shall survive the delivery of an assignment by the Limited Partner of the whole or any fraction of his or her Interest, except that, where the assignment of the whole of the Limited Partner's Interest has been performed in accordance with this Agreement, the power of attorney of the assignor shall survive the delivery of such assignment for the sole purpose of enabling the General Partner to execute, acknowledge, swear to, deliver, record and file any instrument necessary or appropriate to effect such substitution. In the event of any conflict between this Agreement and any document, instrument, conveyance or certificate executed or filed by the General Partner pursuant to such power of attorney, this Agreement shall control.

ARTICLE 12

AMENDMENTS TO AGREEMENT

Without the approval or written consent of each of the Partners and except as otherwise provided for in any other provision of this Agreement, no amendment shall be made to this Agreement.

ARTICLE 13

NOTICES

13.1 <u>Method of Notice</u>. All notices hereunder shall be in writing and shall be sent by (i) certified or registered mail, return receipt requested, (ii) national prepaid overnight delivery service, (iii) facsimile transmission (following with hard copies to be sent by prepaid overnight delivery service) or (iv) personal delivery with receipt acknowledged in writing. All notices shall be addressed to the Partners (with a copy to an attorney or representative for each Partner if designated) at their respective addresses as set forth on Schedule A annexed hereto (except that any Partner may from time to time upon fifteen days' written notice change his or her address for that purpose), and shall be effective on the date when actually received or refused by the party to whom the same is directed (except to the extent sent by registered or certified mail, in which event such notice shall be deemed given on the third business day after mailing).

79073.14                              -47-

13.2  Routine Communications.  Notwithstanding the provisions of Section 13.1 hereof, routine communications such as distribution checks or financial statements of the Partnership may be sent by first-class mail, postage prepaid.

13.3  Computation of Time.  In computing any period of time under this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day that is not a Saturday, Sunday or legal holiday.

ARTICLE 14

REPRESENTATIONS AND WARRANTIES

14.1  Investment Purpose.  Each Limited Partner represents and warrants to the General Partner that he or she has acquired his or her Interest for his or her own account, for investment only and not with a view to the sale or distribution thereof.  Each Limited Partner further represents and warrants that the General Partner has made no guaranty or representation upon which such Partner has relied concerning the possibility or probability of profit or loss or the realization of any tax benefits as a result of the acquisition of such Interest.

14.2  Investment Restriction.  Each Limited Partner recognizes that the Interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), in reliance upon an exemption from such registration, and agrees that he or she will not sell, offer for sale, transfer, pledge or hypothecate his or her Interests in the absence of an effective registration statement covering such Interests under the Securities Act, unless such sale, offer of sale, transfer, pledge or hypothecation is exempt from registration and further recognizes that the restrictions on transfer may severely affect the liquidity of his or her investment.

14.3  Suitability of the Investment.  Each Class A Limited Partners represents and warrants that he or she:

(a)  has had an opportunity to ask questions of the General Partner and its Principals concerning the terms and circumstances of the offering;

(b)  has either

(i)  a net worth alone or together with his or her spouse of $1,000,000;

79093.14                              -48-

(ii)  an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or

(iii)  an executive officer or director of the General Partner; and

(c)  has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the prospective investment.

14.4  <u>Other Warranties and Representations of All Partners</u>.  All Partners represent and warrant that they are and will remain either individuals, trusts (other than tax-exempt trusts), S-corporations or partnerships having only individuals, trusts (other than tax-exempt trusts), S-corporations or partnerships as beneficiaries, shareholders or partners.

14.5  <u>No Prior Business of the Partnership</u>.  The General Partner represents and warrants that prior to the closing held as of the date hereof, the Partnership had no assets and no liabilities, and has conducted no business except with respect to the proposed business of the Partnership set forth in Section 1.3.

ARTICLE 15

GENERAL PROVISIONS

15.1  <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes any prior agreement or understanding among the parties hereto with respect to the subject matter hereof.

15.2  <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without giving effect to the provisions, policies or principles thereof relating to choice or conflict of laws.

