# EXHIBIT
# 2

W. Monsees Stubbs
September 17, 2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 25-CV-800071-REINHART

GARY FELSHER,

        Plaintiff,

-vs-

W. MONSEES STUBBS, JR.,

        Defendant.
_____/

TAKEN PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE,
THE DEPOSITION OF

W. MONSEES STUBBS, JR.

VOLUME 1
Pages 1 Through 222

Wednesday, September 17, 2025
10:02 a.m. - 4:59 p.m.

LOCATION:  JONES FOSTER, P.A.
505 South Flagler Drive
Suite 1100
West Palm Beach, Florida 33401

Stenographically Reported By:
Barbara L. Kent, RMR, RPR, FPR, CSR-MI

Job No.:  421283

W. Monsees Stubbs
September 17, 2025

Page 2

APPEARANCES:

On Behalf of the Plaintiff:
     GREENBERG TRAURIG, P.A.
     777 South Flagler Drive
     Suite 300 East
     West Palm Beach, Florida 33401
     (561) 650-7900
     BY:  MARK F. BIDEAU, ESQUIRE
          COREY A. GROSS, ESQUIRE
     bideaum@gtlaw.com
     corey.gross@gtlaw.com


On Behalf of the Defendant:
     JONES FOSTER, P.A.
     505 South Flagler Drive
     Suite 1100
     West Palm Beach, Florida 33401
     (561) 659-3000
     BY:  SPENCER KEYSER, ESQUIRE
          SCOTT G. HAWKINS, ESQUIRE
     skeyser@jonesfoster.com
     Shawkins@jonesfoster.com



VIDEOGRAPHER:  Brian Rosenthal



ALSO PRESENT:

     Gary Felsher, Plaintiff

W. Monsees Stubbs
September 17, 2025

Page 3

INDEX OF PROCEEDINGS

WITNESS                                                      PAGE

W. MONSEES STUBBS, JR.

Direct Examination by Mr. Bideau                               6

CERTIFICATE OF OATH                                         219

CERTIFICATE OF REPORTER                                     220

NOTIFICATION LETTER                                         221

ERRATA SHEET                                                222

PLAINTIFF EXHIBITS

EXHIBIT                  DESCRIPTION                        PAGE

    1    DOCUMENT:  Defendant's Second Answers               64
         To Interrogatories

    2    DOCUMENT:  Assignment of LLC membership             83
                    Interest & Assumption agreement

    3    PHOTOGRAPH:  Zeus website screenshot                82

    4    PHOTOGRAPH:  Zeus website screenshot                82

    5    PHOTOGRAPH:  Zeus website screenshot                82

    6    DOCUMENT:  Monsees initial disclosure               90

    7    DOCUMENT:  Agreement Felsher 000481                127

    8    DOCUMENT:  Email 8/16/10, Felsher 180467,          152
                    180468, Pembroke Capital Expenses

    9    DOCUMENT:  S2 Corona, LLC, Felsher 180841          158
                    180840, memo 5.26/10

W. Monsees Stubbs
September 17, 2025

Page 4

PLAINTIFF EXHIBITS Continued

EXHIBIT                    DESCRIPTION                          PAGE

10   DOCUMENT:  FGHP Capital, Felsher 00487        161
                000555-000559

11   DOCUMENT:  Email, 10/19/20, Felsher 086600    185
                086601, Zeus Pledgor Member Equity

12   DOCUMENT:  Email, 7/3/21, Felsher   000622     187

13   DOCUMENT:  Monte Distribution, Felsher         190

14   DOCUMENT:  Pembroke Capital, 7/18/09           197
                Felsher 835378

15   DOCUMENT:  Email, 9/15/11, Felsher 192844      198

16   DOCUMENT:  Letter, 6/8/24, Felsher 000617-18 203

17   DOCUMENT:  Email, 12/1/17, Felsher 018857-58 205

18   DOCUMENT:  Email, 11/10/18, Felsher 002577     207

19   DOCUMENT:  Answers and affirmative defenses    210

W. Monsees Stubbs
September 17, 2025

Page 5

Thereupon,

the following proceedings began at 10:02 a.m.:

THE VIDEOGRAPHER:  Good morning.  We are now going on the record and the time is 10:02 a.m.

This is the video recorded deposition of W. Monsees Stubbs, Jr., taken in the matter of Gary Felsher versus W. Monsees Stubbs, Jr.

This deposition is being taken at 505 South Flagler Drive, Suite 1100, West Palm Beach, 33401 on September 18th, 2025.

My name is Brian Rosenthal, I am the videographer.  The court reporter is Barbara Kent, both in association with Lexitas.

Would Counsel please announce their appearances for the record, after which the court reporter will please swear in the witness.

MR. BIDEAU:  Mark Bideau and Corey Gross from Greenberg Traurig on behalf of Mr. Felsher, and Mr. Felsher is also with us today.

MR. KEYSER:  And Spencer Keyser and Scott Hawkins with Jones Foster on behalf of Mr. Stubbs.

THE STENOGRAPHER:  Would you raise your right hand, please.

Do you solemnly swear or affirm that the testimony which you shall give in this cause will

W. Monsees Stubbs
September 17, 2025

Page 6

be the truth, the whole truth and nothing but the truth?

THE WITNESS:  Yes.

Thereupon,

W. MONSEES STUBBS, JR.,

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BIDEAU:

Q.    Good morning, Mr. Stubbs.

A.    Good morning.

Q.    We haven't meet before, have we?

A.    Not to my knowledge.

Q.    Well, my name is Mark Bideau and my colleague, Corey Gross, we represent Gary Felsher, the plaintiff in this lawsuit.

Have you had your deposition taken before?

A.    Yes.

Q.    Okay.  So then you know sort of what the ground rules are, but let me repeat them just to make sure we're on the same page.

A.    That would be prudent.

Q.    Okay.  Well, the first thing is, so we can get a good record here, I would ask that you let me finish my question.  I will try then to let you finish

W. Monsees Stubbs
September 17, 2025

Page 7

your answer so that we don't talk over each other because our court reporter can't get down conversations when we're talking over each other, okay?

A.    (Nodding.)

Yes.

Q.    Second thing is, although we're on a video record, nods of the head don't show up on the record and the official record is what the court reporter takes down.  So I would ask that you verbalize all of your answers.  I know in normal conversation, we shake our heads, we talk over each other, but none of that works well with the deposition record.

So again, if you just answer the question verbally, that would be great.

A.    I will do my best.

Q.    Terrific.

You know you're under oath today just like you would be in a courtroom, correct?

A.    Yes.

Q.    If you don't -- I'm going to try to make my questions clear, but if you don't understand one of my questions, if you don't hear my question, please let me know and I will do everything I can to try to make the question clear for you, okay?

A.    Okay.

W. Monsees Stubbs
September 17, 2025

Page 8

Q.   If you answer, I'm going to assume that you understood it, so just let me know if you don't understand my question, all right?

A.   Will do.

Q.   If at any time today you want to take a break, please let me know and I will be happy to accommodate you.  I would just ask that you answer the pending question and then we can take a break, okay?

A.   Okay.

Q.   Are you on any medications or taking any drugs that could affect your ability to remember or testify truthfully today?

A.   Not to my knowledge.

Q.   Anything going on in your life that would impact your mental capabilities for answering in --

A.   No.

Q.   -- today's deposition?

A.   No.

Q.   Okay.  Can you state your full name for the record.

A.   Wilmer Monsees Stubbs, Jr.

Q.   And, Mr. Stubbs, what is your home address?

A.   3 Orchard Drive, Rye, New York, 10580.

Q.   And what is your date of birth?

A.   11/16/1951.

W. Monsees Stubbs
September 17, 2025

Page 9

Q. And for how long have you lived at the Rye address?

A. Three years, approximately.

Q. Where did you live before that?

A. 195 Milton Road in Rye.

Q. And how long did you live there?

A. Decades.

Q. Are you married?

A. Yes.

Q. And children?

A. Yes.

Q. How many?

A. Three.

Q. Grandchildren?

A. Yes.

Q. How many?

A. One.

Q. You said that you had your deposition taken before.

In what type of -- in what capacity have you had your deposition taken?

A. I don't recall. It's been several occasions.

Q. Okay. How many times have you had your deposition taken?

W. Monsees Stubbs
September 17, 2025

Page 10

A.    Oh, a small handful.

Q.    Well, is a small handful two, three, four?

A.    I don't recall.

Q.    Do you recall if it's more than five times?

A.    I would say five plus or minus is a good guess.

Q.    Okay.  Can you recall any of the circumstances in which you were deposed?

A.    No.

Q.    You can't recall any of them?

A.    Well, I haven't really thought about that and, no, not at the top of my head.

Q.    Okay.  How long ago was your last deposition?

A.    Many years.  A number of years.  I don't know.

Q.    Again, when you say many years, can we get any more specific?

A.    I have no recollection of them.

Q.    You have no recollection of any of the depositions you've taken?

A.    Not off of the top of my head.  I mean, yeah, I do not.

Q.    Okay.  One of the things we're doing is we're talking over each other a little bit.

W. Monsees Stubbs
September 17, 2025

Page 11

A.    Okay.

Q.    So some of it's my fault, so let's just try to --

A.    I mean, if you want, I can start trying to think back in -- you know, I'm -- I'm not sure that it's a good use of our time, but I've had several depositions, several depositions in the past.  None of which are recent or particularly germane and I don't recall the specifics of any of them.

Q.    Okay.  Do you -- have you been a party in litigation before?

A.    Yes.

Q.    Okay.  Can you tell me how often you've been a party in litigation?

A.    I have been involved in the purchase of workouts of nonperforming loans over an extended period of time.  And litigation is a, you know, a significant portion of -- a part of that business, and so I have been involved.

You know, I've prosecuted a lot of foreclosures and evictions and that's just part of the job.

Q.    Now, when you say you've prosecuted a lot of foreclosures and evictions, are you talking about assets that you or some entity in which you owned or had

W. Monsees Stubbs
September 17, 2025

Page 12

an interest was involved?

A.   Yes.

Q.   Okay.  Have you ever personally -- you personally been a party to a lawsuit?

A.   Yes.

Q.   Okay.  And for how many lawsuits have you personally been a party?

A.   I -- I -- I don't know off the top of my head.

Q.   And can you recall any of the lawsuits for which you personally were a party?

A.   No.

Q.   All right.  Are there any lawsuits currently going on in which you are personally a party?

A.   No.

Q.   When was the last time you were in a lawsuit that you were personally a party?

A.   I don't recall.

Q.   More than five years?

A.   Probably.

Q.   Ever been convicted of a crime?

A.   Yes.

Q.   And what crime?

A.   I -- failure to have a dog license.

Q.   Okay.  Have you ever been convicted of a

W. Monsees Stubbs
September 17, 2025

Page 13

felony?

A.    No.

Q.    Have you ever been convicted of any crime other than failure to have a dog license?

A.    No.

MR. HAWKINS:  That's a new one to me.

MR. BIDEAU:  It was a new one for me as well.

THE WITNESS:  I was taken to jail barefoot.

(Discussion held off the record.)

BY MR. BIDEAU:

Q.    Okay.  Outside of your conviction for failure to have -- or outside of your conviction for failure to have a dog license -- well, wait, is that a felony in --

A.    That's not a felony, no.

Q.    And you've not been a party to any other criminal proceeding?

A.    No, not to my knowledge.  No.

Q.    When did you -- what did you do to prepare for today's deposition?

A.    Well, we just had a brief meeting to go over the particulars.  You know, do's and don'ts.

Q.    Did you review any documents?

A.    No.

W. Monsees Stubbs
September 17, 2025

Page 14

Q.    When you say "we," you speak with your counsel?

A.    Yes.

Q.    Did you speak to anyone else to prepare for your deposition today?

Again, let me --

MR. KEYSER:  Just one thing we have to do is, I know where you know his question is going, just make sure he finishes it before you answer.

THE WITNESS:  Okay.

MR. KEYSER:  Because she's typing everything down.

BY MR. BIDEAU:

Q.    And again, the recording will be just fine, but the official record, she's going to have a really bad day if we keep talking over each other.

A.    Okay.  My apologies.

Q.    Other than speaking with your counsel, did you do anything else to prepare for today's deposition?

A.    No.

Q.    Did you review any documents to prepare for today's deposition?

A.    No.

Q.    When is the last time you talked to any limited partner of FGHP?

W. Monsees Stubbs
September 17, 2025

Page 15

And when I use the term FGHP, I'm referring to FGHP Limited Partnership.

A.   Oh, within the last two weeks.

Q.   Okay.  And which partner of FGHP did you speak to within the last two weeks?

A.   My sister.

Q.   And did you speak to your sister about any of the business of FGHP?

A.   No.

Q.   Have you spoken to any other partner of FGHP?

A.   Yes.

Q.   Who?

A.   Steve Swire.  S-W-I-R-E.

Q.   And when did you speak to Mr. Swire?

A.   It's probably been a good month.

Q.   Did you speak to him in person or on the telephone?

A.   Telephone.

Q.   What did you speak to him about?

A.   Taxes.

Q.   What do you mean?

A.   Well, just the -- the -- the tax reporting for FGHP.

Q.   And why did you call Mr. Swire to talk

W. Monsees Stubbs
September 17, 2025

Page 16

about the tax reporting for FGHP?

A.   I don't recall.  I mean, that's -- it's -- you know, I don't -- I don't recall.

Q.   Is Mr. Swire your tax accountant or tax advisor?

A.   No, no.  He's a business school classmate and a friend that made an investment in this, you know, eons ago.  And, you know, I called him to just -- well, we talk on a regular basis.

Q.   And how large was Mr. Swire's investment?

A.   I don't recall.

Q.   Was it -- do you have any sense of magnitude?

A.   No, it was a small investment.  This was many years ago.

No, I don't know the specific number.  Not meaningful in the grander scheme of things.

Q.   Other than Mr. Swire, have you talked to any other investor or limited partner in FGHP?

A.   No.

Q.   When you spoke to Mr. Swire, did you speak to him about this litigation with Mr. Felsher?

A.   I do not believe so.  Mr. Felsher had made a proposal to acquire his interest and we spoke about that, and I said that, you know, I thought it was worth

W. Monsees Stubbs
September 17, 2025

Page 17

more than he was being offered and he chose not to take advantage of the offer.

Q.   So Mr. Swire chose not to take advantage of Mr. Felsher's offer?

A.   Yes.

Q.   So did you talk to -- so was the purpose of you talking to Mr. Swire -- strike that.

Did you have more than one conversation with Mr. Swire about FGHP?

A.   I don't believe so.

Q.   Okay.  So in the -- what was -- who called who?

A.   I don't recall.

Q.   And when was it?

A.   This would have been within the last six months.

Q.   And you don't recall who called who?

A.   I believe I called him.

Q.   And what was -- your purpose of your calling him, I thought, we discussed, was to get information about taxes, tax reporting for FGHP?

A.   No.  He -- he received an offer to acquire his interest in FGHP.  He contacted -- reached out to me, email or whatever, I responded to him.

Q.   Okay.  I perhaps misunderstood you earlier.

W. Monsees Stubbs
September 17, 2025

Page 18

So the way in which this communication with Mr. Swire started, was that he reached out to you regarding an offer he'd received?

A.   Yes.

Q.   Okay.  And do you recall whether he reached out to you orally or in writing?

A.   Oh, it would have been orally.

Q.   Okay.  Well, you said before it might have been an email.

A.   It could have been.  I mean, we -- we've known each other for many decades and -- and, you know, correspond from time to time by telephone, by emails, Pony Express, whatever.

Q.   Okay.  Well, I assume you're being facetious on Pony Express.  But in this particular case, the only reason I asked if it was oral or in writing is you said perhaps an email.  So do you have a recollection as to whether it was an email between you and Mr. Felsher?

A.   I have no recollection on that specificity, no.

Q.   Okay.  So sometime within the last month, you spoke to Mr. Swire.  You don't remember whether it was initiated by an email or by a phone call?

A.   I do not recall.

W. Monsees Stubbs
September 17, 2025

Page 19

Q.    Anybody else present on that conversation?

A.    No.

Q.    What -- tell me the best you can recall what Mr. Swire said to you and what you said to him.

A.    He wanted my -- he wanted to know whether I thought that he should sell his interest or not.  And I responded that, you know, I thought that it was -- you know, that it was worth more than that.

Q.    Did you -- did you explain to him why you thought it was more?

A.    No.

Q.    Did you tell him what you thought it was worth?

A.    No.

Q.    Why not?

A.    I didn't take the time to do the math.  It was quite -- it was, you know, pretty obvious to me that -- that it was not.

I mean, this is something that happens on a -- has been happening on a regular basis, and -- and, you know, he -- well, I mean, you know, he just asked me what my opinion of it was, and I told him what my opinion was, and he made his own decision as to whether or not he wanted to -- to take it or not.

Q.    So the best of your recollection is that

W. Monsees Stubbs
September 17, 2025

Page 20

all you told him was you thought it was worth more but you didn't tell him any -- any numbers, any other information?

A.   No.  No, I didn't.  No, it -- it's -- it was a small -- it's a small sum and, you know, not -- and neither he nor I, you know, really tried to go through the math, nor did we really have sufficient, you know, detailed information to come up with a good approximation of the value.

But -- but the offer on its face seemed to be, you know, well below what it -- what I thought it could -- could be attained in an open market.  And so it was better off to hold it than to sell it.

Q.   And did you communicate all of that information to Mr. Swire?

A.   Yes.

Q.   I'm trying to understand what the conversation was.

A.   Well, it was -- you know, in a nutshell, it was just say, I got this -- I got this letter, you know -- you know, should I take the offer or not.  And I said, no, I thought it was -- you know, it's worth more than that.

Q.   And -- but you didn't give him any information as to what it -- what you thought it was

W. Monsees Stubbs
September 17, 2025

Page 21

worth --

A. No.

Q. -- or how much you thought it was worth?

A. No.

Q. You didn't do any calculations?

A. No.

Q. The only thing you said was, "I think it's worth more"?

A. Yes.

Q. And how long did the conversation with Mr. Swire last?

A. A couple minutes.

Q. Okay. Now, did you also have a discussion with him about the -- about some tax issue? Because we started this conversation by you saying you contacted him about a tax issue, tax reporting for FGHP, and then we got off into, well, it was really a conversation about the offer.

So did you have a conversation with him about tax reporting or was it another topic?

A. I don't recall.

Q. Do you recall at all whether it was a discussion about tax reporting or why did you -- why did you mention to me when you started out that it was a call about tax reporting?

W. Monsees Stubbs
September 17, 2025

Page 22

A.    I would say it's probably a mistake, because the specific call with respect to the offer to purchase the shares would have been independent of the -- the tax issues, any tax issues.

Q.    Okay.  So -- so your recollection now is that you didn't discuss the tax issue with Mr. Swire, it was really him calling you about the purchase offer?

A.    Yes.

Q.    Okay.  When you spoke to your sister, did you talk to your sister at all about any offers she might have received?

A.    I assume so.  I don't recall.

Q.    So you don't recall whether you -- have you ever spoken to your sister about any offers she's received to buy her interest --

A.    Yes, I'm sure I must have.

Q.    Please let me finish my question.

A.    Yes.

Q.    Again, I know it's a natural thing --

A.    Yes.

Q.    -- in conversation, but have you ever spoken to your sister about an offer to purchase her interest in FGHP?

A.    I have no specific recollection but I'm certain that I would but -- that over the extended period

W. Monsees Stubbs
September 17, 2025

Page 23

of time that she's had an investment in that, that there have been conversations about it.  But, you know, that goes back decades and, you know, I have -- I don't recall them.

Q.    And you're not at all involved with FGHP at this point, correct?  You have an investment but you're not otherwise involved?

A.    I have an investment there and I have been glad to participate there to the extent that I can.

There have been a number of opportunities that have come along in the past few years, particularly for a site that we have on Gunn Highway, where there's a vacancy, CVS, which has attracted some attention, which I've passed along to Gary who has either ignored or declined to pursue that.

Yeah.  It's a -- it is a well-located site that we have enjoyed the benefit of getting the income from yet as they moved across the street and continued to pay rent under their -- under their lease obligation. But it has a potential -- a potential higher and better use.

Q.    So the only involvement you've had in recent years with FGHP is in connection with the potential offers for the CVS site?

A.    Well, that's -- that's --

W. Monsees Stubbs
September 17, 2025

Page 24

MR. KEYSER:  Form.  Object.  I'm just going to object to the form.

You can answer.

THE WITNESS:  Okay.  Well --

BY MR. BIDEAU:

Q.  Okay.  When I talked about your involvement with FGHP, we'll do that in much more detail later on. It's outside of your, you know, Class A investment, but let me back up.

You do have a Class A investment in this --

A.  Yes.

Q.  -- FGHP.  You do have a Class A investment in FGHP, right?

A.  Yes.

Q.  Okay.  And what is that -- what percentage interest do you hold in FGHP on a Class A basis?

A.  I'm not sure what the Class A and Class B, which is which.

Q.  Other than Mr. Swire and potentially your sister, in the last year have you spoken to any other partners or investors in FGHP?

A.  Yes.

Q.  Who?

A.  I don't recall his name.  It's another -- a

W. Monsees Stubbs
September 17, 2025

Page 25

family friend that made an investment that took Gary's

offer when it -- when it was made to sell his shares.

Q. What was the name of the person?

A. I don't recall.

Q. So it was a family friend who took the offer but you don't recall the name?

A. That's correct.

Q. Not too close a friend, perhaps?

A. What?

Q. Not too close a friend.

A. It's on my wife's side.

Q. Okay. And when was that conversation?

A. Within the last year.

Q. You don't remember the name of the investor?

A. No.

Q. And did you discuss with that investor whether or not to take the offer?

A. No.

Q. What -- how did the call come up? Did you call that person or did they call you?

A. No. I -- I -- I saw that he made the decision independent, and I hadn't spoken to him in quite some time. Like I say, it was a -- you know, he was a friend of my wife's, and, you know, just to say, you

W. Monsees Stubbs
September 17, 2025

Page 26

know, a surprise.  I thought he might have reached out, but he made his own decision and hit the bid and -- and, you know, so we caught up and that was it.

Q.    In the last year, have you spoken to any other investor or partner in FGHP?

A.    Not to my knowledge, no.

Q.    Have you spoken to Michael Felsher in the last year?

A.    No.

Q.    When's the last time you spoke to Michael?

A.    Wow.  I -- it's been decades.  I don't -- I don't recall, but it's been an extended period of time.

Q.    Other than your counsel, have you spoken to anyone else about this deposition?

A.    My business partner and I think that would be it.

Q.    And who is your business partner?

A.    Diana Benincasa.

Q.    Who?

A.    Diana Benincasa.

Q.    Can you spell the last name, please.

A.    B-E-N-I-N-C-A-S-A.

Q.    And she is your business partner in what business?

A.    She is my partner associate that we invest

W. Monsees Stubbs
September 17, 2025

Page 27

in real estate.

Well, now primarily in the New York metropolitan area.

Q.    And do you and Ms. Benincasa invest through a company, a name, a partnership, something?

A.    We have -- the entities are, you know, new names for -- for each endeavor.

Q.    And is there one umbrella organization that you and Ms. Benincasa invest through?

A.    No.

Q.    So each time that a property comes available that you may want to invest in, you form a new entity?

A.    Yes.  We form a -- a specific entity.  Each one is tied to its own bottom.

Q.    And do the entities share any common names?

A.    No.  They're usually names that are specific to, you know, to the -- the -- generally, the location of the -- of the property.

Q.    And do you know what is Ms. Benincasa's contact information?  Do you know her home address?

A.    No.  I don't know it off the top of my head.

Q.    How long have you been partners?

A.    Half a dozen years.

W. Monsees Stubbs
September 17, 2025

Page 28

Q.    But you don't know her home address?

A.    No.

Q.    What's her phone number?

A.    My phone number?

Q.    Her phone number.

A.    I don't recall.

Q.    What's her email address?

A.    I believe it would be dbenincasa@zeusrealty.us.

Q.    Is that how you contact her?

A.    I usually contact her by telephone.

Q.    But you don't remember her phone number?

A.    Not off the top of my head, no.

Q.    And when you say Zeus Realty, is that a -- is that a -- I know that's part of an email address.

Is that also a name of a company?

A.    Yes.

Q.    Okay.  And can you describe -- what is your interest?  Do you have an interest in Zeus Realty?

A.    Yes.

Q.    What's your interest?

A.    I believe at this point, it would be a hundred percent.

Q.    By the way, who are you employed -- going back a little bit in your background.  Who are you

W. Monsees Stubbs
September 17, 2025

Page 29

employed by today?

A. I've been self-employed for decades.

Q. Okay. So you -- you own 100 percent of Zeus Realty. What kind of -- what kind of business is Zeus Realty?

A. It's really the administrative arm that, you know, that pays the rent and, you know, it handles all of the back office accounting, et cetera.