15.3  <u>Binding Effect</u>.  Except as provided otherwise herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

15.4  <u>Separability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the

remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

15.5  Headings.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

15.6  Gender and Number.  Whenever required by the context hereof, the singular shall include the plural and the plural shall include the singular.  The gender of pronouns shall not be construed to restrict their applicability to persons of any gender.

15.7  No Third-Party Rights.  Nothing in this Agreement shall be deemed to create any right in any Person not a party hereto (other than the permitted successors and assigns of a party hereto) and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third party (except as aforesaid).

NOT A CERTIFIED COPY

15.8  Counterparts.  This Agreement may be executed in
two or more counterparts, each of which shall constitute an
original, but all of which, when taken together, shall constitute
but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed
this Agreement to be effective as of the day and year first above
written.

GENERAL PARTNER:                    CLASS A LIMITED PARTNER:

GARMONT CAPITAL INC.                CENTURION MANAGEMENT
                                    _____
                                    Print Name

By: _____        X _____
    Gary H. Felsher                   Sign Name
    President

CLASS B LIMITED PARTNERS:           With Respect to Sections
                                    6.3(a) and 9.1(b):


_____             _____
Gary H. Felsher                     Gary H. Felsher


_____             _____
W. Monsees Stubbs, Jr.              W. Monsees Stubbs, Jr.


_____
Michael Felsher

NOT A CERTIFIED COPY

-51-

15.8  Counterparts.  This Agreement may be executed in
two or more counterparts, each of which shall constitute an
original, but all of which, when taken together, shall constitute
but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed
this Agreement to be effective as of the day and year first above
written.

GENERAL PARTNER:                    CLASS A LIMITED PARTNER:

GARMONT CAPITAL INC.
                                    Mark L. Fine Trust
                                    Print Name

By: _____        _____
     Gary H. Felsher                Sign Name
     President                      Mark L. Fine, as Trustee

CLASS B LIMITED PARTNERS:           With Respect to Sections
                                    6.3(a) and 9.1(b):

_____            _____
Gary H. Felsher                     Gary H. Felsher

_____            _____
W. Monroes Stubbs, Jr.              W. Monroes Stubbs, Jr.

_____
Michael Felsher

NOT A CERTIFIED COPY

-51-

15.8  _Counterparts_.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the day and year first above written.

GENERAL PARTNER:                      CLASS A LIMITED PARTNER:

GARMONT CAPITAL INC.

                                      Steven J. Levinson
                                      Print Name

By: _____            _____
    Gary H. Felsher                   Sign Name
    President


CLASS B LIMITED PARTNERS:             With Respect to Sections
                                      6.3(a) and 9.1(b):


_____                _____
Gary H. Felsher                       Gary H. Felsher


_____                _____
W. Monsees Stubbs, Jr.                W. Monsees Stubbs, Jr.


_____
Michael Felsher

NOT A CERTIFIED COPY

79093.13                      -51-

15.8 <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the day and year first above written.

<u>GENERAL PARTNER</u>:

GARMONT CAPITAL INC.


By: _____
     Gary H. Felsher
     President.


<u>CLASS B LIMITED PARTNERS</u>:



_____
Gary H. Felsher


_____
W. Monsees Stubbs, Jr.


_____
Michael Felsher

<u>CLASS A LIMITED PARTNER</u>:

LAURA J. SLOATE
Print Name
_____
Sign Name


With Respect to Sections
6.3(a) and 9.1(b):


_____
Gary H. Felsher


_____
W. Monsees Stubbs, Jr.

NOT A CERTIFIED COPY

79093.13                    -51-

15.8  _Counterparts_.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the day and year first above written.

GENERAL PARTNER:                        CLASS A LIMITED PARTNER:

GARMONT CAPITAL INC.                    _Morris Wessman_
                                        Print Name

                                        _[signature]_
By: _____          Sign Name
    Gary H. Felsher
    President

CLASS B LIMITED PARTNERS:               With Respect to Sections
                                        6.3(a) and 9.1(b):


_____            _____
Gary H. Felsher                         Gary H. Felsher


_____            _____
W. Monsees Stubbs, Jr.                  W. Monsees Stubbs, Jr.


_____
Michael Felsher

NOT A CERTIFIED COPY

79093.13                              -51-

15.8  <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the day and year first above written.