Each investment is a -- each tub, on it's own bottom is a -- it would be a special purpose LLC forum for whatever that endeavor is.

Q. Okay. So the way in which -- well, let me -- are you employed by or do you work for any --

(Brief pause.)

BY MR. BIDEAU:

Q. Are you employed by -- or do you work for any other entity other than Zeus Realty?

A. No.

Q. And when did you form Zeus Realty?

A. I don't recall. Ten years -- it's -- it's over decades.

Q. What is your educational background?

A. Public high school, University of Virginia undergraduate. Harvard graduate. MBA.

Q. What was your -- what was your

W. Monsees Stubbs
September 17, 2025

Page 30

undergraduate degree in?

A.    Economics and psychology.

Q.    And when did -- when did you get your MBA from Harvard?

A.    1981.

Q.    Was there a break between your time in college and the time you got your MBA?

A.    I'm sorry, what?

Q.    Was there a break between your time in college --

A.    Yes.

Q.    -- and the time you got your MBA?

A.    Yes.  I got out of college in 1974, I guess, and I got my MBA in 1981.

Q.    In 1992, at the time that FGHP Capital was formed, by whom were you employed?

A.    Repeat the question.

Q.    Sure.  In 1992, the year that FGHP Capital and the partnership was formed, by whom were you employed?

A.    I was self-employed.

Q.    And what were you self-employed doing?

A.    I was primarily buying nonperforming loans and -- and in OREO, and working out those assets.

Q.    Were you working for a particular company?

W. Monsees Stubbs
September 17, 2025

Page 31

A.    Self-employed.

Q.    Well, did you have a name?

A.    I would -- I would assume Zeus Realty.

Q.    Okay.  So Zeus Realty existed back in 1992?

A.    To the best of my knowledge.

Q.    Have you ever worked under any other business umbrella than Zeus Realty since 1992?

A.    I don't recall.

Q.    Well, have you ever worked for any other company other than Zeus?  Since 1992, have you ever been employed by any --

A.    No.

Q.    -- company other than --

A.    No.

Q.    -- Zeus Realty?

A.    No.

Q.    Okay.

A.    I've been self-employed during that entire time.

Q.    And again, let me try to get my questions out, okay?

A.    Okay.

Q.    But thank you.

      And when you say you've been self-employed, do you receive W-2 income?

W. Monsees Stubbs
September 17, 2025

Page 32

A.    I've not received W-2 income for eons.

Q.    **So are you employed by Zeus Realty?**

A.    I'm not an employee.

I do not take -- get W-2 compensation. There is no salary.  It's an administrative arm.  It receives revenues from some of the -- you know, some of the entities its providing services to.  And to the extent that there's a -- that there's profits, then it would enure to me as the -- as the owner.

More often than not, it's just really -- you know, it's the admin that pays the bills and its more likely than not, operates at a -- at a nominal loss during the year to year.

Q.    **So as I understand it, Zeus Realty is -- is an administrative entity that's set up and then that provides kind of office and support services --**

A.    Yes.

Q.    **-- right?**

A.    Correct.

Q.    **For investments that you might make in other kinds of -- in properties?**

A.    Yes.

Q.    **And for each of those investments, you have a special purpose entity?**

A.    Yes.

W. Monsees Stubbs
September 17, 2025

Page 33

Q.   And you own 100 percent of Zeus Realty?

A.   Yes.

Q.   And have you always owned 100 percent of Zeus Realty?

A.   I believe so.

Q.   Does Zeus Realty have any other partners or employees other than you?

A.   Well, Diana Benincasa and there have been other employees over time, but currently.

Q.   So Ms. Benincasa is actually an employee of Zeus Realty?

A.   Yes.

Q.   And what does she do for Zeus Realty?

A.   She makes it work.

Q.   And what does that mean?

A.   Well, I mean, she's the -- she handles all of the day-to-day things that are required to keep track of and manage the assets that we're involved with.

Q.   And does Zeus Realty have any employees other than Ms. Benincasa?

A.   No.

Q.   You said in the past it has had other employees.

A.   Yes.

Q.   When did it last have an -- employees other

W. Monsees Stubbs
September 17, 2025

Page 34

than Ms. Benincasa?

A.    Within the last five years.

Q.    And where are the offices of Zeus Realty?

A.    Rye, New York.

Q.    Do you hold any professional licenses?

A.    No.

Q.    Have you ever?

A.    No.  Well, I guess I -- at a distant point in time, I -- I had a real estate license but that's been decades ago since I've applied.

Q.    When you say had a real estate license decades ago, what are we talking about, a real estate broker --

A.    Yes.

Q.    -- type license?

A.    Yes.

Q.    And when was that?

A.    Oh, that's probably 25 years ago.

Q.    And who -- who held your license?  Who was your broker or were you the broker?

A.    I was the broker.

Q.    For a particular company?

A.    I don't even recall the name.  I mean, it was -- it was something that I -- I entered into at a point in time.  It really had no particular utility and

W. Monsees Stubbs
September 17, 2025

Page 35

it lapsed and it's been gone for decades.

Q.    And was this like a residential real estate broker license?

A.    Well, I don't know that's there's a difference between residential and commercial but there would have -- if there is, then it would have been commercial, because the preponderance of the -- my real estate endeavors have been commercial, not single family.

Q.    And did you hold that license in the state of New York?

A.    What?

Q.    Did you hold the license in the state of New York?

A.    Yes.

Q.    When did you -- strike that.

I think you told me you -- that to the best of your recollection, you've always owned 100 percent of your recollection, correct?

A.    Yes.

Q.    When did you begin -- strike that.

You said 1992, you were involved with buying OREO properties and/or workout properties.  When did you first become involved in the real estate business in any aspect?

A.    I would say in any -- I would say that the

W. Monsees Stubbs
September 17, 2025

Page 36

most meaningful start day would be after I got my MBA. And, you know -- and at that point in time, I went into the -- into the real estate business.

Q.   And you got your MBA, if I recall correctly, about 1981?

A.   Yes.

Q.   When you say you went into the real estate business, did you -- were you self-employed or did you go into the business with somebody else in 1981?

A.   No, no.  I went into the business with -- with a firm.

Q.   What firm?

A.   I don't recall.

Q.   You don't recall the name of your employer when you got out of business school?

A.   Blyth Eastman.

Paine Webber.

Blyth, B-L-Y-T-H.  Eastman, E-A-S-T-M-A-N. Paine Webber.

Q.   And were you employed by Paine Webber?

A.   Yes.

Q.   So after business school, you were not self-employed your entire time, you worked for a company before?

A.   That's correct.

W. Monsees Stubbs
September 17, 2025

Page 37

Q.   Okay.  How long were you employed by Paine Webber?

A.   Five years, I believe.

Q.   And what did you do for Paine Webber?

A.   Well, I represented our corporate clients in real estate endeavors.

Q.   And what does that mean?

A.   We bought, sold property for them.  We created funds where we invested the company's money in real estate properties.

Q.   So you were a broker?

A.   You could use that term.

Q.   Okay.  So you were a real estate broker for Paine Webber when you got out of --

A.   But they --

Q.   -- business school?

A.   -- they -- they -- that was certainly a portion of the business endeavors, but the -- the primary activity became the -- forming a fund where we solicited investments from the Paine Webber clients and managed those and put those funds into real estate investments of different sorts and managed that toward the benefit of the firm and its clients.

Q.   And when you say you managed that to the benefit of the firm, what -- did Paine Webber have a

W. Monsees Stubbs
September 17, 2025

Page 38

management company that managed the real estate?

In other words, they built a fund.

A.   Yes, we -- we created a fund.  We went out through the brokerage network and we solicited investments from Paine Webber's clients, and then we invested those monies in -- in real estate assets and managed those assets and received a -- a -- a carried interest in the profits therefrom.

Q.   And how long did you stay with Paine Webber --

A.   Five years.

MR. KEYSER:  Just make sure --

THE WITNESS:  Five years.

MR. KEYSER:  You've been doing a good job, but just make sure he finishes his question --

THE WITNESS:  Okay --

MR. KEYSER:  -- before you answer.

THE WITNESS:  Sorry.

BY MR. BIDEAU:

Q.   That takes us to 1986, so why did you leave Paine Webber?

A.   I went to Merrill Lynch, I believe, at that point in time, which had a much stronger platform than -- than Paine Webber in terms of its ability to raise capital for these endeavors.

W. Monsees Stubbs
September 17, 2025

Page 39

Q.    And so what -- what did you do then at Merrill Lynch?

A.    What?

Q.    What did you do at Merrill Lynch? Basically the same thing?

A.    Yes.

Q.    Okay.  And how long did you stay there?

A.    Five years.

Q.    So that would take us up to about 1990 or so, right?

A.    Yes.

Q.    Okay.  So what did you do in 1990?

A.    I would assume that's when we formed the fund, I believe.

Q.    Zeus?

A.    Yes.

Q.    Okay.  And you say "we," who formed Zeus?

A.    That would be me primarily, yes.

Q.    Okay.  So when you said "we," there's not another person involved?

A.    No.

Q.    Was Ms. -- what was her name -- Benincasa involved?

A.    No.

Q.    No?  When did she become involved?

W. Monsees Stubbs
September 17, 2025

Page 40

A.    She would have become involved within the last five years.

Q.    So 1990, you formed Zeus.  Did you have any other partners when you formed Zeus in 1990?

A.    Not that I recall.

Q.    And what did Zeus do in 1990?

A.    Bought nonperforming loans.

Q.    When you say Zeus bought nonperforming loans, can -- what was Zeus' source of capital?

A.    I don't recall.

Q.    I mean, was Zeus -- did Zeus have its own capital?  Was it borrowing money?  Did it have investors?  I mean, do you have any recollection?

A.    No.

Q.    Okay.  So you have no recollection sitting here today of how the company you formed in 1990, as an investment company, raised its money to buy assets?

A.    Unfortunately not.

Q.    And can you tell me in 1990 the types of asset -- did Zeus -- did Zeus actually buy any assets in 1990?

A.    Yes.

Q.    Okay.  Can you tell me -- give me some order of -- for the -- what kind of assets did Zeus buy?

A.    I -- I have a blank.

W. Monsees Stubbs
September 17, 2025

Page 41

Q. Commercial, residential?

A. Generally commercial, some residential. Tried to stay away from retail.

Q. And again, you don't remember how Zeus raised its capital to buy these assets --

A. No.

Q. In 1990, correct?

A. Correct.

Q. Okay. And can tell me your -- you say 1990-91, order of magnitude in terms of what Zeus owned?

A. No.

Q. Hundred thousand, a million, hundred million? I mean --

A. No, no. It was millions of dollars but certainly far less than a hundred million.

Q. When you say millions of dollars, one million, two million? What are we talking about?

A. Five million. Pick a number.

Q. Well, I don't want to pick a number.

I just want to get an accurate answer, if you recall.

A. I don't -- I do not recall.

Q. You don't recall.

Okay. And did Zeus have any other employees other than you in 1990?

W. Monsees Stubbs
September 17, 2025

Page 42

A.    No.

Q.    So -- so when it came to -- I'm using Zeus generally.  I understand, did you -- back in 1990, were you forming single purpose entities each time you bought an asset?

A.    Yes.

Q.    Okay.  But I'm using Zeus kind of euphemistically as --

A.    This is an umbrella.

Q.    As an umbrella?

A.    Yes.

Q.    Your entity then?

Okay.  And so in 1990, when Zeus was buying commercial assets on -- how -- how were you -- were you hiring property management companies to actually manage the assets?

A.    Yes.

Q.    And do you have any idea the order of magnitude, how many commercial properties in 1990, say between 1990 and '92, Zeus --

A.    I don't recall.

Q.    But in each case, whenever you bought commercial property, you would hire a management company, correct?

A.    Yeah.  It depends on the point in time but,

W. Monsees Stubbs
September 17, 2025

Page 43

yes, certainly that was the -- that was the initial thing. But as -- as we -- as we came to understand -- you know, as we grew the portfolio, we were spending a lot of money, you know, hiring property managers and it was not that complicated a business.

So I set up a property management company, hired Colliers to do the back office work of sending out the invoices, collecting the rents, et cetera, and hired individuals in each of the market sample, Orlando, Miami, what have you, with their relative specialties in order to -- to manage the assets.

Q. Okay. I didn't mean to --

A. No. And that was the -- you know, that was the business model and it worked quite well.

Q. And in 1990, where was these -- were these assets located in a particular geography?

A. Tampa, Orlando, Miami.

Q. And you said initially you hired property management companies then you formed a property management company?

A. Yes.

Q. And whether you hired it or formed one, there would be a property management company that would take care of these sort of, you know, day-to-day running of the properties --

W. Monsees Stubbs
September 17, 2025

Page 44

A.    Yes.

Q.    -- correct?

A.    Yes.

Q.    Okay.  But then you as -- then you, as the owner, would then supervise the management companies, correct?

A.    Yes.

Q.    And we -- for commercial properties, obviously, management companies don't run the business, right?  You run the business as the owner?

A.    Yes.

Q.    Correct?

A.    Yes.

Q.    And so notwithstanding you would have a property management company, might have an accountant, I think you said -- you said Colliers to send out bills and that sort of thing.

A.    Well, they -- yes, Colliers did the back office work.  I hired individuals in the market to, you know, handle whatever the issues, there's a pothole or the roof leaks or dealing with the tenants and companies to do the -- to do the leasing.

And it was -- it enabled us to capture the margin, which is meaningful and improves our profitability.  We didn't have, really, the

W. Monsees Stubbs
September 17, 2025

Page 45

infrastructure or the critical mass in Miami and that remained with the third-party managers for an extended period of time.

Q. And we're talking about -- and again, we're talking about your work when you had -- for Zeus, right?

A. Yes.

Q. Yeah. Okay. I just wanted to be clear that this was all about Zeus.

And so notwithstanding whether you hired a management company or your own management company, did -- you, as the owner, still were the one who had to make the ultimate decisions about leasing --

A. Yes.

Q. -- capital improvements, that sort of thing, correct?

A. Yes.

Q. Because notwithstanding the fact that you hired professionals, ultimately, there needs to be somebody managing these operations, correct?

A. Yes.

Q. And is that what you were doing as the person at Zeus?

A. Yes.

Q. And between 1990 and '92, you were talking about properties in Tampa, Orlando, but let's just focus

W. Monsees Stubbs
September 17, 2025

Page 46

on that one period '90 to '92.  Can you -- do you have any idea how many properties Zeus had?

A.    No.

Q.    Are there any records as to how many properties Zeus would have had back in 1990 and 1992?

A.    Yes.

Q.    And who would have those records?

A.    Well, the -- our management entity at FGHP.

Q.    For Zeus?

For Zeus?

I'm talking about Zeus in 1990-92.  FGHP managed Zeus.

MR. KEYSER:  I think he's talking about -- can I just clarify?

MR. BIDEAU:  All my questions are from '90 and '92 have been about Zeus, because FGHP hadn't been formed until '92.

MR. KEYSER:  He's talking about pre-FGHP.

BY MR. BIDEAU:

Q.    I'm on pre-FGHP.  That's why I said '90 to '92 for Zeus.

A.    I don't recall.

Q.    Okay.  Let me back up then, because I thought we were clear that the last group of questions when we were talking about the properties in Orlando,

W. Monsees Stubbs
September 17, 2025

Page 47

Miami, Tampa, I asked you if they were for Zeus and you said yes, but that -- that's not accurate.

A.  No.  Tampa, Orlando, Miami would be at FGHP capital.

Q.  Okay.  So let's go back then.  I was trying -- I was asking you about Zeus.

Okay.  I want to know what Zeus was doing because we -- I specifically limited it to '90 and '92, and FGHP wasn't formed until '92.

So let's talk about, you said you started Zeus, okay, in about 1990.  You said it was in the commercial real estate business?

A.  Yes.

Q.  Okay.  So what I want to understand is, in 1990, can you give me any order of magnitude concerning what Zeus was doing?

A.  No.

Q.  Did Zeus have -- you know, you told me earlier when I asked the question about Zeus earlier for this period, you said something about, you know, maybe $5 million.

A.  I -- I -- for 1990, I do not know off the top of my head what Zeus' assets were.

Q.  Okay.  Where was Zeus operating in 1990?

A.  I don't recall.

W. Monsees Stubbs
September 17, 2025

Page 48

Q.    But it was -- so all that testimony you gave me about Miami, Orlando, property management companies, Colliers, that -- that was all for FGHP?

A.    Yes.

Q.    Okay.  None of that was for Zeus?

A.    Correct.

Q.    Okay.  So let's back up then to make sure we're on the same page.

Can you give me any idea what Zeus was doing in 1990?

A.    I don't recall.

Q.    And you have no recollection of whether it had assets or where it got its money?

A.    No.

Q.    You have no recollection what Zeus had in assets, correct?

A.    That's correct.

Q.    You have no recollection of where Zeus was getting its capital in 1990, correct?

A.    That's correct.

Q.    You have no recollection of any of the properties that Zeus might have owned in 1990?

A.    That's correct.

Q.    And you have no recollection of what you were even doing with Zeus in 1990?

W. Monsees Stubbs
September 17, 2025

Page 49

A.    Unfortunately, that is correct.

Q.    Okay.  And when you say -- I mean, have you had any medical issues or something that would impact your memory because you said unfortunately?

A.    Yes.

Q.    Okay.  And what -- tell me about that.

A.    Well, I'm -- my -- my memory is not as good as it used to be.

Q.    Okay.  So did Zeus hire property management companies to manage any of its properties in 1990-91?  All pre-FGHP.

A.    I don't recall.

Q.    How much of the time in 1990 and '91 was spent working for Zeus?

A.    In 1990?

Q.    Again, I'm talking about pre-FGHP.

A.    I don't think that Zeus existed pre-FGHP.

Q.    Okay.  Well, I asked you if it did and you said yes.  You said it started when you first got out of business school, okay?

You said you started at -- you started right after you left Merrill Lynch.

MR. HAWKINS:  That's right.

BY MR. BIDEAU:

Q.    Okay.  That's what you said.

W. Monsees Stubbs
September 17, 2025

Page 50

Okay.  And that was in 1990.  So did Zeus exist in 1990 or was -- were you doing something else?

A.   I don't believe that Zeus existed in 1990.

Q.   Okay.  So what were you doing between 1990 and 1992 when FGHP started?

To give you just a little background, you said you left Merrill Lynch in 1990 and we know FGHP didn't start until 1992.  What were you doing in the gap?

A.   I don't recall.

Q.   Were you involved at all in the real estate business?

A.   Yes.

Q.   In what way were you involved --

A.   I don't recall.

Q.   Let me finish my question.

A.   Okay.

Q.   In what way were you involved in the real estate business in the gap between 1990 and 1992?

A.   I would have to do a timeline in order to be able to come up with a reasonable answer to your question.

Q.   Well, did you have a source of funding in 1990 to buy real estate?

Were you -- strike that.

Were you buying real estate in 1990, 1992?

W. Monsees Stubbs
September 17, 2025

Page 51

A.    I would assume so, yes.

Q.    Well, do you know if you were buying real estate?

A.    Not off the top of my head.

Q.    And so you don't know if -- do you know of any business that you were in between 1990 and 1992 before FGHP?

A.    Not off the top of my head.

Q.    So sitting here, you have no recollection of what you were doing to earn a living in that period between the time you left Merrill Lynch and the time you joined -- and the time that FGHP started?

A.    I don't recall.

Q.    No recollection at all?

A.    No.

Q.    Did you have full-time employment between 1990 and 1992?

A.    I have been -- during that period, I was self-employed.

Q.    By whom?

Because you said Zeus didn't exist then. So what were you doing in that period?  You say you were self-employed.  What were you doing in that period?

A.    I don't recall.

Q.    Were you ever involved with a company

W. Monsees Stubbs
September 17, 2025

Page 52

called Metronexus?

A. Yes.

Q. What -- what was Metronexus?

A. Metronexus was a firm that was formed by Eric Assimakopoulis from -- oh, yes, to do TELECO Health Hotels.

Q. And what were your -- when you say TELECO Health Hotels, what do you mean?

I just don't know what that is.

A. And I'm struggling to come up with an answer for you.

Q. And what was your -- what was your position with the company?

A. I don't recall.

Q. Were you employed by the company?

A. I believe I was a -- a founder of it.

Q. Okay. And so can you take -- just describe to me what -- when were you involved with Metronexus?

A. Well, within the time frame that you just enumerated.

Q. So that was 1990?

A. To my knowledge.

Q. When you say "to your knowledge," do you have a recollection it was 1990?

A. I don't have a specific recollection of the

W. Monsees Stubbs
September 17, 2025

Page 53

time frame for when we went into the TELCO hotel
business.

Q.    Okay.  And when you say the TELCO hotel
business, what is that?

A.    I don't have an answer.

Q.    So you're a founding member of a company
that was in the TELECO hotel business but you don't know
what that is?

A.    I -- I'm having difficulty recalling it.

Q.    And were you in that business at the same
time that you were a member of FGHP or was it before
FGHP?

A.    I don't recall.

Q.    You have no recollection of when --

A.    No, I have no recollection --

Q.    Let me finish my question.

A.    Yes.

Q.    You have no recollection of when you were
in the TELCO hotel business with Metronexus?

A.    That's correct.

Q.    Do you know if it was before FGHP, after
FGHP?

A.    I do not recall.

Q.    And you don't have any recollection of what
the hotel business -- TELCO hotel business that you were

W. Monsees Stubbs
September 17, 2025

Page 54

involved with was?

A. No.

Q. And just -- you don't have a recollection, correct?

A. Okay. Yeah. Okay.

Q. Okay. So you have no recollection. Do you have a recollection that you were removed from your position at Metronexus for wrongdoing?

A. No.

Q. You were removed for wrongdoing, right?

MR. KEYSER: Form.

You can answer.

THE WITNESS: I don't recall.

BY MR. BIDEAU:

Q. Yeah. You don't recall. You don't recall being removed as a partner in connection with an allegation that you misappropriated funds?

A. No.

MR. KEYSER: Form.

BY MR. BIDEAU:

Q. That didn't happen or you just don't recall?

A. I don't recall.

Q. You have no recollection as to how you left Metronexus?

W. Monsees Stubbs
September 17, 2025

Page 55

A.    No.

Q.    Or why you left Metronexus?

A.    No.

Q.    You don't know when you were involved with the company and you don't know exactly what it did?

A.    That's correct.

Q.    Do you recall being involved with Metronexus?

MR. KEYSER:  Form.

THE WITNESS:  Through Eric Assimakapoulis?

BY MR. BIDEAU:

Q.    Okay.  And who is Mr. Assimakapoulis?

A.    He was a -- he was a business partner that -- I can't remember how we -- how we originally connected but he was the one that had knowledge of that -- that business.

Q.    Okay.  And you don't remember now how you got together with him?

A.    No.

Q.    Did you do other business with him?

A.    Well, yes.  We -- we were active in the TELCO hotel space for some time.

Q.    For how long?

A.    I don't recall.

Q.    Other than being active in the TELCO hotel

W. Monsees Stubbs
September 17, 2025

Page 56

space for some time, did you do any other business?

A.    You mean other than TELCO hotels?

Q.    Yes, sir.

A.    No.

Q.    And when you were in the TELCO hotel business, was that pretty much a full-time job for you?

A.    Pretty much.

Q.    Are there any other -- I just want to understand your -- make sure I've gotten your employment history, okay?

We got the two companies that you were in after business school.  We got the Paine Webber, the Merrill Lynch.  Between 1990-1992, you don't remember exactly what you were doing?

A.    That's correct.

Q.    And at some point you formed Zeus, and maybe we'll go into that a little bit later, and you were in this Metronexus business for some period that you don't recall, right?

A.    Correct.

Q.    Is there any other business that you were -- have been involved with other than Zeus and anything that we talked about?  Any other employers, businesses you've been in?

A.    I don't think so.

W. Monsees Stubbs
September 17, 2025

Page 57

Q.   Did you have a company called S2 Corona, LLC?

A.   Yes.

Q.   What is that?

A.   S2 Corona was a project in Corona, Queens in New York City, and that was a -- I believe a nonperforming loan that we acquired and prosecuted the foreclosure and, you know --

Q.   And was that S2 Corona, LLC one of these single purpose entities?

A.   Yes.

(Discussion held off the record.)

MR. HAWKINS:  Is that the number 2?

MR. BIDEAU:  The number 2, yeah.

BY MR. BIDEAU:

Q.   And that -- that operated under the umbrella of Zeus?

A.   No.  S2 was Jeff Stewart and myself.  We were the two partners of S2, and that's how the name came about, and we -- we formed that to do that -- those kinds of investments.

Q.   Okay.  So there -- I'd asked you about whether there was any other employment or things you were involved with other than things under the Zeus umbrella and we talked about that.