<u>GENERAL PARTNER:</u>

GARMONT CAPITAL INC.


By: _____
        Gary H. Felsher
        President


<u>CLASS B LIMITED PARTNERS:</u>


_____
Gary H. Felsher


_____
W. Monsees Stubbs, Jr.


_____
Michael Felsher

<u>CLASS A LIMITED PARTNER:</u>

Neil J. Weismy
Print Name

_____
Sign Name

With Respect to Sections
6.3(a) and 9.1(b):


_____
Gary H. Felsher


_____
W. Monsees Stubbs, Jr.

NOT A CERTIFIED COPY

79093.13                    -51-

15.8  <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the day and year first above written.

<u>GENERAL PARTNER</u>:

GARMONT CAPITAL INC.


By: _____
    Gary H. Felsher
    President


<u>CLASS B LIMITED PARTNERS</u>:



_____
Gary H. Felsher


_____
W. Monsees Stubbs, Jr.


_____
Michael Felsher

<u>CLASS A LIMITED PARTNER</u>:

Gary S. Fragin
Print Name

_____
Sign Name


With Respect to Sections 6.3(a) and 9.1(b):


_____
Gary H. Felsher


_____
W. Monsees Stubbs, Jr.

NOT A CERTIFIED COPY

79093.13                            -51-

15.8 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the day and year first above written.

<u>GENERAL PARTNER</u>:                     <u>CLASS A LIMITED PARTNER</u>:

GARMONT CAPITAL INC.

                                       Eliezer Peleg
                                       Print Name

By: _____                 Sign Name _____
    Gary H. Felsher
    President

<u>CLASS B LIMITED PARTNERS</u>:          With Respect to Sections
                                       6.3(a) and 9.1(b):


_____                     _____
Gary H. Felsher                        Gary H. Felsher


_____                     _____
W. Monsees Stubbs, Jr.                 W. Monsees Stubbs, Jr.


_____
Michael Felsher

NOT A CERTIFIED COPY

77093.13                     -51-

15.8  Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the day and year first above written.

GENERAL PARTNER:                    CLASS A LIMITED PARTNER:

GARMONT CAPITAL INC. —
                                    Joel M. Pearlberg
                                    Print Name

By: _____            _____
    Gary H. Felsher                Sign Name
    President

CLASS B LIMITED PARTNERS:           With Respect to Sections
                                    6.3(a) and 9.1(b):


_____              _____
Gary H. Felsher                    Gary H. Felsher


_____              _____
W. Monsees Stubbs, Jr.             W. Monsees Stubbs, Jr.


_____
Michael Felsher

NOT A CERTIFIED COPY

79093.13                           -51-

15.8 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the day and year first above written.

GENERAL PARTNER:                    CLASS A LIMITED PARTNER:

GARMONT CAPITAL INC.               Worcester Partners, Ltd.
                                   as Agent for the Account of Denise Rich
                                   _____
                                   Print Name

By: _____       By: _____
       Gary H. Felsher                 Edward Kirtman, Attorney-In-Fact
       President

CLASS B LIMITED PARTNERS:           With Respect to Sections
                                    6.1(a) and 9.1(b):


_____            _____
Gary H. Felsher                     Gary H. Felsher


_____            _____
W. Monsees Stubbs, Jr.              W. Monsees Stubbs, Jr.


_____
Michael Felsher

79093.13                           -51-

15.8  <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the day and year first above written.

<u>GENERAL PARTNER:</u>

GARMONT CAPITAL INC.