W. Monsees Stubbs
September 17, 2025

Page 58

So this S2 Corona, LLC was a different -- was an entity formed -- was it under Zeus?  Was it with Jeff Stewart?

A.    Yes.

Q.    Okay.  And are there any other entities or businesses that you were involved with that are not under the Zeus umbrella that we haven't talked about besides the S2 Corona?

A.    Yes, there were other projects that were done with Jeff Stewart.

Q.    Okay.  And when did you do S2 Corona, LLC with Mr. Stewart?

A.    I don't recall.

Q.    You don't recall if it was in the '90s, the 2000s?

A.    No, it would have been in the 2000s.

Q.    In the last ten years?

A.    Yes.

Q.    Okay. Any -- anything closer?  Can you nail it any closer than that?

A.    I would say ten years is probably -- is probably, you know, spot on.

Q.    And how many investments have you done with Mr. Stewart?

A.    A handful.

W. Monsees Stubbs
September 17, 2025

Page 59

Q.    Well, what's a handful?

A.    I -- you know, pick a half, just to pick a number, a half dozen.

Q.    So six?

A.    Yes.  That's a half dozen.

Q.    And what kind of projects were they?

A.    They were primarily residential.

Q.    When you say residential, what kind of residential?

A.    Multi-family or condominiums.

Q.    And what did your -- did you guys build residential?  Did you buy residential?

A.    We generally bought.  We rarely would be involved in new construction.

Q.    And were all of these investments, say, in the last ten years?

A.    The last 15 years, yes.

Q.    What, you operated Zeus and you operated this --

A.    S2.

Q.    -- this S2, LLC entity.

Any other entities that you operated for employment?

A.    When you say operated for employment?

Q.    Well, that you earned money from that you

W. Monsees Stubbs
September 17, 2025

Page 60

operated.  You have a bunch of things you did under Zeus?

A.    Right.

Q.    Now you told me there's an S2, LLC?

A.    Right.

Q.    What else?  Anything else?

A.    Yes, there were other entities.

Q.    Okay.

A.    And other properties.  If you want a list, I would be glad to prepare a list for you.  I don't -- I couldn't pull these off the top of my head.

Q.    Are you currently subject to any judgment liens?

A.    No.

Q.    Any tax liens?

A.    No.

Q.    By the way, is S2 still making it in business?

A.    We have -- no, I'm fairly certain everything there has been liquidated.  There may be some remainder of interests, that kind of Hope Certificates that, you know, may produce something that the -- in the future, but nothing that I would --

Q.    Okay.  When did --

A.    -- count on.

Q.    When did S2 stop doing business?

W. Monsees Stubbs
September 17, 2025

Page 61

A.    It's probably four or five years ago.  Jeff retired, moved down to Florida and, you know, plays golf.

Q.    Okay.  And with respect to S2, did you operate the same way you operated Zeus, which is you would hire property management companies to manage the assets.

Let me back up.  I want to make sure I'm clear on what we were talking about before.

With S2, you told me it was primarily in the residential --

A.    Yes.

Q.    -- correct?

Correct?

A.    Yes.

Q.    Okay.  And so for 2S, did you hire property management companies and other professionals to manage the assets after you hired them?

A.    Yes.  On a case-by-case basis, some would be -- you know, they will be different.  It depends on the facts and circumstances of the property and that could change over time, where, you know, if something was, you know -- in some cases, were not complete, the construction was not complete.  You know, there were different needs, and so we fulfilled those needs on an ad hoc basis, depending on the facts and circumstances of

W. Monsees Stubbs
September 17, 2025

Page 62

the property.

So once they were stabilized, then, yes, then there would be property management companies which over time we would try to, you know, do internally, because it's more profitable.

Q.   Well, did the S2 -- how many employees did S2 have?

A.   Well --

Q.   You and Jeff were partners.  Were there any other partners?  Remember, it was an LLC.  Any other members, besides you and Mr. Stewart?

A.   Not that I recall.

Q.   Did S2 have any employees?

A.   No.

Q.   So if somebody needed to be manage the -- manage the property or build it, you -- S2 would have to hire --

A.   They would contract -- we would contract with them, yes.

Q.   Okay.  Let me just finish.  If S2 had to do some construction or operate a condominium property, they would have to hire professionals to do that, right?

A.   Yes.

Q.   But the fact that they hired professionals didn't mean there was nothing for you and Jeff to do,

W. Monsees Stubbs
September 17, 2025

Page 63

right?  You-all had to manage those professionals, right?

A.    That's correct.

Q.    Because as the owner, whether it's commercial or residential, there always has to be somebody that manages the professionals, right?

A.    Yes.

Q.    One of the owners has to be there to manage those professionals?

A.    Well, not necessarily be there.

Q.    Right, that's a bad question.

One of the owners has to be responsible --

A.    Yes.

Q.    -- for managing the professionals, right?

MR. KEYSER:  Just let him finish the question before you answer.

THE WITNESS:  Okay.

BY MR. BIDEAU:

Q.    And to the best of your recollection -- strike that.

S2 was formed in 2011, correct?

A.    I don't recall.

Q.    And you were one of the managing members, right?

A.    Yes.

MR. HAWKINS:  Can we take a break?

W. Monsees Stubbs
September 17, 2025

Page 64

MR. BIDEAU: Oh, yeah. I'm sorry. I lost track of time. We have been going for an hour and 15, so why don't we take a break.

THE VIDEOGRAPHER: Can you please have everybody unclip their microphones.

Off the record at 11:20 a.m.

(Proceedings recessed at 11:20 a.m.)

(Proceedings reconvened at 11:39 a.m.)

THE VIDEOGRAPHER: Back on the record. The time is 11:39 a.m.

This is beginning of Media Unit Number 2 and we are back on the record.

(Plaintiff's Exhibit No. 1 was marked for identification.)

BY MR. BIDEAU:

Q. Mr. Stubbs, I've handed you what I've marked as Exhibit 1 for today's deposition, and it is Defendant's Notice of Service for Seconded Amended Answers to Plaintiff's First Set of Interrogatories, and at this point, I just want to go to your answer to interrogatory Number 10, which I think you'll find on the third page, perhaps.

Right there, the chart. (Indicating.)

Okay. Do you have that in front of you?

A. Yes.

W. Monsees Stubbs
September 17, 2025

Page 65

Q.   Okay.  And if you look at the last page, you signed this document under penalty of perjury, correct?

A.   It would appear so.

Q.   Excuse me?

A.   Yes.

Q.   Okay.  And so the question was, "Can you identify all asset management businesses, companies or entities in which you possessed an interest?"

And you provided us with a list that is identified in response to Number 10, right?

A.   Yes.

Q.   Okay.  Now, we've talked about S2 Corona, LLC, right?

A.   Yes.

Q.   And you said you had a 25 percent interest in that?

A.   That's what it says.

Q.   Is that accurate?

A.   I assume so.  I mean, I'm not that much into the weeds there, but my colleague that prepared the schedule would know the -- I -- I trust her judgment.

Q.   And who is your colleague who prepared the schedule?

A.   Diana Benincasa.

W. Monsees Stubbs
September 17, 2025

Page 66

Q.     Okay.  Your business partner?

A.     Yes.

Q.     Okay.  And it says that you were involved with S2 Corona, LLC from 2011 to 2024, right?

A.     Yes.

Q.     By the way, did you ever tell Mr. Felsher that you were involved with S2 Corona?

A.     Well, not to my knowledge.

Q.     Now, Zeus Canal, LLC.  What is Zeus Canal, LLC?

A.     Oh, okay.  It's a property that is in Stanford, Connecticut and that -- yes, that's a multi-family property.

Q.     Okay.  And you say multi-family.  Are we talking like two -- like a townhouse with two families or --

A.     No, no, no, multi-family.  It's an apartment project.

Q.     Okay.  And this is Zeus Canal, LLC.  Now this says you have a 20.84 interest.  Who has the other interest?

A.     Diane Benincasa has an interest in that. This is a Zeus Canal, LLC.  It's a -- it's a very complicated structure which has multiple parties in it, and I couldn't begin to tell you the -- all of the

W. Monsees Stubbs
September 17, 2025

Page 67

components of it, but the largest -- but the largest chunk comes from a group of -- in Dallas, Texas. Well, which has -- represents a bunch of limited partners and we came into this through an investment with the Fields organization, which is one of the -- the -- one of the original landowners.

So there are a good half dozen different entities owning chunks, which are then owned by their respective investors. So it's a complicated -- it's a very complicated structure.

Q. And where it says that you own 20.84, is that -- again, you're relying on this?

A. Relying on what?

Q. You're relying on your colleague --

A. Yes.

Q. -- in terms of the number?

A. Yes. There are lots of accountants involved here and it's extraordinarily complicated.

MR. KELSER: Form.

BY MR. BIDEAU:

Q. And what's the value of your interest?

A. A million bucks.

Q. A million bucks?

A. Yeah. Plus or minus.

Q. So it's basically a $5 million project?

W. Monsees Stubbs
September 17, 2025

Page 68

A.   No, the project is much larger than that.

Q.   Okay.  Well, you have a 20 percent interest, you said.

A.   Okay.  But there are -- there are -- well, it's a complicated structure.  If you look at the decision -- the decision tree of all of the entities that have investments that have gone into there, there are literally dozens, all right?

So we are in a -- I don't know how to simply describe it, other than it's a complicated structure with a -- a bunch of different entities that have come together to own this project.

Q.   And you don't have any role in managing that project, do you?

A.   No.

Q.   And do you have any role in managing the S2 Corona, LLC project?

A.   Yes.

Q.   Okay.  And you have a 25 percent interest in that.

Let's see, 452 Berkeley, LLC, 2023 to present, you have a 55.54.  What is 20 --

A.   Forty-five.

Q.   What is 425 Berkeley, LLC?

A.   452 Berkeley, LLC is a single family

W. Monsees Stubbs
September 17, 2025

Page 69

residential project in New Jersey.

Q.    Okay.  And when you say single, is it one house?

A.    Yes.

Q.    Okay.  And then 15316 Estancia Lane, you own a 40 percent interest in.  What is that?

A.    It will come back to me.  Let's go through the rest of them right now.

I'm struggling with that one.

Q.    Because it says you have an interest in 2021 to 2025, so it seems like you still have that interest.

A.    That's correct.

Q.    But you don't remember what it is?

A.    That's correct.

Q.    Okay.  Then Zeus Realty Services, 2012 to present, that -- is that the Zeus that we have been talking about?

A.    Yes, that's -- that's the administrative arm.

Q.    Okay.  And it says here that it was formed in 2012, is that accurate?

A.    I assume it is, yes.

Q.    Well, you signed it.

A.    I understand that.  I'm just saying, I -- I

W. Monsees Stubbs
September 17, 2025

Page 70

didn't prepare it.  I -- I signed it but, yes, I'm attesting to the -- it's my responsibility to -- to accept responsibility for the work that's done by my colleagues and employees.  And so that's -- I assume that to be accur -- I trust that to be accurate.

Q.   And when you say that -- that it was your colleague and employees, it was that Diana -- I'll get her name wrong.

A.   Benincasa.

Q.   Benincasa.  That's who prepared it, right?

A.   Yes.

Q.   Okay.  Nobody else involved in preparation of this document?

MR. KEYSER:  Form.

BY MR. BIDEAU:

Q.   Nobody else other than perhaps your counsel involved in the preparation of these answers?

A.   Correct.

Q.   Okay.  Liberty Street Associates, LP, what is that?

A.   This is something that goes back, I believe, to the Paine Webber, you know, long, long, long time ago.  These are basically residual interests and -- and a lot of different partnerships that were formed back when I was involved with the Dean Witter

W. Monsees Stubbs
September 17, 2025

Page 71

Realty.

Q.    Were you a past investor in this?

A.    Yes.

Q.    And Zeus 737 Park Avenue, LLC, what is that?

A.    It's 737 Park Avenue in Manhattan.  It's a Harry Macklowe development, and we have a participation in that.

Q.    All right.  It says you have less than one percent, right?

A.    That's correct.

Q.    Okay.  And, again, you're not involved in the management of that?

A.    No.

Q.    And Zeus Cottage Pledgor, LLC., what is that?

A.    Well, that's going to be a toughy.

The Zeus Cottage Pledger is a -- I don't even remember which entity it is, but it's basically -- it's -- it's kind of a sandwich slice that -- that, you know, has no -- has a participation in the profits, losses and whatnot, but no -- no control, no management decision-making authority.

Q.    Why -- it has a participation interest in, in what?

Page 72

A.    I don't remember.

Q.    Is it commercial real estate?

A.    Yes.

Q.    Is it residential real estate?  Is it --

A.    Cottage would probably be residential.

Q.    Do you know?

A.    No.

Q.    Okay.  So you don't even know what the asset is?

A.    No.

Q.    And then PCC 301, LLC, what is that?

A.    Capital Corp.  It's -- that's an administrative -- it's something of no economic consequence.

Q.    Okay.  So when you say no economic consequence, it has no value, never had any value?

A.    Well, it did at a point in time but it's just a residual interest.  It's -- it's a -- it's a -- it's of minimal economic consequence.

Q.    Can you give me what it -- what it was composed of?  I'm just trying to understand the investment.

A.    I don't recall.

Q.    You don't recall what the --

A.    No.

W. Monsees Stubbs
September 17, 2025

Page 73

Q.    -- what kind of property it was?

A.    No.

Q.    You don't recall what it did?

A.    No.

Q.    Do you recall who managed it?

A.    No.

Q.    Do you recall anything at all about it?

A.    Well, it's on 301 Highway.

Q.    Okay.

A.    I can't remember what state.

Q.    Okay.  So it's on Highway Number 301 in some state somewhere in the country?

A.    It would be on the east coast.

Q.    Okay.  We've narrowed it down to the east, but that's about all you remember about it?

A.    That's correct.

Q.    And then we have -- do you remember who you owned it with?  It says you have 74 percent.  Who did you own it with?

A.    I don't know.

Q.    And then we have -- we have six Garmont companies?

A.    Yes.

Q.    Those are all involved with FGHP, correct?

A.    Yes.

W. Monsees Stubbs
September 17, 2025

Page 74

Q.    Okay.  Do you know what Garmont 117, Inc. is?

A.    Garmont 117th Street is in Miami, as I recall.

Q.    Okay.  And when did you last do any -- when did you last look at any documents relating to FGHP and its assets?

A.    Well, within the last couple weeks.

Q.    Okay.

A.    And in advance of this meeting.

Q.    Okay.  So when I asked you before you did the preparation -- to prepare for your deposition, you didn't tell me -- I asked you if you looked at any documents, you said no.

A.    Well, I didn't spend a whole lot of time studying them, that's for sure.

Q.    Okay.  But now you're telling me you actually did look at documents to prepare for the deposition, right?

A.    Well, I guess you could call -- yes.

Q.    Okay.  So tell me what documents you looked at to prepare for the deposition.

A.    I don't recall.

Q.    Okay.  So do you have any recollection at all of any documents you looked at?  You said you -- you

W. Monsees Stubbs
September 17, 2025

Page 75

looked at documents.

A.   I know I did.  What I looked at, I have no clue.

Q.   Was it partnership agreements?  Was --

A.   I said I have no clue.  I have no recollection whatsoever as to what I looked at.  I do know that I did something.

Q.   Okay.  And when was it that you did that?

A.   Sometime within the last couple weeks.

Q.   Okay.

A.   And in anticipation of this.

Q.   All right.  But you have no recollection --

A.   I just said that three times.

MR. KEYSER:  All right.  Just make sure he finishes his question.

THE WITNESS:  Yes.  Sorry.

MR. BIDEAU:  Yes, my bad.

BY MR. BIDEAU:

Q.   Did anybody select documents for you?

A.   No.

Q.   And did you discuss any of the FGHP documents that you were reviewing with anybody besides your counsel?

A.   No.

Q.   You talked to Diana?

W. Monsees Stubbs
September 17, 2025

Page 76

A.    Not on this, no.

Q.    Does she have any involvement with this stuff, this FGHP stuff?

And I know I'll mispronounce her name.

A.    Benincasa.

Q.    Benincasa.

A.    I mean, she -- she is -- handles administrative things.  So, you know, in terms of filing some stuff, I mean, she has had no reason to go into reading the documents or coming up to speed on any of that, so it just wouldn't be -- you know, there's no reason for her to do that.

So, you know, would she be, you know, helping file or maintain records or things of that nature, yes.  But would she have any knowledge of any of the content, there's no reason that she would have, no.

Q.    Okay.  And then this conversation has not refreshed your recollection as to any documents you looked at --

A.    No.

Q.    -- in preparation for the deposition a few weeks ago?

A.    No.

Q.    Okay.  And then we have FGHP Capital Limited Partnership, 50 percent (Class B).  Now, you told

W. Monsees Stubbs
September 17, 2025

Page 77

me that you didn't remember what was -- the difference -- do you remember the difference between Class B and Class A partnerships and --

A.    Well, the Class B would be the promote as I recall.

Q.    The promote.  Okay.

And so you don't recall, right?  Because earlier you told me you don't remember which was which, right?

A.    No, my memory gets better as the day goes along.

Q.    Okay.  Then you're different than me, mine gets worse.

And then Pembroke Capital, LLC, okay.  Oh, wait.  It says that you have a 2.0796 Class A interest. Is that you or is that you and a group of people?

A.    Well, I believe that says that's me. That's a -- me, as a natural person, I believe.

Q.    Okay.  So you believe you have a 2.0796 Class A interest?

A.    Yes.

Q.    And then it says Pembroke Capital, LLC, you do have a 100-50 percent.  What does that mean?

A.    Well, I assume that it's just 100 going to 50.  So I assume it's 100 percent at a point in time and

W. Monsees Stubbs
September 17, 2025

Page 78

now it's a 50 percent interest.

Q.    But you assigned your whole interest in Pembroke, LLC to Mr. Felsher back in 2019, didn't you?

A.    I don't recall.

Q.    Are there any other entities or businesses that you possess an interest in that are not on this list and that we have not talked about this morning?

A.    I hope not.  To my knowledge, no.

Q.    Nothing else comes to --

A.    No.

Q.    -- mind?

Okay.  What was the business of Pembroke Capital, LLC?

A.    Pembroke has served as the administrative arm, and it was really, you know, keeping track of the income and expenses, you know, primarily from a -- a management standpoint in terms of, you know, getting -- keeping lights on, getting bills paid, et cetera, et cetera.

Q.    And so fair to say that Pembroke Capital, LLC was kind of the entity that was tasked with managing --

A.    Yeah, the administrative stuff.  Yes.

Q.    Let me finish my question --

A.    Certainly.

W. Monsees Stubbs
September 17, 2025

Page 79

Q.    -- okay?

I know it's tempting to jump in.

Pembroke Capital, LLC, was the entity that was tasked with managing the various FGHP properties, correct?

A.    Overseeing them, yes.

Q.    Overseeing them.  Right.

Because, again, these properties would have management companies perhaps involved.  In some cases, it --

A.    Yeah, it depends on the size, the complexity.

MR. KEYSER:  Sorry.  I don't want to cut you off but you've got to -- you've got to let him --

THE WITNESS:  Let him speak.

MR. KEYSER:  -- finish.  Just take a beat before you --

THE WITNESS:  Okay.

MR. KEYSER:  -- before -- once he's done.

BY MR. BIDEAU:

Q.    In fact, my dad told me when I went to get my driver's license, when you come to the stop sign, just wait a second, okay?  Even if you think you're stopped, all right?

W. Monsees Stubbs
September 17, 2025

Page 80

So fair to say that you understood Pembroke Capital, LLC to be the entity that was formed to oversee and manage the portfolio that was in the FGHP Limited -- Capital limited partnership?

MR. KEYSER: Object to the form.

THE WITNESS: What's object to the form?

MR. KEYSER: I will object to the form. You can answer.

THE WITNESS: You're the lawyer.

MR. BIDEAU: He's the lawyer.

THE WITNESS: Okay. I'm kind of a novice at this.

BY MR. BIDEAU:

Q. I'm going to ask that -- that question again.

Do you understand that Pembroke Capital, LLC was the entity that was responsible for -- to oversee and manage the portfolio that was contained within the FGHP Capital Partnership?

A. Yes, that's my understanding. Recollection.

MR. BIDEAU: Mark as Number 2.

(Plaintiff's Exhibit No. 2 was marked for identification.)

BY MR. BIDEAU:

W. Monsees Stubbs
September 17, 2025

Page 81

Q.    I've just handed you what I've marked as Exhibit 2, which is an Assignment of Limited Liability Company Membership Interest and Assumption Agreement.  Do you see that?

A.    Yes.

Q.    Okay.  And that is the document by which you assigned your 50 percent interest in Pembroke Capital, LLC, in May of 2019 to Mr. Felsher, correct?

A.    That appears to be.

Q.    Okay.  And you know -- and I'm just showing you this --

A.    Yeah.  I haven't, you know, had the opportunity to review it, you know, to give you a more conclusive answer.  But I take it, you know, this speaks for itself.

Q.    Well, take a second, because the first page -- it's only a one-page document with an attachment of the actual operating agreement.  But it says that you are assigning your -- your 50 percent membership interest to Mr. Felsher.  Do you see that?

A.    Yes.

Q.    Okay.  And so in May of 2019, you assigned your 50 percent interest in Pembroke Capital to Mr. Felsher, correct?

A.    Well, I would want to review this to

W. Monsees Stubbs
September 17, 2025

Page 82

understand it.  I don't have any recollection of the document and -- and I can't really, you know, answer your question without, you know, understanding it, you know, reviewing it and -- and --

Q.    Okay.  Well, it's a one-page document. Take your time.  Read it.

(Pause in proceedings.)

BY MR. BIDEAU:

Q.    And again, I'm assuming that that's why on the chart it says that it was through 2019.  If you look at the interrogatory answers, it says that his interest in Pembroke went away in 2019, and this gives you the document that did that.

Do you have a recollection that in 2019, you made the decision to assign your interest in Pembroke Capital to Mr. Felsher because Pembroke Capital needed money?

MR. KEYSER:  Form.

You can answer.

THE WITNESS:  I -- I have no recollection of it, no.

BY MR. BIDEAU:

Q.    You have no recollection of assigning your interest or why you did it?

A.    No.

W. Monsees Stubbs
September 17, 2025

Page 83

Q.    None.  Zero?

A.    Zero.

(Plaintiff's Exhibits No. 3, 4 and 5 were marked for identification.)

BY MR. BIDEAU:

Q.    Mr. Stubbs, I have handed you Exhibits 3, 4, and 5 which are just screenshots of various pages of the website for Zeus.  Do you recognize that?

A.    Yes.

Q.    Okay.  And Zeus is the company we've been talking about for the last few minutes that you -- the umbrella company that you invested in, correct?

A.    Yes.

Q.    Okay.  And you are one of the managing partners, correct?

A.    Yes.

Q.    And are there any other managing partners of Zeus Realty Services?

A.    I believe so.

Q.    Who are they?

A.    Well, Ty Howard.  T-Y.  Ed Rotter.  I believe Mark Goodman may be in that.  Diana Benincasa may be in that.  I don't know if she's a managing member of Pembroke.

I don't recall the specifics.

W. Monsees Stubbs
September 17, 2025

Page 84

And I think that would be -- I think that covers the front.

Q. And do you -- does Mr. Howard play a different role in Zeus than you or is there something different that he does?

A. I mean, we all have different skills, knowledge, geographical understanding, geographical locations and it's a -- it's a loose affiliation.

So we tend to invest together, not everybody is in the same -- in all of the entities. Some people, you know, have, you know, different preferences and so, you know, it's kind of a collegial group but we're not the -- we're not taking the same positions in each of the investments, nor does everybody participate in all the investments. These are things that we look at together and we like or dislike or like a lot or like a little and participate accordingly.

Q. Okay. Some sort of loose affiliation of folks who --

A. Yes.

Q. -- invest together?

A. Yes.

Q. All right. Take a look at Exhibit 3. Is this -- are these little red dots different investments that Zeus purports to own?

W. Monsees Stubbs
September 17, 2025

Page 85

MR. KEYSER:  Number 3 is the one he's asking about, I think.

MR. BIDEAU:  The top one.

Number 3.

MR. KEYSER:  Which one is this?  Is this 3?

BY MR. BIDEAU:

Q.    Let me show the exhibits to you.  Look at the exhibit sticker on the bottom, okay?

A.    Yes.

Q.    Okay.  Are -- is that a list of the -- is that sort of a site map of properties that Zeus has invested in in Florida?

A.    Yeah.  Yes, its affiliates, members, however you want to characterize them, yes.

Q.    What do you mean by Zeus, its affiliates, members?  I mean, this is Zeus' website, right?

A.    Yes, and Zeus is a handful of individuals that have known and worked together off and on for an extended period of time.  And we will -- you know, we invest in each other's projects, kind of on a case-by-case basis, you know.