By: _____
    Gary H. Felsher
    President

<u>CLASS B LIMITED PARTNERS:</u>

_____
Gary H. Felsher

_____
W. Monsees Stubbs, Jr.

_____
Michael Felsher

<u>CLASS A LIMITED PARTNER:</u>

Michael H. Steinhardt
Print Name
_____
Sign Name

With Respect to Sections
6.3(a) and 9.1(b):

_____
Gary H. Felsher

_____
W. Monsees Stubbs, Jr.

NOT A CERTIFIED COPY

79093.13                          -51-

15.8  <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the day and year first above written.

<u>GENERAL PARTNER</u>:

GARMONT CAPITAL INC.

By: _____
    Gary H. Felsher
    President

<u>CLASS B LIMITED PARTNERS</u>:

_____
Gary H. Felsher

_____
W. Monsees Stubbs, Jr.

_____
Michael Felsher

<u>CLASS A LIMITED PARTNER</u>:

_Shimon Topor_____
Print Name

_____
Sign Name

With Respect to Sections
6.3(a) and 9.1(b):

_____
Gary H. Felsher

_____
W. Monsees Stubbs, Jr.

NOT A CERTIFIED COPY

79093.13                      -51-

JAN 28 '93 15:25 BATTLE

P.2

15.8 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the day and year first above written.

<u>GENERAL PARTNER</u>:                    <u>CLASS A LIMITED PARTNER</u>:

GARMONT CAPITAL INC.

                                        _____
                                        Print Name

By: _____             _____
    Gary H. Felsher                     Sign Name
    President

<u>CLASS B LIMITED PARTNERS</u>:          With Respect to Sections
                                        6.3(a) and 9.1(b):

_____                 _____
Gary H. Felsher                         Gary H. Felsher

_____                 _____
W. Monsees Stubbs, Jr.                  W. Monsees Stubbs, Jr.

_____
Michael Felsher

-51-

NOT A CERTIFIED COPY

15.8  <u>Counterparts</u>.  This Agreement may be executed in
two or more counterparts, each of which shall constitute an
original, but all of which, when taken together, shall constitute
but one instrument.

IN WITNESS WHEREOF, the parties hereto have executed
this Agreement to be effective as of the day and year first above
written.

<u>GENERAL PARTNER</u>:                  <u>CLASS A LIMITED PARTNER</u>:

GARMONT CAPITAL INC.                   Gary H. Felsher
                                       Print Name

By: _____           _____
    Gary H. Felsher                    Sign Name
    President

<u>CLASS B LIMITED PARTNERS</u>:         With Respect to Sections
                                       6.3(a) and 9.1(b):

_____               _____
Gary H. Felsher                        Gary H. Felsher

_____               _____
W. Monsees Stubbs, Jr.                 W. Monsees Stubbs, Jr.

_____
Michael Felsher

79093.13                        -51-

Schedule A

Partner Name and Address

| | Capital Contribution |
|---|---|
| **General Partner** | |
| Garmont Capital Inc.<br>8 Channel Pond Court<br>Southampton, NY 11968 | $218,850 |

| **Class A Limited Partners** | Capital Contributions | Class A Percentage Interests |
|---|---|---|
| Gary H. Felsher<br>8 Channel Pond Court<br>Southampton, NY 11968 | $5,490,875 | %25.3420 |
| W. Monsees Stubbs, Jr.<br>1075 Park Avenue 7B<br>New York, New York 10128 | 450,575 | 2.0796 |
| Centurion Management | 4,000,000 | 18.4620 |
| Mark Fine Trust | 500,000 | 2.3077 |
| Steven Levinson | 750,000 | 3.4616 |
| Laura Sloate | 750,000 | 3.4616 |
| Morris Weissman | 500,000 | 2.3077 |
| Neil Weisman | 1,000,000 | 4.6155 |
| Gary S. Fragin<br>118 Osborn Road<br>Harrison, NY 10528 | 1,000,000 | 4.6155 |
| Eliezer Peleg<br>45 West 67th Street 19B<br>New York, NY 10023 | 500,000 | 2.3077 |
| Joel Pearlberg<br>17 Hearthstone Terrace<br>Livingston, NJ 07039 | 25,000 | .1154 |
| Denise Rich<br>c/o Steinberg Partners L.P.<br>605 Third Avenue<br>New York, NY 10158 | 2,500,000 | 11.5387 |