So one is located in Colorado or California and so, you know, there's a geographic preference.  Others like property types, the liquidities are different at different points in time.  So these are -- this is a

W. Monsees Stubbs
September 17, 2025

Page 86

group of people that have been investing together for decades on that basis.

Q.   Okay.  So this -- these could be proper -- these could represent properties that any one of the people at -- who is loosely affiliated with Zeus has some interest?

A.   Yes, that's correct.

Q.   And take a look at Exhibit Number 4.  Zeus Realty Services itself doesn't have any interest in La Caretta Plaza located on 88th Street in Kendall?

A.   Say that again.

Q.   Zeus Realty Services doesn't have any interest in the La Caretta Plaza, C-A-R-E-T-T-A --

A.   No.

Q.   -- Plaza located in Kendall, right?

A.   No.

Q.   And yet that property is identified on the -- on Zeus' website, correct?

A.   Yes.

Q.   And why is that?

A.   Because I, as a member of Zeus, have an investment there and so this is showing the -- the kind of -- the breadth of -- of geographic property types, types of things that they -- that they -- that this lose affiliation of people have been involved in over whatever

W. Monsees Stubbs
September 17, 2025

Page 87

period of time.

Q.    Well, that plaza is owned -- is, actually, part of the FGHP portfolio, correct?

A.    Yes.

Q.    Okay.  And so your listing it on Zeus Realty's site map because?

A.    As a project which -- which a member -- which one of the members of this cabal, if you will, has a -- has an investment showing breadth of experience, the types of things that we have done over time.

Q.    And so when we look at Exhibit 6, Zeus doesn't have any interest in the property located at --

MR. KEYSER:  Exhibit 4.

Sorry, 5.

MR. BIDEAU:  Sorry, 5.

BY MR. BIDEAU:

Q.    Look at Exhibit 5, please.

Zeus doesn't have any interest in the property located at 4667 LB McCleed, M-C-L-E-E-D, Road.

A.    No.

Q.    Correct?

A.    Correct.

Q.    And that is -- who actually owns that property?

A.    It's -- it's a -- it's a -- it's in a

W. Monsees Stubbs
September 17, 2025

Page 88

partnership, and I don't know, you know, the specific --
that -- the title of the specific entity that owns that
right off the top of my head.

Q.    But it's certainly not a Zeus Realty,
correct?

A.    No.  I think if you looked at the -- looked
at the website, you know, all of these are -- they are as
things which include -- demonstrate the experience level,
the nature of things that the people there have been
involved with over the course of their careers over time
to show that breadth of experience.

Q.    And who --

A.    It's not with any kind of representation
that it is an entity, you know, that there's one common
entity that owns all of those things, but more than that,
this is the -- the experience base of the individuals
involved.

Q.    So Zeus lists basically anything that any
one of you has any interest in?

A.    Well, that's broad, yes.  That's not --
that's not incorrect.  It's not inclusive but --

Q.    What do you mean it's not inclusive?

A.    I'm sure there are other things that are
not included here.

I mean, this is a -- you know, this is a --

W. Monsees Stubbs
September 17, 2025

Page 89

a -- these are projects which were selected to be put into this.

Q.    Have -- I may have asked you this.  With respect to any of these investments that you have, you never discussed any of these with Mr. Felsher, correct?

A.    I don't understand.

Can you repeat the question?

Q.    Sure.  We went -- other than the FGHP assets that we're going to talk about, these entities that we talked about on Exhibit 1, Exhibit 1 being to your right there.

A.    Okay.

Q.    That chart.  (Indicating.)

You never discussed the fact that you were investing in any of these entities with Mr. Felsher, correct?

A.    So repeat your question again.

Q.    Sure.  Sure.

Other than the FGHP properties listed in response to Interrogatory Number 10, Exhibit 1, you never discussed the fact that you were investing in any of the projects?

A.    So you're saying excluding the Garmonts and the FGHP?

Q.    Yes, sir.

W. Monsees Stubbs
September 17, 2025

Page 90

A.    Did I ever discuss Corona, Canal, Berkeley, Estancia or ZRS, Liberty Street --

Q.    Right.

A.    I don't even remember.

Q.    I recognize you don't even remember some of these properties.

A.    Yeah, some of them are old and cold. But -- but, yes, to my knowledge, I think that's correct.

Q.    You never discussed any of them with Mr. Felsher?

A.    No.

Q.    Did you ever discuss with Mr. Felsher that you were investing millions of dollars in real estate properties in the same general locations as some of the FGHP properties?

A.    No.  And I don't know that there are -- are you concerned about conflicts?  I mean --

Q.    I'm just asking a question.

A.    To my knowledge, no.  No.

(Plaintiff's Exhibit No. 6 was marked for identification.)

BY MR. BIDEAU:

Q.    Mr. Stubbs, I've handed you what I marked as Exhibit 6, which is the defendant's initial disclosures filed in connection with this lawsuit.

W. Monsees Stubbs
September 17, 2025

Page 91

Have you seen this document before?

A.    Not to my recollection.

Q.    Okay.  Now, the question that you -- that was being asked is the name of any one who would have discoverable information that the disclosing party may use to support claims of defenses.

And so I'm just going to ask you about these folks and any communications you've had with them or what they may know.

Well, put aside Mr. Benowitz for a minute, okay?  He is the first one on number 2.

A.    Right.

Q.    Okay.  Who is Steve Swann?

A.    Steve Swann is located in Tampa and he is a -- a real estate broker professional, whatever, that has worked with FGHP on a number of projects in the Tampa marketplace and perhaps at some point into the minimus extent, Orlando.

Q.    Who's Mr. Swann work for?

A.    Mr. Swann, to my knowledge, is an independent contractor.

Q.    Who does what?

A.    He -- on behalf of FGHP Capital, he is the -- our representative in the properties in Tampa.

Q.    When you say "your representative," what do

W. Monsees Stubbs
September 17, 2025

Page 92

you mean?

A.    For FGHP Capital, the properties that we have there at -- or in Tampa, North Port, the one at Gunnet -- Gunnet -- Gunn Highway, or Gunner Anderson.

Q.    Well, my question is, what is Mr. -- to your recollection, what does Mr. Swann actually do?

A.    Well, he -- he represents our interest there.  So he is the person that is responsible for seeing that the properties are maintained, leased.

Q.    Okay.  When is the last time you talked to him about anything having to do with the -- strike that.

When's the last time you talked to Mr. Swann about anything having to do with any properties owned by FGHP?

A.    I would say it's probably been two years.  That was a -- the last in Tampa.

Q.    Do you have a recollection of talking to him two years ago, Mr. Swann two years ago?

A.    I think so, yeah.

Q.    And where was that conversation?

A.    It was in Tampa.  I was there.

Q.    And what was the occasion for you to be there and speak to Mr. Swann?

A.    Well, I get to Florida on a regular basis and -- and I can't tell you the -- you know, off the top

W. Monsees Stubbs
September 17, 2025

Page 93

of my head what the -- what the -- if there was a specific reason, what the specific reason was.

But, you know, I'm -- I'm there for a variety of reasons year in and year out.

Q.   So you're in Tampa for a variety of reasons year in and year out?

A.   Well, not ness -- I haven't been there in the past year, 18 months, but, yeah, I'm in Florida regularly, whether it be in Miami, Orlando, Palm Beach, you know.

Q.   Why?

A.   Well, I have investments here.

I have friends here.  I vacation here.

Q.   Is there anything specific that caused you to go visit Mr. Swann two years ago in Tampa?

A.   Well, no, I think that was a combination trip that I was down further south on the -- on the west coast.  And I can't remember exactly why, but it was not a -- it was not a trip specific to the property.  But I certainly, you know, wanted to -- I certainly spend time there visiting him while I was there and, you know, getting up to speed with Steve.  And understanding what's going on -- you know, what's going on in the market.  What's going on with the properties.

Q.   Now, two years ago you were not involved in

W. Monsees Stubbs
September 17, 2025

Page 94

managing any of the FGHP properties, correct?

A.    That's correct.

Q.    And two years ago you were not involved in overseeing the management of any of the FGHP properties, correct?

A.    That is correct.  But I'm a -- certainly an interested party.

Q.    Well, you haven't -- you're a limited -- you're a limited partner in -- yeah, strike that.

You have a Class A limited partnership interest and you have a Class B limited partnership, right?

A.    Okay.  You know the nomenclature better than I.  I have an interest in -- in those properties and, you know, however it's structured.

Q.    Right.  You're not quite sure how it's structured?

A.    Not off the top of my head.  I mean, it's a --

Q.    All right.

A.    I'd rather not make -- I'd rather not make a representation that's inaccurate just because I didn't dot the i's or cross the t's.

Q.    When you saw Mr. Swann, you weren't there doing any business on behalf of FGHP, correct?

W. Monsees Stubbs
September 17, 2025

Page 95

A.    I was -- I don't know how to respond.

Certainly, I have a -- an interest in the -- the properties and certainly like to see that they are, you know, well-leased, well-represented, well-maintained.

Q.    You're an investor?

A.    That's right.  And -- and there are other assets that we have there that have potential.  And as an example, at Gunn Highway, we have a site which is a former CVS.  They went dark, moved across the street and we have been the beneficiary of their continuing to pay rent to honor their lease obligation.  But that's --  you know, all good things come to an end.  And there is the opportunity to redevelop that into something that's more remunerative, that then there's a number of opportunities that I've forwarded to Gary that has not found them of interest, shall we say kindly.

But, you know, I think that it would be -- be a credit to the partnership's interest to redevelop that as the end is coming near for the -- for the CVS lease.

Q.    How about Mr. Blanco?  Anthony.

A.    Anthony Blanco.

Q.    Okay.  Now, you say here that he works on projects in Miami.  When is the last time you spoke to

W. Monsees Stubbs
September 17, 2025

Page 96

Mr. Blanco?

A.    Oh, it's probably been a year and a half.
Year, year and a half.  I did -- I think I was down there
last year some time.

Q.    And again, you weren't down there on
business on behalf of FGHP.  Were you down there socially
were you down there just to look at your investments?

A.    Well, I continue to do business in Florida
and so I'm down in Florida on a -- I don't know, not a
regular basis, but from -- you know, from time to time,
for all kinds of different reasons.

You know, some vacation, social,
investments, opportunities, visiting friends and --
and -- and I have an interest in -- in real estate.

Q.    Sure.

A.    So certainly I want to know and see.
La Carreta is a spectacular location and I had dinner
there -- I guess it was last year.  It's a wonderful
property so I love to see it.

Wish we had ten more like it.

Q.    So if -- then have you talked to Mr. Swann
or Mr. Blanco about anything having to do with this
litigation?

A.    No.

Q.    Have you talked to Bruce -- McCord Fraser?

W. Monsees Stubbs
September 17, 2025

Page 97

A.   McCord Fraser is I guess, most accurately described as a broker.

Q.   Okay.  And who's he work for?

A.   To my knowledge, independent.

Q.   Okay.  And when is the last time you spoke to Mr. Fraser about anything having to do with anything -- strike that.

Have you ever spoken to Mr. Fraser about anything having to do with this lawsuit?

A.   No.

Q.   Do you have any idea what knowledge he may have concerning the facts and circumstances of this lawsuit?

A.   I'm not sure what concerning the facts and circumstances.

You know, he's -- he's knowledgeable of the properties in Tampa, which is where he is.  I have -- I'm not aware what, if any, knowledge that he has about the lawsuit and that would not have come -- I've had no communications with him with respect to the lawsuit.  Whether or not he has with Steve Swann or anybody else is -- I just don't have a clue.

Q.   And you've had no discussions about the lawsuit with Mr. Swann or Mr. Blanco?

A.   With Mr. Blanco, no.  None whatsoever.

Page 98

Q.    How about Mr. Swann?

A.    I don't think so, you know.  No, I don't think I've talked to him.  I don't -- I'm not even sure that I've talked to him since the -- the commencement of this.  But I would have to check the dates, travel dates from what records or whatnot.

Q.    How about Mr. Crossman?  Have you talked to Mr. Crossman about anything to do with this lawsuit?

A.    No.

Q.    And what was with Mr. Crossman's role at FGHP Capital?

A.    Mr. Crossman is a -- a -- primarily a retail broker and I think quite good, who we have enjoyed a -- a good relationship with through the years.  He's based in Orlando.  And I can't recall off the top of my head, you know, specific things where we closed up within -- though, I probably suspect it would have been some leases, which he was involved with, you know, a long time ago.  He's a good guy.  Capable.

Q.    And you've spoken -- when is the last time?

A.    It's been a while.  I don't recall exactly when.

Q.    When is the last time you spoke to Mr. Crossman?

A.    I said I don't recall.

W. Monsees Stubbs
September 17, 2025

Page 99

MR. BIDEAU:  I think this is a good time to take a break.

MR. KELSER:  Yeah.  I think -- do you want to grab a bite?

THE WITNESS:  Whatever.  I can either quit now or keep going.  I'm fine either way.

MR. KEYSER:  It's --

MR. BIDEAU:  12:30.  I don't know if you want to take a break.  We can maybe go 15 or 30 more minutes or take a break now.

Why don't we start -- we stop generally -- why don't we take a break now and then we'll come back.

MR. KELSER:  Okay.

MR. BIDEAU:  Okay.

THE VIDEOGRAPHER:  The time is 12:30 p.m. We're off the record.

(Proceedings recessed at about 12:30 p.m.)

(Proceedings reconvened at about 1:23 p.m.)

THE VIDEOGRAPHER:  The time is 1:23 p.m. This begins Media Unit Number 3 and we are back on the record.

BY MR. BIDEAU:

Q.    **Mr. Stubbs, take a quick look at Exhibit 1, please.**

W. Monsees Stubbs
September 17, 2025

Page 100

Okay.  And back to the third page of the list of properties.  If I look at this, it looks like the -- other than the FGHP properties, the only properties that are currently having -- that are currently existing are Zeus Canal, LLC, which has the present 452 Berkley, LLC.

MR. KEYSER:  Sorry.  Sorry.  Don't mean to interrupt you.  He was starting to make notes on it.

MR. BIDEAU:  Yeah.  Don't make notes on that document.

MR. KEYSER:  So this is -- this is going to go with her.  So just listen to the question that he's asking and just try not to mark that up.

THE WITNESS:  I don't get my own copy?

MR. KEYSER:  You can have mine.

MR. BIDEAU:  Yeah, I have a copy.

MR. KELSER:  Yeah, if you have an extra copy.

MR. BIDEAU:  We do.  I'll give you a copy.

(Discussion held off the record.)

BY MR. BIDEAU:

Q.    Let me start again, Mr. Stubbs.  I have handed you that back, Exhibit 1, which are your interrogatory responses.

W. Monsees Stubbs
September 17, 2025

Page 101

A.    Right.

Q.    And we're going back to Number 10 again. If I -- if I understand this chart correctly, the only -- the only asset management, businesses, companies or entities in which you have an interest that are currently existing are Zeus Canal, LLC, which we talked about, 452 Berkeley, LLC, and then, of course, Zeus Realty, but you said that's just a service company?

A.    Can you start that list over again?

Q.    Sure.  The -- the only two -- strike that.
          Looking at Exhibit 1, your response to question 10, the only two entities outside of the FGHP entities that appear to be active are Zeus Canal, LLC and 452 Berkeley, LLC, correct?

A.    No, Zeus Realty Services, LLC.

Q.    Right.  But Zeus Realty Services is not an investment.  It's a service company, right?

A.    That's correct.

Q.    Okay.  So do you possess an interest in any other asset management businesses, companies or entities. Other than the ones listed on paragraph number -- in response to paragraph 10?

MR. KEYSER:  You're talking about at present, right?

MR. BIDEAU:  At present, right.

W. Monsees Stubbs
September 17, 2025

Page 102

THE WITNESS:  I don't believe so.

BY MR. BIDEAU:

Q.    Okay.  And are you -- is Zeus Realty Services, LLC providing management services to any entities or businesses or investments at present, other than perhaps Zeus and 452 Berkeley?

A.    When you say management, do you mean property management or do you mean asset management or what kind of management?

Q.    Well, how about -- we'll make it broader. Thank you.

Is Zeus Realty Services providing any services of any type to any companies or entities, other than Zeus Canal, LLC and 452 Berkeley?

A.    I don't believe so.

Q.    I want to turn now to talk a little more detail about the FGHP Partnership and some issues in this lawsuit, okay?

A.    One more question.  There are -- there were one of the -- one of the entities, there are, let's say, residual interest to which we ascribe no value, which may at some point in time have value, but it was kind of a -- you know, it's a -- it's remained an interest that's germane to whole lot of stuff.  That -- and I don't even remember -- I don't know the specifics.  All I'm saying

W. Monsees Stubbs
September 17, 2025

Page 103

is there's Hope Certificates, sometime in the bulk of this time, may add some value that is, I think, irrelevant for all purposes unless you're really being anal. And I'm not even sure I could even -- I could -- I could go back, call my office and try to get the particulars, if it matters.

Q. So there are some entities -- well, two questions.

There are some entities or businesses not listed in response to number 10 in which you have an interest?

A. No, no, no. I think there -- there is an entity here which does have something that may or may not have any value at some point way down the road.

Q. Which entity is that?

A. That's what I'm trying to remember. I -- I -- the chances of that being meaningful are just so remote, it's -- it's not -- it's not even one here that I recall and I don't recall the name of it. It's -- it's --

Q. What kind of --

A. All I'm saying is kind of like there's a Hope Certificate that's, you know, in the fullness of time, if the stars aligned, there might be a shekel or two left.

W. Monsees Stubbs
September 17, 2025

Page 104

Q.   What kind of property is it?

A.   I don't remember.

Q.   And -- and you don't -- you don't remember the name, you don't remember the kind of property.  Do you remember where it's located?

A.   No.

Q.   Well, how do you know there's even --

A.   Well, just reading this list, it's -- oh, yeah, there's -- you know, there's a, you know, there's something that -- that's consummated, you know, that's been resolved, that we still have a piece of -- you know, we have a piece of paper that has a claim on something that may or may not be worth something way down the road in the future.

So it's -- it's a -- I am being overly anal, probably.

Q.   Okay.  But you can't tell me anything about it sitting here?

A.   But -- but I could call and find out.

Q.   Is there anything else besides this one Hope Certificate --

A.   Nope.

Q.   -- that you think seems to be missing?

A.   Nope.

Q.   And does Zeus Realty Services provide any

W. Monsees Stubbs
September 17, 2025

Page 105

services to that entity that you can't remember?

A.   Oh, no.  I mean, it is literally a Hope Certificate.

No, there's nothing to be done.

Q.   Okay.  So the only entity for Zeus providing any services today --

A.   Are on this list.

Q.   Are the two that are listed as active on this list?

A.   Yes.  Wait a minute --

Q.   Is there something that you remember?

A.   Yes, yes.

My memory is not what it used to be.

MR. BIDEAU:  All right.  Why don't we go off the record so I'm not using my time while he's thinking.

THE VIDEOGRAPHER:  Off the record at 1:33 p.m.

(Proceedings recessed at about 1:33 p.m.)

(Proceedings reconvened at about 1:33 p.m.)

THE VIDEOGRAPHER:  The time is 1:33 p.m.  We're back on the record.

BY MR. BIDEAU:

Q.   Did you remember another entity?

A.   Yes.  44 Warburton, LLC.

W. Monsees Stubbs
September 17, 2025

Page 106

Q.  Okay.

A.  It owns a -- a -- an interest in a -- a property, a property in New York state that -- where I have, I think, a one third interest, plus or minus, that has some value and -- but that would get me the specifics from my colleague.

Q.  All right.  So what's the name of it?

A.  44 Warburton, LLC.

Q.  And can you spell that.

A.  W-A-R-B-U-R-T-O-N.

Q.  You have a one third interest and it has value?

A.  Yes.

Q.  You just don't know how much value?

A.  That's correct.

Q.  And does Zeus Realty Services provide any services to it?

A.  Yes.  It's not something that really requires services.

Q.  What is it?

A.  I don't recall.

Q.  How do you know it doesn't require services?

A.  It if required services, I would be more likely to recall it because it required, you know, my

W. Monsees Stubbs
September 17, 2025

Page 107

activity.  It -- it's a project which is a -- you know, it does not require any management oversight to speak of. It's a passive investment.

Q.    So Zeus Realty Services doesn't provide any services to that entity is your testimony?

A.    No, that -- that would be, yes, an accurate statement.

Q.    Okay.

A.    So if -- if that -- if that's the bar here, then its exclusion would be appropriate.

Q.    That was a different question, so --

A.    Okay.

Q.    So its exclusion wouldn't be appropriate for number 10 but you answered my next question.

Okay.  You said that you had visited the La Caretta rental property and the property in Tampa, in the last two years, have you visited any other properties that are in the FGHP portfolio?

A.    I don't believe so.

Q.    And did you participate in the renegotiation of the La Caretta rental property in 2020?

A.    No.

THE STENOGRAPHER:  What property?

MR. BIDEAU:  La Caretta.  C-A-R-E-T-T-A.

BY MR. BIDEAU:

W. Monsees Stubbs
September 17, 2025

Page 108

Q.   And the answer is no.

Let's talk about the -- the formation of FGHP, okay?

A.   Okay.

Q.   Yeah.  And do you have that --

A.   You can -- you can hand me --

Q.   I don't want -- I don't want you to be distracted while we're doing this.

MR. KEYSER:  Okay.  That's okay.

I think we can do this.  Your notes and stuff like that.  So just listen and take it from him.

THE WITNESS:  Why does he take it?

MR. KEYSER:  It's something that he gave us for you to use.

THE WITNESS:  Oh, I was just making notes on it.

MR. KEYSER:  Yeah, you don't -- don't worry about that.

THE WITNESS:  Okay.

BY MR. BIDEAU:

Q.   Okay.  So let's talk about FGHP, okay?

A.   Okay.

Q.   Prior to you becoming involved in FGHP, did you know Mr. Felsher?

W. Monsees Stubbs
September 17, 2025

Page 109

A.    No.

Q.    Did you ever meet Mr. Felsher?

A.    Before that?

Q.    Before that.

A.    No.

Q.    And how was it that you came to be introduced to -- strike that.

Under the FGHP Partnership Agreement, there's a -- there's a description of a portfolio that mentions that it was acquired as a result of negotiations with NationsBank?

A.    Yes.

Q.    Do you recall that?

A.    Yes.

Q.    Okay.  So this -- this, you do remember?

A.    Yes.

Q.    And how was it that you became aware of the fact that NationsBank had some assets to sell?

A.    Well, I represented NationsBank in the sale of the first portfolio of nonperforming loans in the RTC era, which was pretty groundbreaking at the time.  I had strong relationships in Japan, I was able to make that -- make that happen.  As a result --

Q.    So what year was that?

A.    I don't recall what year this was.  This

W. Monsees Stubbs
September 17, 2025

Page 110

would have been -- this had been around 1991.  '90-'91,
I think.

Q.    And -- and how did it come about that you were involved in the sale of a portfolio from NationsBank to some group in Japan?

A.    I was in real estate investment banking and had been for the past decade and had a -- well, the actual introduction was made from an associate of mine, somebody that worked for me and -- and that's when I left and started my business on was working with NationsBank.

I got this done and that -- Hugh McCall, who was running the bank, who was the CO of the bank at the time, was ecstatic because -- and, obviously, he had given this shit away and his response was simply that I want to get my stock --

THE VIDEOGRAPHER:  Sir, stop talking for a moment.  Your microphone --

MR. KEYSER:  You lost your microphone.

THE VIDEOGRAPHER:  And repeat everything you said after you put your microphone back on.

THE WITNESS:  Okay.  I don't --

THE VIDEOGRAPHER:  Wait, wait, wait.  Don't speak until you put the microphone on.

BY MR. BIDEAU:

Q.    Okay.  And now we can go, okay?

W. Monsees Stubbs
September 17, 2025

Page 111

And I'm not interested in what other people may have told you or hearsay.

I'm asking you how -- how had you gotten involved in selling a portfolio of assets from NationsBank?

A.    I had represented NationsBank in a sale of another portfolio.

Q.    And that -- and when you say you represented them, did you represent them while you were with Merrill Lynch Capital?

A.    No.

Q.    When did you represent them?

A.    I represented them after I left Merrill Lynch.

Q.    Okay.  So now you remember what you were doing after you left?

Because when I asked you this morning, you didn't remember what you were doing after you left Merrill Lynch.

A.    I think you will find my mornings and afternoons are quite different.

Q.    Okay.  I hope I do not have to repeat the whole morning.

A.    I hope so as well.

Q.    Okay.  So now you remember that you were --

W. Monsees Stubbs
September 17, 2025

Page 112

were you working for a company after you left Merrill Lynch?