96137.2

NOT A CERTIFIED COPY

| | | |
|---|---:|---:|
| Michael Steinhardt<br>1158 Fifth Avenue 16A<br>New York, NY 10029 | 3,000,000 | 13.8465 |
| Shimon Topor<br>303 East 83rd Street 14B<br>New York, NY 10028 | 500,000 | 2.3077 |
| Gap Loan | 700,000 | 3.2308 |
| Class A Total | $21,666,150 | $100.0000 |
| Total Contributions | $21,885,000 | |

<table>
<tr><td></td><td>Class B<br>Percentage<br>Interests</td></tr>
<tr><td><u>Class B Limited Partners</u></td><td></td></tr>
<tr><td>Gary H. Felsher<br>645 Fifth Avenue<br>New York, New York 10022</td><td>30%</td></tr>
<tr><td>W. Monsees Stubbs Jr.<br>645 Fifth Avenue<br>New York, New York 10022</td><td>50%</td></tr>
<tr><td>Michael Felsher<br>645 Fifth Avenue<br>New York, New York 10022</td><td>20%</td></tr>
</table>

NOT A CERTIFIED COPY

96157.2

FGHP Capital Limited Partnership
Schedule B
Investment Properties

| Asset | NationsBank AFS $ | NationsBank Note # | Amount |
|---|---|---|---|
| Breakers Inc./Breakers North | 660589 | 299 | $190,926 |
| Breakers North | 30285 | 26 | 5,598,288 |
| Breakers, Inc. | 30871 | 117 | 491,199 |
| Breakers, Inc. | 30871 | 59 | 8,710,481 |
| Henricus Associates office loan | 253236 | 34 | 2,337,438 |
| Henricus Associates land loan | 253236 | 42 | 101,628 |
| Casselberry Collections | 2404478 | 26 | 3,739,621 |
| Jeff & Elaine Berkowitz boat loan | 2128119 | 18 | 190,510 |
| Jeff & Elaine Berkowitz house loan | 2128119 | 26 | 706,001 |
| Kendall 117 Shopping Center | 2265952 | 26 | 2,470,708 |
| Kissimmee Shopping Ctr. | 2211626 | 18 | 3,068,977 |
| Koger Properties | 2271174 | 299 | 1,633,571 |
| Mark W. Maconi | 2296353 | 273 | 2,319,480 |
| Bloody Point Group LP | 136017 | 34 | 324,363 |
| Bloody Point Group LP | 136017 | 59 | 43,361 |
| HHP Limited Partnership | 359429 | 50096 | 1,017,954 |
| HHP Limited Partnership | 359429 | 50104 | 1,445,087 |
| HHP Utilities, Inc. | 104700 | 18 | 919,338 |
| Hilton Head Plantation Co | 932084 | 42 | 25,922 |
| Melrose Co. | 18546 | 45013 | 10,084 |
| Melrose Co. | 439734 | 45062 | 5,042 |
| Melrose Co. | 998820 | 75 | 5,042 |
| Melrose Group LP | 440138 | 51177 | 356,833 |
| Melrose Group LP | 440138 | 51201 | 10,084 |
| Money Mungen Partnership | 1169207 | 265 | 354,347 |
| Robert Kolb boat loan | 45382 | 34 | 10,084 |
| Lexington industrial park | | | 769,348 |
| Tri-Plex industrial park | | | 2,724,394 |
| Northport industrial park | | | 2,302,459 |
| Turtle Creek land | | | 25,000 |
| Buschwood land | | | 25,000 |
| Gunn land | | | 25,000 |
| Northport Phase III land | | | 25,000 |
| | | | $41,982,570 |

NOT A CERTIFIED COPY

<u>Schedule B</u>

INVESTMENT PROPERTIES


[To Be Completed]

NOT A CERTIFIED COPY

94137.2

Schedule C

PARTNER DUE DILIGENCE EXPENSES

[To be Completed]

NOT A CERTIFIED COPY

96137.2