A.   No.

Q.   So what was the name of the entity that you were working for?

A.   It was my -- it was my -- it was me, myself and I.  I don't know that I had a corporate entity at that time.  I was working as a -- an independent investment banker doing transactions with companies that I had built up relationships with over time, NationsBank being one of them.

Q.   Okay.  So you spoke to -- so you got involved in a portfolio with NationsBank to sell to -- to an investment group out of Japan?

A.   Yes.

Q.   A portfolio?

A.   Yes.

Q.   Okay.  And then how did you -- how did you come to learn about the portfolio that was ultimately acquired at FGHP?

A.   I was working with Jeff Figgy and Jim -- Jim Hansen, who was the chief credit officer and the chief financial officer of NationsBank, in concert with Hugh McCall who was the CEO.  He was sufficiently grateful for what I'd gotten done, but as he said, "I

W. Monsees Stubbs
September 17, 2025

Page 113

don't give a shit about the price.  I just want to get this stuff off my balance sheet.  So that the -- the analysts will see the good things that are happening here and get my stock price up so I can go buy other banks."

So he gave me a weekend alone in the special asset bank in Charlotte, North Carolina to go through every nonperforming loan in the bank's portfolio and pick out a couple hundred million of cherries.

Q.   Do you have any document that reflects that conversation?

A.   Of course not.

Q.   Do you have any documents that will reflect any of the work you did at Nations -- for NationsBank back in 1990?

A.   I sincerely doubt it because of the passage of time and my recordkeeping.  But I think that you could go -- you could probably be able to find this because the bank held the -- the bank's books open until the 8th of January in order for me to be able to get this thing closed so that they could get the -- get it off -- you know, get it off their books before the end of the year.  It was a -- a significant undertaking.

Q.   And are we talking about the deal with Japan or FGHP now?

A.   That's the deal from Japan.

W. Monsees Stubbs
September 17, 2025

Page 114

Q.    Okay.  So we had the deal with Japan.
After that, NationsBank was happy and so --

A.    So I spent a weekend going through the
special asset bank in Charlotte, and I picked up a couple
hundred million dollars of things that were -- whether it
was good, fundamental underlying real estate and bad --
bad capital structure.

Q.    And so when you said --

MR. KEYSER:  Sorry, were you finished with
your answer?

THE WITNESS:  Yes.

BY MR. BIDEAU:

Q.    Okay.  So when you say there was a couple
hundred million dollars, do you have any notes or lists
or documents about that?

A.    Well, I would assume I could go pick this,
the -- the -- I haven't looked at that stuff in over 20
years.

So is there something somewhere?  I don't
have a clue.  Likely, but --

Q.    And -- and was that list of -- were those
documents some of the documents that you looked at that
ultimately got presented as part of the portfolio?

A.    Absolutely.

Q.    Okay.

W. Monsees Stubbs
September 17, 2025

Page 115

A.    Yes.

Q.    So where are the documents that you looked at to see if you have those documents that show what you did?

A.    For the -- the FGHP portfolio?

Q.    Yes, sir.

A.    I don't have a clue.  Do I have those records somewhere?  Perhaps.  I don't know.

Q.    Okay.  And then when you say that you made a -- okay.  When you say you picked up a "couple hundred million dollars," how is it that you did an evaluation of those assets?

A.    I was an investment banker.  That was my livelihood.

Q.    Okay.  Did you use appraisals?  Did you use appraisers?

A.    No.

Q.    So you eyeballed it?

A.    I went through -- I -- yes.  That's what I did for a living is I raised money for banks.  I mean, yes, that's my specialty.

Q.    Okay.

A.    All right.  When I went through -- I went through, you know, hundreds of boxes of loan documents in order to find things where there were what I believed to

W. Monsees Stubbs
September 17, 2025

Page 116

be good collateral so that there would be a decent chance of recovery, and where the pricing on the bank's books was such that it, you know, it was an advantage to them, and they were happy and we were happy.

Q.   And did any -- did anybody work with you on that project?

A.   No, not at that point.

Q.   And when -- when did you do that?

A.   It was -- what?  This is 1990, plus or minus.  '91.

Q.   1992 when FGHP was born?

A.   Yeah.  So it would have been immediately prior to that.

Q.   And did you make any reports or take any -- prepare any charts or spreadsheets or anything with respect to those assets?

A.   Some, absolutely.

Q.   Okay.  And you may have those, you just don't know?

A.   I would say the likelihood is -- you know, at that level of detail, is pretty remote.

Q.   Why?

A.   It's been decades.

Q.   Okay.  So how is it then that -- so did you have the funds available to purchase those assets?

W. Monsees Stubbs
September 17, 2025

Page 117

A.    No.

Q.    And how is it that you were introduced to Mr. Felsher?

A.    Through a John Shugrue.

Q.    And how did you know Mr. Shugrue?

A.    John Shugrue worked for me, reported to me when I was at Merrill Lynch.  He knew Gary because he was at Citibank and Gary was a -- a client of Citibank and he made the introduction.

Q.    Okay.  And have you ever -- you had never worked with Mr. Felsher before, right?

A.    No.

Q.    Did you present that portfolio of loans from NationsBank to anyone besides Mr. Felsher?

A.    I don't recall.  I would have -- they would -- I don't recall the specifics, but the answer I'm stating is yes, because, you know, I would have looked for -- to try to find, you know, the best fit that I could.

Q.    You are out looking -- basically, when you identify the assets, you're out looking for money?

A.    Yes, that's correct.

Q.    Okay.  And the reason you went to Mr. Felsher is he was recommended by somebody that had worked for you?

W. Monsees Stubbs
September 17, 2025

Page 118

A. Yes.

Q. As somebody who could bring money to the table?

A. And who would -- would have an interest in this kind of financing, which was somewhat esoteric at the time.

Q. Did you do any background work on Mr. Felsher?

A. Not that I recall. I don't believe so.

Q. And why did you bring the opportunity to him?

A. Well, I had -- I had somebody that worked for me who I knew well and as a result -- and trusted, and he made the recommendation. And so that was a -- you know, that was a good recommendation.

Q. And do you remember the name of anyone else you brought the opportunity to?

A. Not off the top of my head, no.

Q. Do you have records that would show that?

A. That would show what?

Q. Records that show who else you brought this opportunity to.

A. I can't imagine. I mean, that's decades ago.

Q. Now, at this time in 1992, you had not been

W. Monsees Stubbs
September 17, 2025

Page 119

involved in actually managing commercial real estate properties, correct?

A.     That's correct.

Q.     I think you told me -- I think you told me that you were involved in -- when you worked for both Dean Wittner and Merrill Lynch, you were involved in overseeing the management of the portfolio, is that right?

A.     Absolutely, yes.

Q.     Okay.  So we were talking about management. You mean, you weren't doing the actual property management, you were overseeing those people who were doing the property management?

A.     Yes.  At -- at -- at that point in time, it was -- I was with a firm and we had, you know, had people under me that did a lot of those more granular things.

When I was out on my own, I became chief cook and bottle washer.

Q.     Now, when you -- was anybody with you when you met with Mr. Felsher?

A.     I don't have any recollection.

Q.     Do you have any recollection of meeting at all?

A.     No, I don't remember the meeting.

Q.     Do you remember where it was?  When it was?

W. Monsees Stubbs
September 17, 2025

Page 120

A.    No.

Q.    And do you recall discussions with Mr. Felsher that Mr. Felsher did not want to be involved in the management of the portfolio?

MR. KEYSER:  Object to the form.

You can answer.

THE WITNESS:  Yes.  I mean, that -- that was not his role and he -- you know, he had a -- he had a good -- good comfortable life.  He didn't want to get, you know, drug into the weeds.  That was understandable.

That was -- his job was providing capital, my job was to make money with it.

BY MR. BIDEAU:

Q.    All right.  Okay.  And did he explain to you that part of your job was to once it got started, to sort of oversee the operations, the actual operations?

A.    I would say more broadly, it was to make it work whatever it took.

Q.    When you say "make it work," make sure the properties worked?

A.    Well, it -- these were not properties. These were loans that -- these were -- these were -- these were problem assets, I mean --

Q.    How long has it been backed up by real --

W. Monsees Stubbs
September 17, 2025

Page 121

commercial real estate, correct?

MR. KEYSER:  Sorry.  I want to make sure, were you finished with your answer before?

I just want to make sure you're giving him --

THE WITNESS:  Well, just to give you a flavor -- a flavor for this, there was a guy named Seth Cadensky, who was a developer in the Miami area who -- who NationsBank had been chasing for some point for some time to the extent where he escaped out of a second story window of his office building, the rear of the building in order to get away from the -- to get away from the people trying to serve him papers.

We brought him up, at Gary's suggestion, to our offices in New York where he was able to plead his case and came down with a financial partner from -- from Canada in order to try to see if he could set -- make some kind of a deal.

And so we sat down with him there and heard his story and, you know, tried to negotiate something that we thought made sense, and there was no meeting of the minds.  So as he was leaving the building, we had a process server standing by that we had flown up from -- flown up from Florida

W. Monsees Stubbs
September 17, 2025

Page 122

sitting in the lobby, pressed the papers against him when he left.

BY MR. BIDEAU:

Q.   Okay.  So --

A.   So it's a rough and tumble business.

Q.   I get that.

And what Mr. Felsher made clear to you was at his stage of life, he didn't want to deal with the -- with the operations?

A.   Absolutely.

Q.   That was good -- that, as between the two of you, that was going to be your job, he was going to bring in the money?

A.   That's correct.

Q.   And in this portfolio, there were debtors. There were also properties, too, right --

A.   Yes.

Q.   -- that NationsBank, taken back.

Okay.  And somebody was going to have to be sure -- somebody was going to have to supervise the management companies and the landscapers and all that kind of stuff, right?

A.   No.

Q.   No?

A.   No.

W. Monsees Stubbs
September 17, 2025

Page 123

Q.   Nobody's going to have to supervise them?

A.   Because we were buying loans, we were not buying the properties at that point in time.

Q.   Okay.  So that's why I asked.  I said --

A.   But -- but that's different.  There was some OREO there but the preponderance of the assets were debts.

Q.   That's what I asked.  I understood there were debt instruments and then I said there were also some actual properties, right?

A.   Yes.

Q.   And you said yes?

A.   Yes.

Q.   And so with respect to the actual properties, okay, part of your job was going to be making sure that those properties were properties were properly taken care of and handled?

A.   All of the assets, whatever they were, yes.

Q.   Whatever they were, it was your job to make sure that they were -- they were handled?

A.   Yes.

Q.   Gary supplied the investor's money and you took care of the operations?

A.   Yes.

Q.   And that's what your -- that's what you --

W. Monsees Stubbs
September 17, 2025

Page 124

and that's what you called your promote.  That was what your promote was for?

A.    Well, my promote was for the -- the financial results.  However, they -- however, that happened to be.  It was not -- you know, it wasn't dependent on the nature of the asset, whether it was a loan, whether it was a property --

Q.    I get that.

A.    -- those kinds of things.  It was kind of, you know, we had to get to certain financial hurdles in order to get the promote.

Q.    Well, sure.  In order to get the -- actually, realize it but --

A.    Yeah.

Q.    -- in terms of what you were going to do, Gary's going to -- Gary was getting a promote for bringing the money, you were getting a promote for making sure that --

A.    For bringing the deal and making it work.

Q.    And making sure it worked, right?

A.    Yes.

Q.    Okay.  And was it ultimately Mr. Felsher who selected which of the assets to include in this partnership?

In other words, you have a list and he was

W. Monsees Stubbs
September 17, 2025

Page 125

going to supply the money.  Was it ultimately he who decided these are the ones that were going to --

A.    These were the joint -- these were joint decisions.  Obviously, he wouldn't approve putting his money into something that he didn't think was good.  I wouldn't propose going forward to acquire an asset that didn't make any sense.

And so, you know, I scrubbed the stuff down, I got it located, located the properties and we would sit there and go through on an asset-by-asset basis, this is, you know, so that he would become comfortable that this made sense and that we would be able to execute it.

Q.    Right.  But you put together the information.

Ultimately, as the investor, he was going to make the decision as to which --

A.    He had to sign, absolutely, if --

Q.    Let me finish.

A.    Yes.  Go ahead.

Q.    He had to sign off on the investment?

A.    Absolutely.

Q.    Okay.  Ultimately he made the ultimate decision which properties, which assets were going to be included in the portfolio that -- that would be acquired?

W. Monsees Stubbs
September 17, 2025

Page 126

A.   Yes.  I mean, of course.  If he didn't want an asset, we wouldn't buy it.

Q.   Okay.  And do you recall who the -- so you presented the assets to Mr. Felsher.  Was there some due diligence done?  What was done?

A.   Yes.  There was due diligence.

Q.   Okay.  You presented but do you remember who the attorney was who worked on the transaction for FGHP?

A.   It might have been Donald Fowler.

No.  I don't recall for certain.

Q.   Do you remember a lawyer by the name of Martin Edelman?

A.   Donald Fowler.

I think Marty Edelman was at Battle Fowler and he was this -- he was a --

Q.   Kind of the senior partner on the deal?

A.   What?

Q.   He was kind of the senior partner on the deal?

A.   Gary's nodding yes.

Okay.  Yes.

No, I mean, you know, this was a -- this was a -- somebody that he knew and was comfortable with and was new to me and -- yeah.

W. Monsees Stubbs
September 17, 2025

Page 127

MR. BIDEAU:  Let's mark this.

(Plaintiff's Exhibit No. 7 was marked for identification.)

BY MR. BIDEAU:

Q.    Okay.  Showing you Exhibit 7.

Okay.  Do you recognize the document?

A.    Yes.

Q.    Okay.  And this is an agreement between you and Mr. Felsher?

A.    Yes.

Q.    Okay.  And this agreement was executed prior to the time that the FGHP Limited Partnership Agreement was signed and prepared, correct?

A.    Yes.

Q.    And as I read this agreement, it looks like Mr. Felsher or related persons or entities will be responsible for investing -- on the first page --

At least 5. -- $5,550,000, and you were going to be investing $500,000.  Do you see that?

A.    Yes.

Q.    And hopefully, Mr. Felsher brought the investors to the deal that made this deal happen, correct?

A.    Yes.

Q.    Okay.  And it then says that "Mr. Felsher

W. Monsees Stubbs
September 17, 2025

Page 128

will not make the investment unless subject agrees to make the time and effort described in the agreement."  Do you see that?

A.    Yes.

Q.    And you understood that, right?

A.    Yes.

Q.    In 1992, other than working on this particular transaction, were you working -- were you doing other transactions?

You said you had your own company?

A.    Yes.

Q.    Okay.  Was your company doing other transactions besides this one?

A.    I don't recall specifically.  But this became all-consuming, and so, you know, certainly there were other things that I was doing along the way, but, you know, lesser consequence.

This was a -- this was an extraordinary situation where -- because of the -- I had the good fortune to represent the bank.  They repaid me in kind with a tremendous opportunity, and so this -- everything else paled in comparison to this.

Q.    Okay.  So this was a significant transaction for you?

A.    Yes.  And for everybody that got involved.

W. Monsees Stubbs
September 17, 2025

Page 129

Q.    And let's go to paragraph 6 of the agreement.

Okay.  So it fails -- strike that.

You're familiar with paragraph 6 --

A.    Yes.  I'm looking at it.

Q.    Before I -- before I go to paragraph 6.

Okay.  Before we go to paragraph 6, did you have an office location in 1992?  Were you working out of your home?

A.    I -- I -- I don't recall.  I -- obviously, I had to have -- I don't recall.

Q.    Okay.

A.    I'm not -- I'm not sure how it matters whether I was working out of a phone booth or a --

Q.    Ultimately, after the transaction closed, did you begin working with -- out of Mr. Felsher's offices?

A.    Oh, yes.  After -- after the closing, yes.

Q.    Okay.  And at the time that this FGHP -- strike that.

At the time that Exhibit 7 was executed, you understood that Mr. Felsher expected you, okay, to devote the time and expense -- the time and effort necessary to manage the portfolio, correct?

A.    Yes.

W. Monsees Stubbs
September 17, 2025

Page 130

Q.    Okay.  And you're familiar with paragraph 6 of Exhibit 7, correct?  It says --

MR. KEYSER:  I think the page before.  Just tell us what page.

BY MR. BIDEAU:

Q.    Sure.  I'm on page 3, top of paragraph 6.

"If Stubbs fails to comply with the terms of 3. -- 6.3a of the FGHP agreement relating to the time and effort he must provide to the transactions on behalf of the partnership for any reason other than his debt..." and it goes on to talk about a number of other things that we'll talk about, okay?

So you understood that one of the things that you were responsible to do was to comply with the terms of paragraph 6.3a of the FH -- of the FGHP agreement, correct?

A.    Yes.

Q.    Would you agree with me that in the last five years, you have not done anything to manage any of the assets of the portfolio?

A.    I would say anything is an extreme position, but I have not -- it has certainly not been my primary endeavor.

The -- the -- the portfolio, we changed our business plan substantially after the acquisition because

Page 131

we originally anticipated if we would resolve the problems with the nonperforming loans, convert all of that to cash, send money out to everybody and go about our business.

After meeting the initial hurdle rate of 40 percent IRR to the investors, in order to get into the promote, which we did by taking a discounted payoff of two hotel loans in Myrtle Beach, South Carolina and got into the process, we said, well, this is -- these are good assets.  There's additional money to be made here. But through the finishing off some of the projects, developing them, maximizing the income and that our profits would be maximized, not by the liquidation of everything and paying taxes on that, but to go forth, build them out, you know, finish the -- finish the project, because most of them were stalled along the way, increase their value, finance them to get our money back, and enjoy the benefits of the net operating income of the properties.

**Q.    And so at -- during the life of this project, there were -- the FGHP had a substantial number of properties --**

A.    Yes.

**Q.      -- that you-all kept and developed, managed, operated, et cetera, correct?**

W. Monsees Stubbs
September 17, 2025

Page 132

A.    That's correct.

Q.    Okay.  And in the last -- and FGHP still owns a number of properties, correct?  In fact, like you said --

A.    Yes.

Q.    -- La Caretta was a jewel, right?

A.    Yes.

Q.    Okay.

A.    Well, it's really not a jewel.  It has one of the best locations that you could ever imagine.

Q.    Okay.

A.    It would be hard to do wrong in that location.  It's a little down on it's -- you know, it's a little -- it's -- it could be prettied up, shall we say.

Q.    Okay.  But -- but you have not been involved in overseeing the management of any of the remaining assets of FGHP in the last five years, correct?

A.    Well, what happened was --

Q.    No.  Just a simple yes or no, and then you can answer.

A.    Repeat your question.

Q.    In the last five years, you have not been involved in overseeing any of the management of the -- any of the remaining assets of FGHP, correct?

MR. KEYSER:  Object to the form.

W. Monsees Stubbs
September 17, 2025

Page 133

You can answer.

THE WITNESS: You're saying any of the management, the property management?

No. I've not been involved in property management.

BY MR. BIDEAU:

Q. Okay. Well, what we talked about -- we talked about property management before, and you and I agreed that -- I thought that was this morning. So maybe it's changed. You and I agreed that properties that had property managers, but ultimately the owner must oversee the property manager?

A. Yes.

MR. KEYSER: Object -- sorry, I'm going to object to form.

You can answer.

BY MR. BIDEAU:

Q. You will agree with me that in -- with any commercial property, including the ones owned by FGHP today, the owner must oversee the operation of the property managers, the accountants, whoever is operating, whoever is doing the day-to-day stuff, correct?

MR. KEYSER: Form.

THE WITNESS: There are different levels of management of any property. You know, people that

W. Monsees Stubbs
September 17, 2025

Page 134

are -- with boots on the ground all the way up to people that are -- you know, that just, in the case of a large public company, that are overseeing the books are keeping track of that.

BY MR. BIDEAU:

**Q.   Okay.  Let's talk about the FGHP properties, okay, because I didn't think this was controversial but maybe it is.**

**Let's talk about the FGHP properties.  In the last five years, you have not been involved in overseeing the management of any of those properties, correct?**

A.   Let me ask you a question more closely. The -- we had made the determination to change the business plan from liquidating all of the assets and giving everybody their money back to taking it -- to increasing the value of the assets by finishing the construction, leasing them out, so on and so forth, in order to enhance the value and ultimately to, you know, finance them, get our money back and enjoy the fruits of our labor by continuing to own, operate and manage them.

To that end, I created a -- a property management company from Hope Law, hiring Colliers to do the -- the books and records for a point and then hiring individuals in the local market to take care of the basic

W. Monsees Stubbs
September 17, 2025

Page 135

day-to-day needs of the properties and to manage that stuff or oversee it from the New York office.

Q.   **And -- and the New York office, one of the owners was going to have to then oversee whatever the property manager was doing, whatever Colliers was doing, whatever contractors were doing, correct?**

A.   Yes.  And I initially did that, and then as we worked out the portfolio, trimmed down what we had to those things that we wanted to keep, I put in place the property management company and we hired ultimately Jay Benowitz who came in there initially as the controller, dealing with the books and over time, took over the -- and was quite covetous of it, the -- the -- the profit -- the asset management, if you will, the oversight of those -- of those properties.

And so it was a well-oiled machine that had -- that worked for an extended period of time enhancing the value of these assets, enjoying the fruits of that and creating a good bit of -- of -- in addition to the operating income from the properties, producing revenues from the property management which -- and enure it to the benefit of the sponsor.

Q.   **Jay Benowitz is an employee, correct?**

A.   That is correct.

Q.   **Okay.  Jay Benowitz is not an owner, right?**

W. Monsees Stubbs
September 17, 2025

Page 136

He's not one of the partners of FGHP, correct?

A.    That's correct.

Q.    Okay.  And with respect to the owners of that FGHP, you -- in the last five years, you've not been involved in overseeing Mr. Benowitz' work, correct?

A.    That's correct.

Q.    In fact, in the last five -- and you haven't been involved in overseeing the work of any of the folks that are involved in actually operating any of the buildings, right?

A.    I put -- I put the infrastructure in place, hired the people, got the software so that this thing worked and ran on its own with supervision ultimately from Jay Benowitz, all right, to keep the properties leased, being competitive in their marketplaces and then generating the net operating income.

So I put the overstructure in place so that it ran like a clock kicking out money so --

Q.    So you --

A.    -- it didn't require me.  We hired and put in place the people to do all of that stuff.

Q.    So -- so --

A.    And it makes a lot of money.

Q.    So Mr. -- and you've made a lot of money on this investment?

W. Monsees Stubbs
September 17, 2025

Page 137

A.   As has everybody that's been involved with it.

Q.   Right.  You've made in excess of $15,000,000, correct?

A.   Wow.  I should be so lucky.  I didn't -- I didn't think it was that high but --

Q.   I can show you the distribution list, you made in excess of $15 million?

A.   Mazel tov.

Q.   Let's go back.  Mr. Benowitz can't decide on the amount of the lease for a tenant, correct?

A.   No.

Q.   He doesn't have that authority?

A.   Well, I -- I don't know, because he has -- he -- he replaced me, if you will, from that -- from that respect, and I would expect that -- does he make those decisions?  I would have to ask Gary at this point.  Is he comfortable with divulging it down to him?

Q.   When you say -- so now -- now Gary would be the one taking care of the operation of supervising Mr. Benowitz and supervising the property management.  As between the two of you, you now say it's Gary's responsibility to do that?

A.   I think that --

MR. KEYSER:  Form.

W. Monsees Stubbs
September 17, 2025

Page 138

THE WITNESS: Sorry.

BY MR. BIDEAU:

Q. Well, strike that.

Is it your position that it is Mr. Felsher's position to supervise Mr. Benowitz and the property management companies that handle the assets of FGHP?

A. I'd be glad to do that at any point in time. That is -- that is the way it has evolved. He has done that, Jay and I -- Jay very much wanted to replace me, which I resisted, you know, because I'm kind of a micromanager myself. And over time, we all were comfortable with what he was doing.

I certainly wouldn't have stepped back had I not had comfort and confidence in that because it -- you know, because it's -- you know, I didn't want to hurt my own returns.

Q. Did you talk to Mr. Felsher and get his agreement that Jay was now going to take over your job and you could walk away?

THE VIDEOGRAPHER: Counselor, I need you to stop playing with your microphone, it's -- I can't hear you and it's going to wipe out the witness as well.

Thank you so much.

W. Monsees Stubbs
September 17, 2025

Page 139

BY MR. BIDEAU:

Q.    Okay.  Did Mr. -- did you speak to Mr. Felsher and get his agreement that Jay could take over your role and that you could step out?

MR. KEYSER:  Form.

BY MR. BIDEAU:

Q.    You can still answer.

A.    I'm not sure.  I mean, it became -- it became evident because over time that's what evolved. And at no point in time, did he ever object.  Everybody liked it.  It worked.  We made money.  If -- if he had any concerns whatsoever at any point, he could have said so.

I was certainly under the impression from everything that I heard, saw -- and saw is that this was a great thing, everybody liked it.  It worked.  We made -- we made a good bit of money.  Certainly far more than any of us had ever anticipated coming from these things.  If he had been -- if he felt that this was not the right way to go, he had every opportunity under the sun to say so.

Q.    Did -- did you -- my question is a little bit different.  Did you -- you agree that at the beginning, you were handling the operations side.  You were handling the overseeing of everybody, correct?

W. Monsees Stubbs
September 17, 2025

Page 140

A.   Yes.  And it was -- when I -- when we -- we started, there was nothing.

Q.   Let me finish.  Let me finish.  I understand you-all came in and -- and the deal was Gary brings in the money, you're going to --

A.   I make it work.

Q.   You're going to make it work.  You're going to supervise employees, you're going to do whatever needs to happen to make it work, right?

MR. KEYSER:  Form.

BY MR. BIDEAU:

Q.   Is that correct?

A.   At the time we entered into the transaction?

Q.   Correct.

A.   The deal was that we were going to liquidate the assets and send -- and send everybody their money.

Q.   Let me -- let me --

A.   The business plan changed over time as it evolved, and we figured we could make more money by taking over the management, owning and operating the properties rather than just liquidating the -- liquidating the loan.

Q.   Now, let's get --

W. Monsees Stubbs
September 17, 2025

Page 141

MR. KEYSER: Wait, excuse me, you've got to let him finish his question, all right?

MR. BIDEAU: I --

MR. KEYSER: And then -- he has a right to do that.

MR. BIDEAU: If he wants to answer my question --

MR. KEYSER: Okay.

MR. BIDEAU: -- but he doesn't have a right to filibuster with a prepared answer each time my question happens to be --

Now, can you read back my question before that long speech.

(The stenographer read back: "You're going to make it work. You're going to supervise employees, you're going to do whatever needs to happen to make it work, right?")

BY MR. BIDEAU:

Q. Okay. Let me ask a better question.

Okay. So at the time that you-all entered into that transaction, you had a certain agreement. Gary's job was to bring in the money. Your job was to do whatever it took to make it work, supervise the operations --

MR. KEYSER: Form.

W. Monsees Stubbs
September 17, 2025

Page 142

BY MR. BIDEAU:

Q.    -- correct?

A.    My job was to make it work.

Q.    And your job was --

A.    I made it work by getting Benowitz trained so that he could assume the responsibility -- the responsibilities for managing the assets, which he has done for the last, I don't know -- for the last, I don't know, 10, 20 years.

Q.    Well, Mr. Felsher told you at the time that he entered in this transaction that he was expecting you to manage the asset -- the portfolio, correct?

A.    Yes.

Q.    Okay.  In fact, you wrote Gary a letter -- you wrote Gary a memo in 2010, didn't you, in which you said that you understood that Gary was insistent that you were going to be responsible for managing the assets in the portfolio, correct?

A.    I put a little nuance to that, as I was to be responsible for seeing that the job got done.

Did I need to be the -- in the trenches forever?  Absolutely not.  I performed.  I got it set up. I got the infrastructure in place.  I hired the people. I put the system in place, and it runs like a clock and has been throwing off cash for the last 20 years.

W. Monsees Stubbs
September 17, 2025

Page 143

And so do I need to be the person that's stuck doing that if I can hire somebody that, you know, that does that and -- and create -- change the business plan so that we make a lot more money?

Q.   So let me ask you a question then.

Jay Benowitz can't decide on his own, as -- Jay Benowitz can't decide on his own with -- whether to go with a particular tenant or not, correct?

That's an ownership decision, is that correct?

A.   That's correct.

Q.   Okay.

A.   Whether or not that has been divulged to him, I don't know.

Q.   Well, did -- you never divulged it to him, right?

A.   No.

Q.   Okay.

A.   But he has a much --

Q.   Hold on, let me ask the question, okay?

After -- when you were still there, you were the one who had to approve whether or not there was going to be a lease for a particular tenant or what the square footage was, correct?

A.   It depends on the size of the lease.  Some

W. Monsees Stubbs
September 17, 2025

Page 144

of these, you know, you just kind of have somebody renewing and -- or a minor, it doesn't really matter, you know.  Anything of consequence would be a joint decision.

Q.    Anything of consequence could be a decision, though, in the first instance, you were responsible for making, correct?

A.    I don't know what you're saying.

I'm saying, if there was anything of economic consequence, there would be a joint decision.  If it was a tenant renewing his lease that had no particular -- you know, it was inconsequential, then that didn't really require wasted breath to -- to decide it.  So it would not be my, you know, personality to do something without achieving concurrence on the part of -- of my partners.

Q.    Well, your only partner in this deal was --

A.    I understand that.  That's so -- he was knowledgeable of all of the things that we did along the way.  I mean, that is -- you know, that's just the way I am and that's the way that we ran it.

Q.    And so at the time that you were -- you know, Mr. Benowitz was hired in 2015, correct?

A.    I'll take your word for it.

I don't know the exact date of hire.

W. Monsees Stubbs
September 17, 2025

Page 145

Q.   You don't know when he was hired?  You don't know when you put this well-oiled machine in place?

MR. KEYSER:  Form.

THE WITNESS:  Not off the top of my head. It's been decades.  I wouldn't -- I wouldn't tell you what I had for breakfast without checking, so, I mean --

BY MR. BIDEAU:

Q.   As -- as the person responsible for managing the assets in a portfolio, when was it that -- that you determined that Jay was able to make decisions on his own and didn't need concurrence of ownership?

A.   It went --

MR. KEYSER:  Form.

THE WITNESS:  Go ahead.

MR. KEYSER:  Sorry.  You go ahead.  I was just saying objection for the record.

THE WITNESS:  Now, this is something which evolved over time.

You know, he was there for an extended period of time.

When we lost our lease at 645 5th Avenue, rather -- Gary moved to a new location, it was closer to his home, and I decided why do I need to, at this point in time, commute to Manhattan

W. Monsees Stubbs
September 17, 2025

Page 146

every day, because everything is being done by telephone anyhow down in Florida.

And -- and so I started working from the house and that, you know, that worked well. Jay had evolved into taking more and more responsibility with the tenants over time to the extent that in a case, we both showed up at the -- at the same tenants' organization on the same day with that -- without him having told me, because he was trying to establish himself and, you know, take over that role, which initially I resisted but ultimately said, well, this is really the best thing for everybody is to let him go into that.

BY MR. BIDEAU:

Q. And when did you tell your partner that you were going to -- going to give your role to Mr. Benowitz? When did you tell Mr. Felsher you were going to do that?

A. I don't recall ever having that conversation. It became apparent over time, and it operated that way for decades. And at no point did he ever say, oh, gee, I wish you would spend more time here. He never said that. He was happy we were all doing well.

Q. Well, how do you know Mr. Felsher -- did Mr. Felsher tell you I'm real happy with the infrastructure you put in place, and you -- you can go

W. Monsees Stubbs
September 17, 2025

Page 147

off and you don't --

A.    Well, I would say --

Q.    Let me finish my question.

A.    Go right ahead.

Q.    Did Mr. Felsher ever tell you that he was okay with you no longer overseeing the operations over the assets of FGHP?

A.    At no time did he ever say that he was uncomfortable with the infrastructure that I'd put in place to do all of those things.  And certainly he has benefitted from the asset management fees and the margin of the property management fees which enured to his sole benefit at this point in time.

Q.    So let me just -- let me just ask you again to answer my question, okay?

A.    I thought that was a good answer.

Q.    It was your answer.  Just didn't have an answer to the question I asked you.

Okay.  At any time -- okay, did Mr. Felsher tell you that he was agreeable to you no longer managing the assets in the portfolio as set forth in the original agreement between the two of you?

A.    Not to my recollection.  But at no time did he -- oh, over that 20-year span, did he ever say that, gee, I think you should be devoting more time to this.

W. Monsees Stubbs
September 17, 2025

Page 148

It's not working well.  It needs your attention.  You're supposed to do this.  There was never any communication at all that -- that indicated that that's what he thought I should be doing.

Q.   So -- well, the communication about what you were supposed to be doing was in the original contract you signed, right?

A.   But the business plan changed 180 degrees from that.

Q.   Did you -- so is that the reason that you stepped out from managing the assets in the portfolio?

A.   I don't understand your question.

Q.   You said the business plan changed.  Did you ever change your agreement?

A.   No.

Q.   Your agreements?

A.   Shame on us.

Q.   Because the -- because the agreement required you to manage the assets in the portfolio, correct?

MR. KEYSER:  Form.

You can answer.

BY MR. BIDEAU:

Q.   You can answer.

A.   And I set up an infra -- but they --

W. Monsees Stubbs
September 17, 2025

Page 149

Q.    But you also --

A.    Wait, wait, wait.

Q.    Back up.  Answer my question, okay?  And then I will let you explain, okay.

      The agreement required you to manage the assets in the portfolio, yes?

      MR. KEYSER:  Form.

      MR. BIDEAU:  What's wrong with the form?

      THE WITNESS:  What does form mean?

      MR. KEYSER:  Are you saying the language of the agreement says he's responsible for the management of the property?

      MR. BIDEAU:  I'm saying that he understood that the agreement required him to manage the assets in the portfolio.

BY MR. BIDEAU:

Q.    Was that -- I thought we were actually in agreement that was your understanding.

A.    Well, I -- I think you're trying to -- and I kind of twist the meaning of it.

      The object -- the -- what we were --

Q.    Go ahead.

A.    The business plan changed.  We were -- we did not set out to own this stuff for 30 years, and we did not document the change in the anticipate -- in the

W. Monsees Stubbs
September 17, 2025

Page 150

anticipated holding period of what we were going to do. It evolved over time.

Q. Okay. So --

A. And so --

Q. You've explained that to me, okay?

A. Yes.

Q. But you still didn't answer my question, okay? My question was -- I didn't ask you about the business plan, I didn't ask you about evolving. You understood when you signed the original agreement, in this case back in 1992, okay, that you were responsible for managing the assets in the portfolio, correct?

A. I would say that the management of the portfolio was accomplished by my efforts in setting up the infrastructure to see that it got done whether I was dead or alive.

Q. Okay. So is -- just so we're clear, though, you agree that it was your responsibility to manage the assets in the portfolio?

A. And I think that I have done so.

Q. First, tell me, "Yes, I agree," and then you can say, "I've done so," and we'll talk about that.

You agree that under the original agreement, you were responsible for setting -- for managing assets in the portfolio?

W. Monsees Stubbs
September 17, 2025

Page 151

A.    I think -- without having gone back to review the documents, I think that's a broadly interpreted inaccurate statement.

Q.    Okay.  Because we'll go through the language in the agreements if you want.

All right.  When did the business plan change?

A.    When we decided to own --

Q.    What year?

A.    What year?

Q.    What year?  What year did the business plan change?

A.    I don't even know what year we closed.  It was within the first few years.

As we liquidated the properties -- started to liquidate the properties, realized the potential there -- got a better understanding of it, realized the potential and figured we could make a lot more money.

Q.    Let me hand you -- so that was sometime in the 1990s?

A.    Yes.

Q.    Yeah?

A.    Yes.

Q.    Okay.

A.    We figured out that we could make a lot

Page 152

more money for everybody's benefit by continuing to own and operate the properties.  We never changed the operating agreement.

Shame on us.

Q.  And -- and you -- do you think the operating agreement should have been changed?

A.  We would -- I mean, we wouldn't be sitting here if -- if we had done so.

(Plaintiff's Exhibit No. 8 was marked for identification.)

BY MR. BIDEAU:

Q.  I'm handing you what I've marked as Exhibit 8, which is three pages.  And so the record's clear, I will explain the three pages.  These are marked Felsher 180467 and 180468, okay, and the last page is a native copy of 468.

The only difference being, if you look at 478 is when it comes to the date, it says date merged format.  That's because apparently when the memo was drafted, there was an auto -- it's an automatic update, so you have to print it in order to get the actual date to the document.  But -- but they're the same document.

MR. KEYSER:  Huh?

MR. BIDEAU:  I'll go through it.

BY MR. BIDEAU:

W. Monsees Stubbs
September 17, 2025

Page 153

Q.    This -- these documents came from your email account, your Pembroke Cap email account?

Mr. Stubbs?

A.    Okay.

Q.    Okay.  Who -- who is Ty Howard?

A.    Ty Howard is a -- a personal attorney, long-term friend.  Someone I've known for and relied upon for eons.

Q.    Okay.  And so --

MR. KEYSER:  Before your next question, if you're going to ask about conversations with him, I understand he's personal counsel, so attorney/client privilege.

MR. BIDEAU:  I wasn't going to ask about personal conversations.  I'm just going to ask about this particular --

MR. KEYSER:  I understand that.

MR. BIDEAU: -- memo.

MR. KEYSER:  I understand.  But I'm just putting that out.

BY MR. BIDEAU:

Q.    Take a look at the memo that's the second page to Mr. Felsher.  Do you see that?

A.    Yes.  Oh, you mean the second or the third?  I don't know which --

W. Monsees Stubbs
September 17, 2025

Page 154

Q.    Well, they're the same document with the exception, if you look under the date, the first one is an electronic copy, and because the date automatically updates when you print it out initially, it comes out with a merged --

A.    Okay.  You're saying the two -- two of the same?

Q.    Exactly the same.

A.    The third is a little easier to read.

Q.    Okay.  So let's use the third.

According to page 3 of Exhibit 8, which is a -- which is a memo from you to Mr. Felsher dated August 16, 2010, it indicates that -- you wrote, "As we were approaching the closing of the NationsBank portfolio, you pulled me into Marty Edelman's office to ensure that I would commit the time and effort necessary to manage the portfolio."  Do you see that?

A.    Yep.

Q.    That's something you -- you wrote to Mr. Felsher in 2010?

A.    Yep.

Q.    Okay.  Long after the business plan changed, right?

A.    Right.

Q.    Okay.  And then it says, "This effort was

W. Monsees Stubbs
September 17, 2025

Page 155

something, which at that point in your life, you did not want to undertake." And that's something that Mr. Felsher made clear to you at the very beginning at the back of 1992, right?

A. Yes.

Q. Okay. And then it says, "From this agreement, we entered into the attached agreement." He's referring to the F&S agreement, correct? The one we've been talking about here. It wasn't attached to your email, but that's the only agreement you-all entered into concerning this subject, right?

MR. KEYSER: Form.

THE WITNESS: Say that again.

BY MR. BIDEAU:

Q. Yeah. I mean, from this conversation, "We entered into the attached agreement," the agreement you're referencing is the one we've been talking about, the first agreement between you and Mr. Felsher, correct?

A. Well, I -- where is -- where are you --

Q. The last sentence of the first paragraph.

A. "From that conversation, we entered into the attached agreement."

Q. Right.

A. Okay.

Q. Okay. And that same language is referenced

W. Monsees Stubbs
September 17, 2025

Page 156

in the agreement you and I were just talking about, correct?

The same language about how --

A. I will take your word for it. I assume, okay.

Q. All right.

A. I don't think there's any argument over this.

Q. Right. And then you indicate in the last paragraph, "Memories fade with the passage of time which is one of the reasons written agreements are helpful." Right?

A. Right.

Q. Okay. And you are criticizing Mr. Felsher. And the next paragraph refers to some Pembroke revenues that you say are inconsistent with the agreement, do you see that?

A. I don't. Where are you?

Q. Sure. Okay. You're reading -- you say, last -- second sentence last paragraph, right?

A. Oh, last paragraph. I thought -- wait a minute.

Okay.

Q. Okay. And so in 2010, you were -- you were confirming -- you were arguing that Mr. Felsher was doing

W. Monsees Stubbs
September 17, 2025

Page 157

things that you thought violated the terms of Exhibit 7,

right?

A.   I don't know what Exhibit 7 is.

Q.   Right next to you, it's the agreement

between you.  That's what this whole document references,

correct?

A.   Paragraph 7?

Q.   No, no.  Exhibit 7.  Okay.

Your -- okay.  Your memo, okay, was saying

that -- your memo was referencing Exhibit 7, right?

Is there any other agreement between you

and Mr. Felsher other than Exhibit 7?

A.   I haven't a clue.

Q.   And the F&H -- well, do you know of any?

A.   Not off the head of my head.  I haven't,

you know, gone back and researched.

Q.   Well, do you -- in this whole litigation, I

can represent to you that there have been no other

written agreements between you and Mr. Felsher, okay,

other than Exhibit 7, and, of course, the partner -- the

ultimate partnership agreement that you took.

A.   Okay.

MR. KEYSER:  Is that right?

MR. BIDEAU:  Huh?

MR. KEYSER:  Isn't the operating agreement

W. Monsees Stubbs
September 17, 2025

Page 158

what Pembroke Capital --

BY MR. BIDEAU:

Q.   Are you -- do you -- well, let me ask you a question then.  Do you know what agreement -- take a moment and read paragraph -- read Exhibit 8 again.

Do you remember what agreement you're referencing there?

A.   This is -- this is the -- the --

Q.   It's that agreement, Exhibit 7, right?

A.   Okay.  You're saying paragraph 7?

Q.   Exhibit 7.

THE VIDEOGRAPHER:  Counselor, I apologize, but I'm going to need a bathroom break very, very soon.

MR. BIDEAU:  All right.  Let's take it right now.

THE VIDEOGRAPHER:  Thank you so much.

Off the record.  2:37 p.m.

Please unplug your microphones.

(Proceedings recessed at about 2:37 p.m.)

(Proceedings reconvened at about 2:51 p.m.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 3:35 p.m.  Excuse me, 2:51 p.m.  This begins Media Unit Number 4 and we are back on the record.

W. Monsees Stubbs
September 17, 2025

Page 159

BY MR. BIDEAU:

Q.    Who is Eric Goldschmidt?

A.    Eric Goldschmidt?  I don't recall.

Can you give me context?

Q.    Let me try.  Here's Exhibit Number 9.

(Plaintiff's Exhibit No. 9 was marked for identification.)

BY MR. BIDEAU:

Q.    Exhibit 9 is a three-page document from your MStubbs Path account, and I will refer to you the second page.  The cover email is May 26 of 2010, and then the second page is a memo from you to an Eric Goldschmiedt.  Do you see that?

A.    Yes, sir.

Q.    The question was, do you recognize this memo that you wrote to an Eric Goldschmidt?  It came from your email account.

A.    Okay.

MR. KEYSER:  Form.

This email is to a Goldschmidt or --

MR. BIDEAU:  It came -- it was --

MR. KEYSER:  It was in there?

MR. BIDEAU:  It was attached to -- the pages were attached.  It was attached to --

MR. KEYSER:  To an email to himself?

W. Monsees Stubbs
September 17, 2025

Page 160

MR. BIDEAU: To an email to himself.

MR. KEYSER: Okay.

BY MR. BIDEAU:

Q. Okay. Do you recognize this is a memo that you prepared for Eric Goldschmidt?

A. I have no recollection of it. I don't -- I don't recall an Eric Goldschmidt but, you know, I'm not sure what the relevance is.

Q. It looks like you were giving Mr. Goldschmidt some information about yourself and your history and background --

MR. KEYSER: Form.

BY MR. BIDEAU:

Q. -- in May of -- in 2010, does that refresh your recollection?

A. No, I've read it and I don't -- I don't recall it. You know, it's like, you know -- well -- so, no, I don't have any recollection and, obviously, I was a -- you know, worked with Jeff, who was a neighbor, and --

Q. Right. Exhibit -- Exhibit 9 is -- Exhibit 9. Exhibit 9 references in the second paragraph, your partner, Jeff Stewart, in S2 Group, LLC and we talked about Mr. Stewart this morning?

A. Yes.

W. Monsees Stubbs
September 17, 2025

Page 161

Q.   Okay.  And in the first paragraph, you -- you note that "In 1992, I formed FGHP Capital Limited Partnership, a real estate opportunity fund which acquired 100 million notes, an REO from NationsBank, the remnants of which I still manage."  Do you see that?

A.   Yes.

Q.   And that's an accurate statement as of the time you wrote this?

A.   I assume.

Q.   Is there any reason to think it's not an accurate statement?

A.   No.

Q.   Okay.  So -- okay.  But you don't remember this particular document or who Mr. Goldschmidt was?

A.   No.

Q.   Okay.

(Plaintiff's Exhibit No. 10 was marked for identification.)

BY MR. BIDEAU:

Q.   Do you recognize Exhibit 10 as a copy of the limited partnership agreement?

A.   Yes.

Q.   For FGHP?

A.   Yes.

Q.   Okay.  And paragraph 1.3, on -- I think

W. Monsees Stubbs
September 17, 2025

Page 162

it's page -- under Article 1.

A.    Uh-huh.

Q.    It says that "The sole business of the partnership is to acquire a portfolio of debt instruments and real estate properties from NationsBank of North Carolina, N.A., NationsBank of South Carolina, N.A., and NationsBank of Florida, N.A., (the NationsBank portfolio) consisting of those assets listed on Schedule B hereto and to operate, manage and sell or otherwise realize the value of some -- such debt interests and properties."  Do you see that?

A.    Yes.

Q.    And is that -- and that's an accurate -- and you understood that to be the business of FGHP, correct?

A.    Yes.

Q.    And then turn over to page 6.3, in terms of "Powers of General Partner."

Turn over to -- I'm sorry, page 23, paragraph 6.3.

Well, let me ask you a question first. Today, you are not devoting any of your time to the management of overseeing of any of the assets of FGHP, correct?

MR. KEYSER:  Form.

W. Monsees Stubbs
September 17, 2025

Page 163

THE WITNESS:  What?

MR. KEYSER:  You can answer.

THE WITNESS:  Not in a meaningful way.

I -- I -- I set up the infrastructure to enable us to reap the benefits from the continued ownership and operation of the properties, which was not the original business plan.

BY MR. BIDEAU:

Q.    Let me -- let me just ask my question again.  It's a pretty simple question, okay?

Tell me everything you've done in the last year in connection with any efforts on your part to manage the assets of the FGHP portfolio, anything you've done in the last year.

A.    I have given to Gary several opportunities to redevelop the vacant CVS property, and Gunn Highway in Tampa.

Q.    Have you done anything else in connection with -- anything else that you consider to be -- strike that.

Do you consider -- strike that.

Do you -- have you done -- been involved in any decisions with respect to leasing of any of the properties in the FGHP portfolio in the last five years?

A.    I have not received any information about

W. Monsees Stubbs
September 17, 2025

Page 164

any of the pending leases coming to the property in the last five years.

Q. Have you ever --

A. I would have been delighted to have been a party to that if they would have wanted my input.

Q. Well --

A. They chose not to include me in those discussions.

Q. When did you last perform any services that you considered to be in connection with your obligations to manage the FGHP portfolio?

A. I signed two guarantees within the last year, plus or minus, of somewhere between 10 and 20 million dollars, enabling the company to finance or continue to finance its properties.

Q. And you signed those guarantees in your capacity as a general -- as a general partner of the operating partnership, correct?

A. I believe that is correct. I'm not an attorney so I'm not going to -- don't want to be --

Q. Right. But by signing -- signing guarantees doesn't -- with all due respect, doesn't have anything to do with managing the operation of the -- managing the assets. So my question is more specific, okay?

W. Monsees Stubbs
September 17, 2025

Page 165

Is there -- can you give me anything you've done in the last five years, okay, that you consider to be fulfilling your obligation to manage the assets of the FGHP partnership?

A.    After putting in place the infrastructure --

Q.    That wasn't my question, with all due respect, sir.

A.    Well, this is the answer you're going to receive.  I did what I thought was required and the partnership has benefitted from that.

Q.    So --

A.    If there was -- if there was a concern that what I was doing was inadequate or did not apply it, I would have expected at some time over the last decade that there would have been some communication that would have said, hey, gee, we would like for you to give us your input, to participate, to do something.

I operated under the assumption that everything was going fine because it was.

Q.    So the answer to my question then is, you've done nothing in the last, say, ten years now to -- in connection with the -- with the operation of the assets -- strike that.

The answer to my question is that you've

W. Monsees Stubbs
September 17, 2025

Page 166

done nothing in the last ten years in connection with the management of the assets of the portfolio.  After you've claimed you built an infrastructure, you have basically left?

A.    If there were -- I received information about them, if there were things that were not operating as well as I had anticipated, then I would have stepped in and made -- you know, and tried to help.

I think that the properties have done well with the management that I put in place and have -- all parties have benefitted from the increases in cash flow coming therefrom.

MR. BIDEAU:  Can I get -- can you read back my question.  It's a yes or no question, then you can give me the same answer that you want to give me for every answer.

So if you go ahead and read back my question.

(The stenographer read back:  "So the answer to that my question then is, you've done nothing in the last, say ten years now to -- in connection with the -- with the operation of the assets -- strike that.

The answer to my question is that you've done nothing in the last ten years in connection

W. Monsees Stubbs
September 17, 2025

Page 167

with the management of the assets of the portfolio, after you've claimed you built an infrastructure you have basically left?")

THE WITNESS:  And I will go back to, there have been several occasions where I have suggested to Gary that there were opportunities to redevelop the vacant CVS site on Gunn Highway.

BY MR. BIDEAU:

Q.    Sure.  Sure.  And we know that, but other than -- than suggesting to Gary that you could -- that there was a possibility of redeveloping the CVS site, other than that, in the last five years, you have done nothing in connection with your obligation to manage the assets of the FGHP portfolio, correct?

A.    My understanding is that --

Q.    That's a yes or no, and then you can give all of your understanding you want.

You've done nothing to manage -- you have done nothing in connection with your obligation to manage the FGHP partner assets -- strike that.

A.    Okay.

Q.    Okay.  I'm going to try this question again.

In the last five years, you have done nothing in connection with your obligation to manage the

W. Monsees Stubbs
September 17, 2025

Page 168

assets of the FGHP portfolio, correct?

A.   I disagree with that characterization.  I think that I have put the infrastructure in place in order for this to be done whether I was dead -- or done well whether I was dead or alive.

And having done that, I think I have fulfilled that obligation.

Q.   Okay.  So your position is, once you built the infrastructure, you were done with your obligations --

A.   No.

Q.   -- under -- hold on.

Your position is that once you built the infrastructure, you were done with your obligations under Exhibit 7, the F&S agreement?

MR. KEYSER:  Form.

BY MR. BIDEAU:

Q.   And partnership agreement, correct?

MR. KEYSER:  Form.

THE WITNESS:  No.

BY MR. BIDEAU:

Q.   Okay.

A.   Were there problems with that not working, then I would gladly fix those problems and get it back on track.  We were fortunate that the infrastructure that

W. Monsees Stubbs
September 17, 2025

Page 169

was put in place has stood the test of time and we're continuing to enjoy increasing the net operating income from the property.

Q.   As long as -- but you're continuing to enjoy an increase in operating income as long as Mr. Felsher manages the operation of the business, correct?  I mean, when there's no new leases.

A.   I don't know that he's managing the operation of the business.  I think that it runs pretty much like clockwork on its own.  If he were -- if he felt differently, that it was not, you know, that there was an obligation that needed to be met that I was not meeting, then all he had to do was pick up the telephone, send me an email, get a carrier pigeon and get me some kind of notice that, hey, by the way, we want you to get more involved.  And I would have gladly done that.

Q.   Well, who do you know has -- is approving -- has to be approving every lease in the property now?

Who do you think is approving the leases?  Who do you think is dealing with the litigation?  Who do you think is dealing with --

A.   I look at --

Q.   -- capital improvements?

MR. KEYSER:  Form.

W. Monsees Stubbs
September 17, 2025

Page 170

THE WITNESS:  I am glad to take over whatever responsibilities that they -- that he wants.

If -- if this were something that he felt that it was -- felt that needed my personal attention, I would have gladly involved myself had I known that.  So all he had to do was ask.

BY MR. BIDEAU:

A.    But you've told me, to your recollection, you never told Mr. Felsher that you were going to "Put this infrastructure in place and then disappear," correct?

Did you ever tell him, once you got Jay Benowitz in place, you were disappearing?

MR. KEYSER:  Form.

THE WITNESS:  I don't -- I never -- I don't think I ever said I was disappearing.

BY MR. BIDEAU:

Q.    **Well, you did disappear.**

A.    Well, I was ready and available any time, and again, I go back to, there were several instances within the past few years where there were opportunities to create profits from a vacant -- from the vacant CVS site, which I brought to his attention which he chose not to -- not to pursue.

W. Monsees Stubbs
September 17, 2025

Page 171

Q.   I understand.  You -- there's a CVS site, we get that.  You've said it six times.

A.   You've asked the same question six times.

Q.   And -- and -- and so the only thing that we know for sure that you've have done is, you have told Mr. Felsher about a CVS site and it could be redeveloped.

I'm talking about, you know, the operation of the assets of the partnership because --

A.   But if he had -- if he -- if he had any.

MR. KEYSER:  There's not a question pending.

BY MR. BIDEAU:

Q.   There really wasn't a question pending, but you can -- I know you want to give me the same speech, he should call you.  Did you ever pick up the phone and call him and say, "Hey, Gary, I know I am responsible for managing these assets, but I'm going back to Rye and invest in my own businesses, start my own company, do my own thing, so you take over the operations here."  Did you ever say that?

A.   We had a number of --

Q.   Did you ever say that?  Yes or no.

A.   Not to my knowledge.

Q.   Did you say anything close to that?

A.   No.  And I didn't think it was necessary.

W. Monsees Stubbs
September 17, 2025

Page 172

If he -- if he had -- if he had any concerns whatsoever, it's very easy for him to express those and I would be very responsive.

Q.   Did you ever pick up the phone and call Mr. Benowitz or Mr. Felsher and, say, "Hey, I want to be involved in approving leases here?  I want the monthly reports.  I want..."  did you ever say in the last five years -- did you ever pick up the phone and say, "Hey, I want the monthly reports and I want the monthly information.  I want to be involved in managing this operation."

A.   No.

Q.   And, in fact, what year was it that you believe that Mr. Benowitz kind of took over and your services were no longer needed?

A.   I don't have -- I couldn't answer that off the top of my head.

Q.   Well, why not?  You put the infrastructure in place.  When was this infrastructure in place such that you believed that you were relieved of any responsibility to manage the assets of the portfolio?

MR. KEYSER:  Form.

BY MR. BIDEAU:

Q.   Well, your position is that once you put the infrastructure in place, you know, unless somebody

W. Monsees Stubbs
September 17, 2025

Page 173

asked you, you didn't have anything else to do with respect to these properties, right?

A. Because it was running well --

Q. Correct?

A. -- but -- let -- so --

Q. Correct?

A. -- had there been a problem --

Q. Correct?

A. -- I would have been glad to go.

Q. That wasn't my question.

A. I thought I had completed my obligations there. I'd set it up. It was working. We'd all made a lot of money.

If -- if that was incorrect, I think I deserve the courtesy of saying -- of somebody, saying over the last ten years, "We're tired of clipping coupons. We want you to come back in here and do something different."

Q. You -- you understand that managing the commercial properties is a little more than clipping coupons, right?

A. Absolutely.

Q. Okay. And so somebody has -- somebody has to be taking the ultimate responsibility for that, and right now, the only partner who's doing anything with

W. Monsees Stubbs
September 17, 2025

Page 174

respect to the operations of the FGHP partnership is Mr. Felsher.  He's the only partner doing anything, right?  Because you're not.

A.    Okay.  I -- I appreciate that.

Q.    Okay.  And --

A.    And I thought that that was the way that Mr. Felsher wanted it to be.  If he did not -- if that was wrong in that assumption, then it was very easy.  He's not shy or bashful, I mean, sure he could have expressed himself.

Q.    When did -- when did Mr. Felsher -- okay.  When did you tell Mr. Felsher that you were leaving the operations, that you weren't going to be -- strike that.

When did you tell Mr. Felsher that you were no longer going to be providing any management services in connection with the assets of the portfolio?

A.    I never said such a thing.

Q.    And when was it that you last did anything in connection with the management of the portfolio?  Other than tell Mr. Felsher about the CVS lease.

Okay.  Anything else?

A.    I think guaranteeing the loans is a pretty meaningful undertaking.

Q.    And you did that as an -- as an investor and a partner.  That was your requirement?

W. Monsees Stubbs
September 17, 2025

Page 175

A.    Yes.

Q.    I'm talking about management of the actual assets.

When -- when's the last time?  Can you remember when the last time was?

A.    I -- I will say the same thing as I said before --

Q.    Other than CVS.

A.    -- is that I put the infrastructure in place, it has worked well.  It has not required that -- that oversight, and if there were a problem, I was ready, willing and able to intercede and do whatever was necessary to fix it.

Q.    Do you know when Mr. Benowitz retired?

A.    Not off the top of my head.

Q.    And when is it that you think that Mr. Benowitz sort of took over -- took over your responsibilities?

A.    That -- that occurred over a -- an extended period of time.  I'm kind of a micromanager and so the -- the -- the parting with that was, you know, somewhat difficult.  He wanted very much to assume more responsibility.  He came in as a bookkeeper without any experience in terms of real estate asset management.

And -- and over time, he came to understand

W. Monsees Stubbs
September 17, 2025

Page 176

that, you know, that end of the business and to take it over.  And there was some elbows between the two of us because I was -- he was kind of coming into my turf, if you will, and after a while, I said, well, this is probably the best thing for all parties involved, and he grew in that -- that role and has done -- executed it successfully for a number of years now.

Q.   And -- and -- but you can't tell me when you believe Jay grew into that role?

A.   I don't know off the top of my head without, you know.  Going back to the timelines, some of the timeline.

Q.   Well, when --

THE VIDEOGRAPHER:  I'm sorry, the crumpling of the paper is completely overshadowing you.

BY MR. BIDEAU:

Q.   When?

A.   When what?

Q.   When was it that Gary took over his role -- strike that.

When was it that Jay took over the role?

A.   Oh, it extended over a period of time.  I mean, he -- he had a lot of -- he had a learning curve, you know.  He had -- this is something that he wanted to do.  He wanted to get more responsibility in working for

W. Monsees Stubbs
September 17, 2025

Page 177

Gary and -- and handling, you know, more of his affairs. And -- and he came in with -- as really a, you know, a controller with limited skills beyond the bookkeeping. And over a period of time that he learned the -- that the asset -- the real estate side of the business, the asset management and bit by bit overtook that over time.

And it was a good thing.  I think it's -- I think it's worked well.

And if it was not, it was only -- I'm -- I'm only a phone call away.

Q.    And Gary is only a phone call away but you never sought his permission to simply walk away from the partnership and turn it over to Mr. Benowitz, correct?

A.    Well --

MR. KEYSER:  Object to the form.

THE WITNESS:  Well, the -- after Mr. Benowitz came in, you know, we did a number of different endeavors, which his participation there helped free me up.

We did a project in Albuquerque, New Mexico, New York, and Salt Lake City.  A retail development on -- I think it was 301 in Tampa. And a project called Air Park, which also is in the airport market which was a -- a flex development.

W. Monsees Stubbs
September 17, 2025

Page 178

So there were a number of things that we were involved in over time which, you know, was the focus of our endeavors as the FGHP portfolio was going along and performing well with the infrastructure that -- that had been put in place.

BY MR. BIDEAU:

Q. Okay. But with all due respect, it didn't come close to answering my question. I understand you did other projects.

A. Right.

Q. Okay. I understand that Jay Benowitz did a good job, but at what point in time -- well, strike that.

You were -- you are aware, correct, under the -- under Exhibit 7, right?

Do you have that in front of you, Exhibit 7? The F&S agreement.

MR. KEYSER: It's on the other side somewhere.

THE WITNESS: Yes.

BY MR. BIDEAU:

Q. You're aware that if you failed to perform that -- this is a hypothetical under -- strike that.

You're aware that under paragraph 6, if you failed to perform the terms of 6.3 of the FGHP agreement relating to the time and effort you must provide to the

W. Monsees Stubbs
September 17, 2025

Page 179

transaction we have for the partnership, for any reason other than your death or disability, then you are required to resign as an officer/director of the general partner, correct?

A.   That's the words.

Q.   Okay.  And to assign your shares of stock to each general partner, to Felsher which shall pay you a dollar, right?

And then your economic interest as the general partner gets allocated as to a Class A interest, correct, and that you lose 50 percent of your B interest if the event occurs after the return of funds to the limited partners, correct?

A.   That's what the words say.

Q.   Okay.  And you know that in this litigation, Gary's position is that you lose 50 percent of your B interest because you're not providing -- because you breached your obligation to apply management services, correct?

A.   I believe that's the case.

Q.   Okay.  And by the way, when you got the demand letter from Mr. Felsher, did you initiate an arbitration contesting what he said?

A.   No.  And that was certainly a -- an oversight on my part.

W. Monsees Stubbs
September 17, 2025

Page 180

Q. I mean, because, you know, the agreement provides that if you disagree with Mr. Felsher's determination that you breached the agreement that your remedy is to provide -- to do an arbitration, correct?

A. I understand that now.

Q. Okay. And you didn't -- that's something that you didn't do at the time, correct?

A. I failed to respond timely.

Q. And, in fact, when you got the demand from Mr. Felsher, did you pick up the phone and call him and say, "Gary, what are you talking about? I would be..." "I would have been glad to come back and do this."

A. I don't recall.

Q. Well, you didn't call Gary --

A. Okay.

Q. -- right? So you didn't take advantage of the remedy in the contract, if you disagreed with his determination?

A. I recognize that was a -- was an error.

Q. Okay. And you didn't pick up the phone and say, "Hey, Gary, what are you talking about? I thought life was good. Jay was doing a great job. Why are you making this claim," right?

A. That's correct.

Q. And you didn't write him a letter, didn't

Page 181

send him an email.  Didn't do anything to follow up with him and say, "Boy, there's been a big misunderstanding here, Gary," right?

A.    Right.

Q.    Why not?

A.    I don't have a good answer to that.

Q.    And the reason you didn't -- strike that.

Other than putting the -- other than your claim that you put the infrastructure in place, do you have any other justification for why you stopped providing management services to the assets of the partnership?

A.    I thought they were no longer needed because it was working well with the infrastructure which I had created.

Q.    Right.  And my question was -- giving you that, okay?  My question was, other than your contention that you put in the infrastructure that was required, is there any -- do you have any other justification for your decision to stop managing the assets of the FGHP partnership?

A.    I did not think that it was necessary.

Q.    Okay.  So --

A.    And -- and I certainly have a very strong motivation to see that the net operating income -- that

W. Monsees Stubbs
September 17, 2025

Page 182

the properties do as well as they can within their market because I have a significant portion of that -- of the proceeds that come from the net operating income that would come to me.

So my motive -- I have a stronger motivation, I think, than any other party because, to me, its a meaningful -- it's a much more meaningful sum than it would be to Gary and it's certainly higher than it would be to the other -- to the other partners.

So my interests are best served by having this smooth running machine, and I feel that it has been. And I -- you know, if I thought that it could be meaningfully improved, I would have every motivation under the sun to have it happen because I would be one of the prime beneficiaries.

I think as you --

MR. BIDEAU:  Can you read back my question because with that answer, I have no idea what I asked, because, I mean, the answer wasn't responsive to anything.  So let me just see if you can read it back for me.

(The stenographer read back:  "And my question was -- giving you that, okay?  My question was, other than your contention that you put in the infrastructure that was required, is

W. Monsees Stubbs
September 17, 2025

Page 183

there any -- do you have any other justification for your decision to stop managing the assets of the FGHP partnership?")

BY MR. BIDEAU:

Q.    And your answer was --

A.    I --

THE STENOGRAPHER:  He said, "I did not think it was necessary."

Then you went on --

BY MR. BIDEAU:

Q.    Okay.  So the answer to my question was, you made the determination that it wasn't necessary for you to do anything further, is that correct?

A.    That's correct.  And if I would -- if anyone thought that that decision was made in error, then they -- it would have been very simple to rectify by giving me any kind of notice that, gee, we really want you to, you know, do whatever.

Q.    Well, when Gary gave you the notice, you told me you didn't take advantage of the arbitration provision to contest it.  You didn't pick up the phone and call Gary and say, "What the heck are you talking about?"

A.    My mistake.  I blew that.

Q.    And you didn't send him a letter and you

Page 184

didn't say, "I'm happy to come back and manage."

You didn't do any of those things after Gary sent you the notice, right?

A.    That's correct.

Q.    So you say you would have been happy to, but when you had the opportunity, you didn't do it.

A.    My fault.

MR. KEYSER:  Mr. Videographer, are you getting feedback from conversations back here?

THE VIDEOGRAPHER:  They're muted.

MR. KEYSER:  Okay.  Appreciate that.

BY MR. BIDEAU:

Q.    And during that period of time, you were using some of the proceeds that you received from being an investor in FGHP to run your other -- your personal real estate business, correct?

A.    Well, I don't know.

Q.    That's just a simple yes or no question. You were using your -- the proceeds you received from FGHP to run --

A.    With the knowledge of funds, you could say I used them to pay the -- to pay the mortgage on my house or whatever.  I mean, it --

Q.    And -- well, you -- during this period of time after you put -- "put the infrastructure in place

W. Monsees Stubbs
September 17, 2025

Page 185

and stopped providing management services to FGHP," you were investing in other real estate transactions, correct?

A.    Yes, in general.  You know, some period there --

Q.    Yeah.

A.    Yes, I mean, it's generally what I do. There are periods where there's more activity than less, so I can't -- I can't say specifically to that -- to the time -- address the time frame that you're talking about without checking but, you know.

(Plaintiff's Exhibit No. 11 was marked for identification.)

MR. BIDEAU:  Here's 11.

MR. KEYSER:  Thank you.

BY MR. BIDEAU:

Q.    Hand you Exhibit 11, which is an October 19, 2020 email from an Edward Rotter.  Who is Mr. Rotter?

A.    He is a -- a business associate.

Q.    Okay.  And it's to you, and it has to do with Capital Call for Zeus Cottage.  Do you see that?

A.    Yes.

Q.    Okay.  And then under it -- attached to it is a Zeus Pledgor, LLC, Member Equity.  Do you see that?

W. Monsees Stubbs
September 17, 2025

Page 186

A.    Yes.

Q.    And can you just explain what this chart shows?  I don't need -- just generally what it shows.

A.    The second page?

Q.    Yeah.  The -- the first page that starts with Member Equity.

A.    Yes.

Q.    Okay.  And it has, for example, you, Stubbs.  It has back in June 18th of 2012.

A.    It has -- yeah, it has capital distributions.

Q.    So this would reflect, say, for example, on July 25, 2012, that you invested $1.165 million?

A.    Yes.

Q.    Okay.  And then it looks like later in -- in December, there's a negative, so that would be distributions made to you?

A.    Yeah.

Q.    I'm just trying to understand the chart.

A.    Yeah.

Q.    Okay.  And then at the bottom, it has Member Equity?

A.    Yes.

Q.    Okay.  And that just reflects the equity at the end of the day?

W. Monsees Stubbs
September 17, 2025

Page 187

A.    Yes.

Q.    Okay.  And this is for Zeus Pledgor, LLC.  I think we talked about that earlier today, right?

A.    Okay.

Q.    Well, remember we talked about it this morning?

A.    No.  But I will take your word for it.

Q.    Okay.

(Plaintiff's Exhibit No. 12 was marked for identification.)

BY MR. BIDEAU:

Q.    Let me show you an email dated Saturday, July 3rd from you to Mr. Benowitz.  Subject:  And tomorrow and tomorrow's tomorrow.  Pretty esoteric there.

Take a moment and look at that and then I will have some questions for you.

Have you seen that, sir?

A.    Yeah.

Q.    Is that your email to Mr. Benowitz?

A.    Yes.

Q.    And you were trying to hire Mr. Benowitz to do some work in connection with your other real estate investments?

A.    Yes.

W. Monsees Stubbs
September 17, 2025

Page 188

Q.    And you indicate that -- in the second paragraph that -- the second sentence, "I'm at a point where I want to reduce my day-to-day responsibilities and trying to figure out the best way to do that."

And you're talking about your day-to-day responsibilities with these other real estate investments that you're doing and you want to take a step back and figure out a way, right?

A.    Well, I've been for decades saying the same thing, that I would like to be able to stop and smell the roses.  Unfortunately, my workaholic side of me has prevented me from -- from doing that.

Q.    My only question really was just that. When you're referring to reducing your day-to-day responsibilities and trying to get away to do that, you're talking about day-to-day responsibilities with the new deals referenced in the first paragraph with your investors, right?

You have your outside investments and you're thinking about trying to find a way to cut back on your day-to-day responsibilities?

A.    Yes.

Q.    And once --

A.    As I say, I have been trying to do that for decades without ever getting around to it and I'm still

W. Monsees Stubbs
September 17, 2025

Page 189

in the office every day of the week.  So it's wishful thinking.

Q.    Right.  Because in order to run a successful real estate portfolio like you're running at Zeus, you need to be in the office every day and you need to be working, right?

A.    I'd -- I would -- I don't think that's accurate.

Yes, everything takes some level of effort and administration and oversight.

Q.    Okay.

A.    And so the -- and so I'm not sure how more to answer that.  I would like to -- I have been wanting -- I have been saying I want to retire for probably 20 or 30 years without doing anything more than saying that, gee, I'd like to smell the roses but I am not inclined to actually do it.

Q.    I recognize the sickness.

A.    It's probably pretty common in your profession.

Q.    And because as you -- but you said, you tend to go into the office every day.

A.    Yes.

Q.    And you do that because that is what, at least in your mind, you need to be doing to successfully

W. Monsees Stubbs
September 17, 2025

Page 190

run your business, correct?

A.   Yeah.

Q.   Because a real -- you know, a commercial real estate business doesn't run itself, it needs people to run?

A.   Yeah, things happen.  The roof leaks.  The tenant moves out.  I mean, you know, there -- there's certainly more management intensive things but it's certainly not without its requirements.

Q.   Do you recall how much money you actually invested in FGHP?

A.   Half a million dollars, thereabouts, I think it was.

(Plaintiff's Exhibit No. 13 was marked for identification.)

BY MR. BIDEAU:

Q.   I have handed you what we mark as Exhibit 13, which is a printout of income distribution to you both on your Class A and Class B.  Do you see that?

A.   Yes.

Q.   Okay.  And it looks like the return on your Class A was $873,584, and the return on your Class B was $15,325,157, correct?

A.   Yes.

Q.   Does that jive with your recollection?

W. Monsees Stubbs
September 17, 2025

Page 191

A.   Well, I cannot say that I really have had any specific recollection going back to 1993.  My memory is certainly not that good but I -- I assume -- I trust the accounting.  I assume this is accurate.

Q.   Okay.  You don't have any reason to believe it's not --

A.   That's correct.

Q.   -- accurate?

THE VIDEOGRAPHER:  Counsel, as much as I have this side of the room still turned down, I can still faintly pick up your conversations and there's not much I can do about that, unfortunately.

BY MR. BIDEAU:

Q.   Just wanted to be clear, it is not your position today that the only thing you are required to do under the F&S agreement and the FGHP partnership agreement was see that the -- the acquisition -- that the acquisition information actually closes, right?

You understood that post-closing you were responsible to manage the assets of the partnership, correct?

MR. KEYSER:  Just, can you verify, are you talking about both the agreements?

MR. BIDEAU:  Yeah, I'm talking about both

W. Monsees Stubbs
September 17, 2025

Page 192

these agreements because they -- they work together.

THE WITNESS:  Yes.  That is, according to the business plan at the time, was to -- which was to liquidate the assets and distribute the proceeds.  That business plan changed.

BY MR. BIDEAU:

Q.   **Under the agreement -- and I don't want to repeat what we've done in the past, but under the agreement, you agree that you were to provide the management of the portfolio, the assets in the portfolio --**

A.   Yes.

Q.   **-- and Mr. Felsher was to provide the investors?**

A.   Mine was to -- my job was to make it work in whatever way, shape or form that that took, and managing the assets of the portfolio, you know, to me, implies kind of a longer term relationship with the portfolio than it was then.  And in an anticipated direction, our original business plan was to resolve the loans and get -- and, you know, liquidate the assets and maximize the cash that came out of them.  We changed that over time to keep a portion of the assets in and operate it.

W. Monsees Stubbs
September 17, 2025

Page 193

Q.   Where is this business plan written down?

A.   What?

Q.   Where is the business plan that says that the original plan was just to buy the assets and then essentially sell them right away as opposed to hanging onto some of the assets and managing over a long term?

A.   I don't -- I have not researched the papers to come up with that.  That would certainly be what we communicated to people.

Q.   Well, let me -- we can go back to the FGHP partnership agreement.  You have that in front of you, right?

A.   I --

Q.   And when describe -- in paragraph 1.3, describing the business, the business it describes as acquiring a portfolio of debt instruments and real estate properties from NationsBank, and to "operate, manage and sell or otherwise realize the value of such debt instruments and properties either directly or indirectly by means of ownership of limited partnership interest, et cetera."

So in the limited partnership agreement, it says specifically that one of the purposes of the business was to operate, manage and -- and sell or otherwise realize the value on these debt instruments and

W. Monsees Stubbs
September 17, 2025

Page 194

properties, correct?

A.    Yes.

Q.    Okay.  So there was a recognition that you might be operating and managing some of these assets, correct?

A.    But not the anticipation that it would be going on for 20, whatever years.

Q.    And you do not have any -- and there's nothing that limits your obligation under the documents to perform management?

A.    Right.  And I think that those -- that those obligations have been met.

Q.    Because you put the infrastructure in place?

A.    Yes.

Q.    Okay.

A.    And it runs on its own.  We hired people, they got it done, and if there was a disagreement with that understanding or interpretation, it could have been communicated at some other time in some -- some more appropriate forum.

Q.    And when it was communicated in 2024, you didn't pick up the phone and call Mr. Felsher, you didn't write Mr. Felsher?

A.    That's correct.  My mistake.

W. Monsees Stubbs
September 17, 2025

Page 195

Q. Because in truth, you had no real interest in coming back and managing it. You had your -- as you told Mr. Benowitz, you were looking to, you know, make your lifestyle a little easier, right? You didn't really want to come back and manage those assets?

A. I would be glad to come back and manage the assets.

Q. You left that to Mr. Felsher to do for all these years?

A. And he collected all the revenues for it.

Q. Oh, because Pembroke Capital was the operating entity that operated these things, and he's now owns Pembroke Capital?

A. Yes. And it generates asset management fees.

Q. Right.

A. And -- and property management fees.

Q. And in 2019, you voluntarily gave up your interest in Pembroke Capital. Again, as, I guess, part of your way to sort of exit stage right?

MR. KEYSER: Form.

MR. BIDEAU: That was a bad question, you were right.

BY MR. BIDEAU:

Q. Okay. In -- in the asset management fees

W. Monsees Stubbs
September 17, 2025

Page 196

you're talking about, are -- were earned through Pembroke Capital, correct?

A. Well, the asset management fees and property management fees and the property management fees were run through Pembroke Capital, yes.

Q. Right. And Pembroke Capital is an entity which he owned 50 percent, but in order to avoid having to make capital calls back in 2019, you gave your interest to Mr. Felsher?

MR. KEYSER: Form.

You can answer.

THE WITNESS: I don't recall the specifics of what happened back then.

BY MR. BIDEAU:

Q. You think -- you don't recall that -- that there were capital calls being made for -- in 2019?

A. No, I have not -- no, I don't know -- off the top of my head, know that.

Q. Do you recall that in 2019, the real estate market was down and there were leasing issues and other things that were costing -- you know, revenues were down and expenses were up, and that Mr. Felsher had to fund those to keep the operation going?

A. I didn't recall that, no. But I am -- I will take you at your word.

W. Monsees Stubbs
September 17, 2025

Page 197

Q.    And you have no recollection today as to why you -- you simply gave up your interest in Pembroke Capital?

MR. KEYSER:  Form.

Asked and answered.

THE WITNESS:  No.

(Plaintiff's Exhibit No. 14 was marked for identification.)

BY MR. BIDEAU:

Q.    Give you a moment to read it.  What I've marked as Exhibit 20 [sic] is a memo from you to Mr. Felsher to you called State of Business in July of 2009.

MR. KEYSER:  To clarify, is this 14?

MR. BIDEAU:  I'm sorry.  Did I --

THE STENOGRAPHER:  Correct.

BY MR. BIDEAU:

Q.    What I've handed you is -- Exhibit 14 is a memo from you to Mr. Felsher dated July 15th of 2009.  Just want to be sure that you recall sending that memo.

A.    No.  But I think it speaks for itself.  I assume that it was sent.

Q.    Okay.  And it talks about a number of investments and other things from Salt Lake Airport to Air Park, et cetera, correct?

W. Monsees Stubbs
September 17, 2025

Page 198

A. Yes.

Q. Okay. I don't have any further questions about it. I just want to --

(Plaintiff's Exhibit No. 15 was marked for identification.)

BY MR. BIDEAU:

Q. -- show you what I marked as Exhibit 15, sir.

Mr. Stubbs, I've handed you Exhibit 15. Not that one. Next one.

Do you recognize that as an email and memo that you sent to Mr. Felsher in September of 2011?

A. Well, do I recognize it? I haven't had the opportunity to kind of go through it and understand.

Q. Take a second and look at it.

A. But, yes, I assume it is what it is.

Q. And then this appears to relate to a dispute between you and Mr. Felsher over the signing of a guarantee.

A. Okay. I will take your word for that.

Q. Take a minute and look at it.

A. Well, I mean, it's a handful of pages so --

Q. Page and a half, page and a quarter. Go ahead and take a look at it.

A. There were two memos.

W. Monsees Stubbs
September 17, 2025

Page 199

What is this?  A copy of the same thing?

Q.   Yes.

A.   Oh, two copies of the same thing?

Q.   Yes, sir.

A.   Well, it's -- okay.

Q.   Have you had a chance to look at it, sir?

A.   I'm doing so now.

Q.   Have you had a chance to look at it, sir?

A.   Yes.

Q.   Okay.  And this relates to an inherent disagreement back in 2011 you and Mr. Felsher had between a guarantee that was being requested by a lender?

A.   Yes.

Q.   Okay.  And ultimately the lender closed the loan without the guarantee, correct?

A.   I don't recall.

Q.   Okay.

A.   I never -- it's been quite a while ago.

Q.   Do you see on the second page, the second sentence, first paragraph, you say, "I doubt, however, they..."

Referring to the bank?

A.   Right.

Q.   "...will proceed on a loan, a partnership with divided management and one sponsor unwilling to

W. Monsees Stubbs
September 17, 2025

Page 200

provide the undertakings they request."

Meaning, you understood that if the partners were fighting --

A.    The lender would be concerned.

Q.    The lender would be concerned.  It would be very difficult to do business --

A.    Yes.

Q.    Let me finish my question.

A.    Okay.

Q.    It would be -- you understood in expressing that, it would be very difficult to do business with a lender or really anybody else on behalf of the partnership if the partners were actually fighting, correct?

A.    Yes.

Q.    In fact, you know partners fighting could end up -- could end up destroying the partnership or destroying the assets, right, because you have lender problems --

A.    Yes.

Q.    -- creditor problems?

A.    Yes.  Yes.  You want to be growing in the same direction.

Q.    I know you sold -- you -- over the years, you talked about how early on you sold some of the assets

W. Monsees Stubbs
September 17, 2025

Page 201

of the partnership and that's what helped return monies to the partnership so quickly, correct?

A. Yes.

Q. But as of today, you still -- the partnership still has not liquidated substantially all of its assets, right?

A. Yes.

Q. It has not done that yet, correct?

A. There are assets remaining.

Q. So it has not liquidated substantially all its assets, right?

A. I'm not sure what the definition of substantially all of its assets would be. I mean, it -- they -- it has -- it has substantial assets remaining.

Q. Okay. That's fair.

A. If there -- you know, cross the threshold of substantial relative to the original amount, I don't -- couldn't -- don't have a clue.

Q. Okay. But you -- you recognize that there's substantial assets remaining in this partnership?

A. Yes.

Q. Okay. In looking at Exhibit 15. Again, that was the memo about the guarantee. You do recognize on the first page that you have a fiduciary obligation to safeguard the assets of the partnership, correct?

W. Monsees Stubbs
September 17, 2025

Page 202

One, two, three, four -- fifth paragraph down starting with "beyond."

A.   Oh, okay.  Yes.

MR. BIDEAU:  Take a short break.

THE VIDEOGRAPHER:  Off the record at 4:06 p.m.

Please unhook your microphones.

(Proceedings recessed at about 4:05 p.m.)

(Proceedings reconvened at about 4:28 p.m.)

THE VIDEOGRAPHER:  The time is 4:28 p.m. This begins Media Unit Number 5 and we are back on the record.

BY MR. BIDEAU:

Q.   Mr. Stubbs, you testified earlier that since you put the "infrastructure in place" that the partnership has been running like a well-oiled machine or a well-oiled clock.  How do you know that if you're not there?

A.   Bad news travels fast.

Q.   You haven't got any bad news?

A.   That's correct.

Q.   Okay.  And you don't -- and you haven't gotten any bad news.  Okay.

A.   I mean, Jay certainly has my number and if there's an issue with something that he would like my

W. Monsees Stubbs
September 17, 2025

Page 203

input in or for Gary, you know, that I'm ready, willing and able to assist.

Q.    Except that when they told you that you were in default under the agreement and they sent you the notice that you didn't respond that you're ready, willing and able to assist, you ignored it.

A.    That's correct.  And that was a -- a poor choice.

Q.    Okay.  And Jay has had to follow-up with you on numerous occasions to get you to sign guarantees, correct?

A.    Yes.  I mean, it -- not so numerous because the loans go for generally 20 years.

Q.    Right.  But once a loan is being refinanced, it is not atypical for Jay to have to reach out to you several times to get you to sign the documents?

A.    No.  No.  I don't think that's the case at all.  I mean, I'm not very hard to reach.  I'm, you know, generally around and it's -- it's not an inconvenience, and it's something that generally has a -- a good result. So I would find that surprising if that was the characterization he gave.

(Plaintiff's Exhibit No. 16 was marked for identification.)

W. Monsees Stubbs
September 17, 2025

Page 204

BY MR. BIDEAU:

Q.   And I just want to confirm, you did receive this letter, correct?

A.   Which letter?

Q.   Exhibit 16 in your hand.

A.   I don't -- that, I don't know.

Q.   Well, it's addressed to you, right?

A.   Yes.

Q.   Any reason to believe that you didn't receive it?

A.   No.

MR. KEYSER:  You can take a minute to understand.

BY MR. BIDEAU:

Q.   By the way, is mstubbs@zeusrealty.us your email address?

A.   .US.

Q.   .US?

A.   Yes.

Q.   Okay.  You received that letter, correct?

A.   What?

Q.   You received the letter, correct?

A.   I -- I assume so, yes.

Q.   Okay.  Let me show you what I will mark as Exhibit 17.

W. Monsees Stubbs
September 17, 2025

Page 205

(Plaintiff's Exhibit No. 17 was marked for identification.)

BY MR. BIDEAU:

Q.    Show you Exhibit 17, which is an email from you to Mr. Benowitz in -- on December 1st of 2017.

Let me direct your attention to the second page, bottom paragraph.  Do you see that Mr. Benowitz is responding to your request for some information to help you fill out financial forms?  Do you see that?

A.    Yes.

Q.    Okay.  And you indicated -- going to the first page on the email from you to Mr. Benowitz on December 1, 2017 that you are "pretty far removed from what's going on there," correct?

A.    That's what it says, I believe.

Q.    Okay.  And that was true then, in December of 2017, you were pretty far removed from anything going on at FGHP Capital?

A.    Is that a question?

Q.    Yeah.  That was true, right?

A.    I think the words speak for themselves.

Q.    You were pretty far removed from anything that was going on at FGHP Capital?

A.    I had not gotten any updates and so I was ignorant of what was going on.

W. Monsees Stubbs
September 17, 2025

Page 206

Q.    And you hadn't requested any updates?

A.    Well, not to my recollection.  I mean, I would assume that those would normally be coming in the normal course of affairs and particularly if there was anything of consequence that required attention.

Q.    But by -- and so were you expecting to get regular updates in 2017?

A.    I was -- was I expecting?  I was anticipating getting any communications when there was anything that they felt that they wanted my attention to.

You know, I would rather have -- I'm a -- I like to read, so I would rather have more information than less.  If they chose not to provide it, then, you know, I'm not going to complain unless it becomes, you know, something that I need for whatever reason.

Q.    And yet, other than this request for financial information for some form you were filling out, from the time you stopped providing management services to the assets of FGHP, you -- there's no emails from you, there's no request from you for more information, right?

A.    I have no -- I -- over that period of time, I would assume that there were communications but I don't know off the top of my head.

Q.    You can't point me to any, can you, right?

A.    Like I say, you're talking about, you know,

W. Monsees Stubbs
September 17, 2025

Page 207

things that happened in the past.  And so I would not --
in this form, I certainly wouldn't speculate on something
that I don't know what the -- whether it is accurate.

MR. BIDEAU:  And let me mark this as
Exhibit 18.

(Plaintiff's Exhibit No. 18 was marked for
identification.)

BY MR. BIDEAU:

Q.   Let me show you an email dated November 10,
2018.  Looks like it's from you to you, and it concerns
Busfar.  B-U-S-F-A-R.  What's Busfar?

A.   I believe, if I remember correctly, that he
is a Saudi national.

Q.   Is this concerning an investment you were
involved in?

A.   I assume, yes.

Q.   Well, you say in the first paragraph, "I am
not generally one to throw stones, but I have been hit
with so many recently, I felt it necessary to set the
record straight."

So were some of your partners complaining
about your performance in connection with this
investment?

MR. KEYSER:  Form.

THE WITNESS:  I can't answer that without

W. Monsees Stubbs
September 17, 2025

Page 208

going through to what -- you know, get up to speed.

BY MR. BIDEAU:

Q.    Well, you can read the email, if you need to, sir.

A.    Okay.

Q.    Does this refresh your recollection, also around -- it looks like an investment to Zeus US Opportunities 2 Inc. was involved in back in 2018.  Do you see that?

A.    Yes.

Q.    Okay.  And it looks like some of the limited -- some of the partners were trying to reallocate some of the money away from your entities that were providing management services to themselves.  Fair characterization of what the fight was about?

A.    I believe so.

Q.    Okay.  And you were complaining that at a personal level, you'd only received $22,156 a year, but you devote a good thousand hours annually to managing that asset.  In addition, you had to bear the management office costs, rents, phones, computers, et cetera.  And you're talking about your losses, correct?

MR. KEYSER:  Sorry.  Form.

BY MR. BIDEAU:

W. Monsees Stubbs
September 17, 2025

Page 209

Q.    You can answer.

A.    Well, yes.

Q.    Okay.  And so at least on this investment, you were spending thousand hours annually, correct?

A.    Well, that's -- it was time-consuming during its completion.  It was -- yes, it was a time sync.  We bought a failed condominium project under construction, and it was a mountainous endeavor to come in there and pick up the pieces and complete the job.

Q.    And did that mountainous endeavor continue in the years after 2018?

This is written in 2018.  So did you continue to have to devote substantial time to this particular investment of Zeus in 2019 and 2020?

A.    I don't think so.  We sold it.  And, you know, at the -- at -- we actually sold it at the request of the Saudi investor under the theory that, you know, if -- if you want to take his money, you have to, you know, do what he -- keep him happy.

And then it was the worst business decision, I think, I've every made.  We sold it to Goldman Sachs and for four years in the brownie [sic], it was the number one performing property in their entire asset management portfolio, and we got out at a modest profit but left all of the -- all of the gravy on for

W. Monsees Stubbs
September 17, 2025

Page 210

the -- for Goldman Sachs in order to satisfy the --

the -- our Saudi backer who was -- he had personal

problems that -- and needed the cash.

(Plaintiff's Exhibit No. 19 was marked for

identification.)

BY MR. BIDEAU:

Q.    This is an answer to the affirmative

defenses that were filed in this case.  So I just want to

ask you about some of the things and associations.  It's

on page three.  The questions that I'm going to ask are

on page 3, starting with number 2, which is Waiver.

It says, "Stubbs has been performing under

the F&S agreement in substantially the same manner for

many years."  That refers to the fact that it had been

many years that you had not been providing management

services to the assets of the portfolio, correct?  Other

than you said --

A.    I wouldn't -- I wouldn't characterize it

that way.  What it was saying is nothing material has

changed one way or the other during that period of time.

Q.    And when did you -- when did you -- when

did you set up your infrastructure and -- strike that.

I think I already asked that question.  We

covered that.

A.    Okay.

W. Monsees Stubbs
September 17, 2025

Page 211

Q.   And I will probably get an objection.

MR. KEYSER:  Yeah.

MR. BIDEAU:  Okay.

BY MR. BIDEAU:

Q.   And did Mr. Felsher ever tell you he agreed that you -- that in his view, you were released from any obligations under the F&S agreement or the FGHP agreement by virtue of the fact that you had set up this infrastructure?

A.   Not to my -- not to my knowledge or recollection.  But I did not, you know, do an investigation to, you know, look for that.

Q.   Well, Mr. -- but you have no recollection -- strike that.

You never told Mr. Felsher that that's what you were doing, right?  That you were going to set up this infrastructure and then you were going to go off and do other things and they should call you if they needed you?

A.   Well, certainly, no.  I would disagree with that characterization very strongly, because at the time that we got going on this, we were all sitting together and we were dealing with these issues and all of, you know -- and all of the business stuff on a day-by-day basis.

W. Monsees Stubbs
September 17, 2025

Page 212

Q. There was certainly a time when you were in the office dealing with the business stuff on a day-by-day basis, true?

A. Okay.

Q. When you stopped doing that, okay, did you ever tell Mr. Felsher that you were going to stop doing it and that you're relying on the infrastructure you set up to excuse any performance under the agreements?

A. Don't recall.

Q. And so then Mr. Felsher never told you, hey, it's okay with me, go off and do what you want?

A. Well, I might also add that Mr. Felsher never said, gee, I think we -- we would like to have you here. We need you here. This -- this requires some attention. There were -- there was never any -- you know, there was never any communication coming the other way.

Q. Until he sent you the letter that you ignored?

A. And he was receiving the income from the property management fees for all of the things that that had -- you know, that had been put in place.

Q. Number 5 is Set-Off. You said, "Felsher had benefited financially from Stubbs' performance of the F&S agreement. Any amounts recoverable by Felsher in

W. Monsees Stubbs
September 17, 2025

Page 213

this action should be set off by the sums earned as a result of Stubbs' performance."

How much -- do you know what that defense even refers to?

A.    No.  Is that --

Q.    Okay.

A.    Which?  Which --

Q.    There's -- did Mr. Felsher seek any money damages from you in this case?

A.    I don't know the answer to the question.

Q.    Okay.  Any performance that you -- that you performed would have been in accordance with your obligations under the F&S agreement, right?

A.    Well, I -- you're saying that anything that I did would have been under -- that -- that would seem to be a non -- that would seem improbable.  I mean, I could do many different things, so if you're saying that all of them would be under this umbrella, I mean, are you -- I think that the -- that the steps that I took were consistent with what was necessary to meet the obligations and to maximize the revenues to the partnership.

Q.    And that was put in place in your infrastructure --

A.    Okay.

W. Monsees Stubbs
September 17, 2025

Page 214

Q.    -- with Mr. Felsher, right?

A.    Yes.

MR. BIDEAU:  Take a two-minute break.  I think we're about done.

MR. KEYSER:  Okay.

THE VIDEOGRAPHER:  Please unclip your microphones.

Off the record at 4:48 p.m.

(Proceedings recessed at about 4:48 p.m.)

(Proceedings reconvened at about 4:53 p.m.)

THE VIDEOGRAPHER:  The time is 4:53 p.m., and we're back on the record.

BY MR. BIDEAU:

Q.    **Just a couple more questions.**

**Those are famous last words.**

A.    You're over your limit now.

Q.    **You're right.**

**Other than putting Mr. Benowitz in place, what else did you do to fill this infrastructure that you're talking about?**

A.    The -- you know, as we evolved our thinking into instead of just washing everything out and collecting the money to what became ultimately let's build a real estate operation down here and use this as the core and keep the assets.

W. Monsees Stubbs
September 17, 2025

Page 215

I went to CB and then the Colliers, and, you know, first and foremost to get the bookkeeping, the accounting, recordkeeping in order to be able to process the money.  And they had the collections system set up and were able to do the invoices and process and produce the -- the reports and whatnot, which we weren't really set up in New York to be able to do.

And then at the local level, I hired the -- either the firms or individuals as the case -- as the case may be on a project-by-project, market-by-market basis in order to have boots on the ground to handle the day-to-day affairs.

And the -- and that was a -- a very profitable decision and it brought in significant management fee revenue, net margins of a couple hundred thousand dollars a year, plus or minus, that was otherwise going to third parties.

And that -- you know, that took some time to, you know, find the right people, get the stuff in place, put in the infrastructure to be one, from my own standpoint, you know, learning and understanding how to be able to operate the properties remotely on a variety of different asset types with the -- with third parties.

Q.   And did you know that Colliers was terminated many years ago from FGHP?

W. Monsees Stubbs
September 17, 2025

Page 216

A.   Well, I'm not surprised.  You know, these things change as they're --

Q.   **My only question was, did you know Colliers were terminated many years ago?**

A.   What?

Q.   **My only question, did you even know that Colliers were terminated many years ago?**

A.   I would imagine.  I prob -- it depends on what year it was but, no, I don't recall that.

Q.   **It was several years after you left, but --**

A.   Okay.

Q.   **-- Colliers would ultimately be terminated.**

A.   Okay.  Well, several years after I left, you know, that, you know, certainly that was not -- I was not involved in the decision-making at that point in time on that issue because I don't recall it.

Q.   **But at that point in time -- at that point in time, you weren't involved in any of the decision-making at any point on anything, correct?**

A.   Well, I certainly on -- on financing, sales, you know, anything of that kind of consequence, yes.  Yes.  Absolutely.

Q.   **And --**

A.   Because it was necessary --  I mean, necessary.  If you do a refinancing, I have to be in --

W. Monsees Stubbs
September 17, 2025

Page 217

all parties have to be involved because they require guarantees.

Q. Well, we got your signed guarantee, we knew that.

A. Yeah.

Q. Okay. But otherwise, you weren't involved in any of the management of the operations in 2017, 2018, 2019, other than you put in the infrastructure?

A. I put the infrastructure in place and it was my understanding, rightly or wrongly, that if there were issues that I could be helpful on, I was certainly there, ready, able and willing because certainly I wanted to maximize the revenues to the partnership, and in order to maximize the distributions coming to me, so whatever could be done in order to achieve that was something that I wanted to do.

But there wasn't really, you know, anything that required my day-to-day involvement and, actually, with the relationship with Jay Benowitz, he didn't really want that. He wanted to be able to get his arms around everything and be the guy.

Q. So you let Jay, the employee, make the decision that he wanted to be the guy and you, as the owner, were just going to let him be the guy?

A. He was not the owner. I'm just telling you

W. Monsees Stubbs
September 17, 2025

Page 218

his mindset, the way that he thinks and the way that he comports himself.

Q.    Do you know who took Colliers place?

A.    No.

MR. BIDEAU:  That's all I have.

MR. KELSER:  Okay.  Mr. Stubbs will read his transcript.

THE VIDEOGRAPHER:  Before I take us off the video record, I do have to ask if there will be any video orders at this time.

MR. BIDEAU:  Not at the moment, but I will get back to you.

MR. KEYSER:  Yeah, not right now.

THE VIDEOGRAPHER:  Hearing nothing further, the time is 4:59 p.m.  This concludes the recorded video deposition, and we are off the record.

(The following was held off the video record.)

THE STENOGRAPHER:  Are you going to order the transcript?

MR. BIDEAU:  Yes.

THE VIDEOGRAPHER:  Do you want a copy?

MR. KEYSER:  Yes.

(Thereupon, the proceedings concluded at 4:59 p.m.)

W. Monsees Stubbs
September 17, 2025

Page 219

CERTIFICATE OF OATH

THE STATE OF FLORIDA )

COUNTY OF PALM BEACH )

I, the undersigned authority, certify that W. MONSEES STUBBS, personally appeared before me and was duly sworn on the 18th day of September, 2025.

Signed this 6th day of October, 2025.

Barbara L. Kent, RMR, RPR, FPR, CSR-MI
Notary Public - State of Florida
My Commission No. HH 233485
My Commission Expires:  March 20, 2026

W. Monsees Stubbs
September 17, 2025

Page 220

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA )

COUNTY OF PALM BEACH )

I, Barbara L. Kent, RMR, RPR, FPR, CSR-MI, certify that I was authorized to and did stenographically report the deposition of W. MONSEES STUBBS, pages 1 through 218; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 6th day of October, 2025.

Barbara L. Kent, RMR, RPR, FPR, CSR-MI

W. Monsees Stubbs
September 17, 2025

Page 221

October 6, 2025
W. MONSEES STUBBS
C/O SPENCER KEYSER, ESQUIRE
JONES FOSTER, P.A.
505 South Flagler Drive
Suite 1100
West Palm Beach, Florida 33401

WITNESS:  W. MONSEES STUBBS
RE:  FELSHER VS STUBBS
CASE NO:  25-cv-80071-REINHART
Type of proceeding:  Deposition on September 18th, 2025.

The transcript of the above proceeding is now available and requires signature by the witness.

Please email fl.production@lexitaslegal.com for access to a read-only PDF transcript and PDF-fillable errata sheet via computer or use the errata sheet that is located at the back of the transcript.

Once completed, please print, sign and return to the email address listed below for distribution to all parties.

If you are in need of assistance, please contact Lexitas Legal at 888-811-3497.

If the witness does not sign the transcript within 30 days, the original transcript may be filed with the Clerk of the court.

If the witness wishes to waive his or her signature now, please have the witness sign in the blank at the bottom of this letter and return to the email address listed below.

Very truly yours,

I do hereby waive my signature.


_____
W. MONSEES STUBBS


Job No.:  421283